UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

THOMAS LOVELACE,

                          Plaintiff,

            -against-

CAROLYN W. COLVIN, Acting
Commissioner, Social Security Administration,

                          Defendant.
-------------------------------------------------------------x

**REPORT AND
RECOMMENDATION**

15 Civ. 4704 (KMK)(JCM)

To the Honorable Kenneth M. Karas, United States District Judge:

Plaintiff Thomas Lovelace ("Plaintiff"), appearing *pro se*, commenced this action

pursuant to 42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security

("the Commissioner"), which denied Plaintiff's application for disability insurance benefits

("DIB") and supplemental security income ("SSI"), finding him not disabled.  Presently before

this Court is the Commissioner's motion for judgment on the pleadings to remand this action to

the Commissioner pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Rule 12(c)").

(Docket No. 19).  Plaintiff has not filed a cross-motion.  For the reasons below, I respectfully

recommend that the Commissioner's motion should be granted.

## I.  BACKGROUND

Plaintiff was born on July 27, 1962. (R.[1] 107).  From 2006 to 2010, Plaintiff was a picker,

loading trucks, at Western Beef. (R. 134, 149).  On October 28, 2011, Plaintiff filed an

application for DIB and on December 8, 2011 he filed an application for SSI, alleging that he

became disabled and was unable to work as of January 1, 2011 as a result of his HIV positive

---

[1] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social
security benefits, filed in this action on November 19, 2015. (Docket No. 14).

status, hypertension, and sinus pressure in his nose. (R. 107, 114, 142). The Social Security Administration ("SSA") denied Plaintiff's applications on February 13, 2012. (R. 63). Plaintiff appealed the denial and, on April 17, 2013, Plaintiff appeared before Administrative Law Judge ("ALJ") Miriam L. Shire. (R. 6-40). Medical Expert Dr. Richard Wagman and Vocational Expert Andrew Vaughan also appeared and testified. (R. 28-36). ALJ Shire affirmed the denial of benefits on January 29, 2014. (R. 48-58). On May 11, 2015, the Appeals Council denied Plaintiff's request for review. (R. 1-3). Thereafter, Plaintiff appealed the SSA's decision by submitting his complaint in the present action to the *Pro Se* Office of this Court on June 16, 2015. (Docket No. 2). The Commissioner filed a motion for judgment on the pleadings under Rule 12(c) on January 15, 2016. (Docket No. 19). Plaintiff did not oppose the motion or cross move.

## A. Plaintiff's Medical Treatment History

The administrative record contains medical records from treatment that Plaintiff has received for his HIV positive status, hypertension, and psychiatric conditions.

Treating records from Woodhull Medical and Mental Health Center following Plaintiff's alleged date of onset indicated treatment with nurse practitioner Valerie Santangelo on February 8 and April 4, 2011 for his HIV positive status, and showed that Plaintiff received education and prescriptions for his HIV medications. (R. 192-97). Regarding his hypertension, Plaintiff said that he had been given medication to treat the condition, but that he never took it because he believed that the increased blood pressure was a result of his use of crack cocaine at the time. (R. 192, 195). He appeared to be in no acute distress, had a normal affect and no evidence of a thought disorder. (R. 194, 197). He denied substance abuse, but said that he drank and smoked marijuana on occasion. (R. 193, 196). On May 11, 2011, his symptoms and treatment were the

same, although he admitted having used crack cocaine recently. (R. 199). On July 7, 2011, he reported additional pain in his left shoulder from a handcuffing injury when he was arrested, and he had decreased range of motion in the left shoulder, but otherwise his examination results were the same as at prior appointments. (R. 203, 205). Plaintiff's blood pressure on Hydrochlorothiazide was measured as 122/77 on October 27, 2011, although he later stated that he did not take his blood pressure medication. (R. 207, 211). At this appointment, and later on December 8, 2011, he denied symptoms of fatigue, depression, nervousness, or sleep disturbance. (R. 207, 211). On December 8, 2011 he was listed as virologically stable. (R. 209).

Following Plaintiff's attestations at the hearing regarding the mental health treatment he had received, ALJ Shire issued a subpoena to Dr. Diane Gottfried at Woodhull Medical Center, seeking all medical records relating to Plaintiff's treatment. (R. 290). The documents produced in response to the subpoena were additional treatment records from nurse practitioner Valerie Santangelo for routine follow up regarding Plaintiff's HIV positive status and hypertension, dating from February 14, 2012 to August 6, 2013. (R. 300-340). Beginning in November 2012, the records indicated a referral to Dr. Chauhdry for psychological services. (R. 320). A record from January 23, 2013 stated that Plaintiff had an appointment with Dr. Chauhdry scheduled on January 31, 2013. (R. 316). Records following that date indicated that Plaintiff attended that appointment, was prescribed BuSpar for anxiety and was seeing Dr. Gottfried. (R. 300, 304, 308, 312). The administrative record does not contain a medical source statement or any treatment records from Dr. Chauhdry or Dr. Gottfried.

## B. Consulting Physicians

The administrative record contains evaluations by two consulting physicians.

**1. Dr. Marilee Mescon**

Dr. Marilee Mescon conducted an independent medical examination on January 5, 2012. (R. 237-40). Plaintiff stated at the examination that he had HIV and high blood pressure since 1990. (R. 237). He said that he was experiencing right shoulder pain occasionally, which was a nine out of ten, reduced to a five out of ten with analgesic medication. (R. 237). He stated that he was always tired and had problems with his memory and concentration. (R. 237). Regarding his substance abuse, he reported that he "was drunk every day when [he] was drinking," and that he used marijuana until 2008 and cocaine until about a year prior to the examination. (R. 238). He reported activities of daily living of cooking, cleaning, doing laundry, shopping. (R. 238). He said that he spent his time playing chess, socializing with friends, watching television, listening to the radio, and reading. (R. 238). Dr. Mescon noted that he appeared to be in no acute distress, his gait was normal, he could squat half way and he required no assistance with changing, rising from his chair or getting on or off the exam table. (R. 238). Her examination showed normal results, including full range of motion in Plaintiff's shoulders. (R. 239). She concluded that Plaintiff had no limitations for physical activities of sitting, standing, climbing, pushing, pulling or carrying heavy objects. (R. 240).

**2. Dr. Michael Kushner, Ph.D.**

Dr. Michael Kushner, Ph.D. conducted a psychiatric evaluation on January 20, 2012. (R. 241-45). At the evaluation, Plaintiff reported that he had seen a psychiatrist while in prison "once or twice," but that he was not currently seeing a mental health specialist. (R. 241). He reported difficulty sleeping, and said that he often needed alcohol to sleep. (R. 241). He did not report any depressive symptoms, but said that he was excessively apprehensive, worried about his future, was irritable, restless, and had memory issues and difficulty concentrating. (R. 241-

42).  He also described symptoms of delusions and paranoid ideation, in that he felt that he could read people's minds and therefore knew that they were talking about him behind his back. (R. 242).  He reported drinking at least one beer every day and often more than that, and said that he had last used cocaine in December 2011. (R. 242).  He stated that he was able to dress, bathe, and groom himself on most days, that he managed his own money, took public transportation, and did his own cooking, cleaning, laundry and shopping. (R. 243).  He reported socializing with friends and acquaintances, saying that he spent his days visiting his friends and watching television. (R. 244).

Dr. Kushner's examination revealed coherent thought processes with no evidence of hallucinations, delusions or paranoia in the evaluation setting, but mild impairments in recent and remote memory skills. (R. 243).  His cognitive functioning was average to below average, his general fund of information was somewhat limited, and his insight and judgment were fair to poor. (R. 243).  Dr. Kushner concluded that Plaintiff could follow and understand simple directions and could perform simple tasks independently. (R. 244).  He found that Plaintiff could not maintain attention and concentration, perform complex tasks independently, make appropriate decisions, or relate adequately with others, and probably could not learn new tasks. (R. 244).  He said that Plaintiff definitely could not appropriately deal with stress. (R. 244).  His diagnoses were anxiety disorder, psychotic disorder, and alcohol dependence/abuse. (R. 244).

## C.  Residual Functional Capacity ("RFC") Assessments

The record contains a Physical RFC Assessment dated January 10, 2012 by W. Begelman. (R. 160-65).  After reviewing the medical evidence in Plaintiff's file, the analyst concluded that Plaintiff was HIV positive and had hypertension, and found that he could occasionally lift and/or carry fifty pounds, frequently lift and/or carry ten pounds, stand and/or

walk and sit for six hours in an eight hour workday, and push and/or pull an unlimited amount. (R. 161). The examiner found no postural, manipulative, visual, communicative, or environmental limitations. (R. 162-63). W. Begelman completed another physical RFC assessment on February 13, 2012 with the same findings, except that the amount Plaintiff was found to be able to frequently lift and/or carry was increased to twenty-five pounds. (R. 263).

 J. Kessel, Psychiatry, completed a psychiatric review and Mental RFC Assessment on February 13, 2012 and determined that Plaintiff's anxiety disorder did not satisfy the "paragraph A" criteria of listing 12.06. (R. 253). Regarding Plaintiff's personality disorder, the examiner found that Plaintiff demonstrated "pathologically inappropriate suspiciousness or hostility." (R. 255). Regarding the "paragraph B" criteria, the examiner found mild limitations in activities of daily living, moderate limitations in maintaining social functioning and concentration, persistence or pace, and no episodes of deterioration of extended duration. (R. 258). The consultant found none of the "paragraph C" criteria. (R. 259). Regarding Plaintiff's mental RFC, J. Kessel concluded that Plaintiff was not significantly limited in most of the categories, but found that he had moderate limitations in the following categories: understanding, remembering and carrying out detailed instructions; working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers; and responding appropriately to changes in the work setting. (R. 268-69).

**D.  Testimony during April 17, 2013 Hearing before ALJ Shire**

Plaintiff, Medical Expert Dr. Wagman, and Vocational Expert Mr. Vaughan testified at the April 17, 2013 hearing before ALJ Shire. (R. 8-40).  Plaintiff testified that he last worked at Western Beef, loading trucks, but that he had missed a number of days of work and was very tired all the time. (R. 12).  He said that he had been drinking "a lot" at the time, and that the substance abuse was part of why they let him go. (R. 12-13).  He also testified about his work in the construction industry in 1997. (R. 11).  He stated that he suffered from right shoulder pain, and took painkillers, but that imaging of the shoulder showed normal results. (R. 14).  He later testified that the pain in his right shoulder was not as severe as it had been previously, and that he was able to reach over his head without a problem. (R. 32).  Regarding his mental health, he said that he had been seeing a therapist, Diane Gottfried, for three months, and that he had seen a psychiatrist on one occasion. (R. 15-16).  He reported that he began seeking these mental health services on referral from his primary health care provider, Valerie Santangelo, because he was experiencing depression, stress, and paranoid thoughts. (R. 16-17).  He had been on the antidepressant BuSpar for two weeks. (R. 18).  He said that he was still drinking. (R. 19).  Regarding his HIV positive status, Plaintiff testified that he previously had thrush, but the medication cleared it up, and his current T cell count was around 180 and his viral load was not detectable. (R. 20).  Regarding any physical limitations, Plaintiff said that he was able to keep up with his apartment, cook, clean, and do the laundry, and that he was physically strong. (R. 21).  He reported that he had difficulty sleeping at night because of his previous work on the night shift for Western Beef, and he missed his mother a lot, as she died while he was incarcerated. (R. 22).  He indicated that he was able to follow along with television programs and the news, and

that he read occasionally. (R. 24).  He also attested that he had been experiencing loss of memory lately. (R. 27).

The medical expert Dr. Wagman testified as well.  He reviewed Plaintiff's medications and testified that he was taking BuSpar, Hydrochlorothiazide for blood pressure, Bactrim DS, Altace, Truvada, Norvir and Prezista for HIV, and Bactrim DS for cholesterol. (R. 26).  He noted that Plaintiff's last CD4 count was at 19 percent on October 27, 2011, and that normal was 25 percent or more. (R. 28).  He said that there was no history of opportunistic infections, aside from thrush, which wasn't considered significant. (R. 28).  He indicated that Plaintiff's high blood pressure was under control with his medication. (R. 28).  In analyzing the listings, he looked at 12.04A, for depression and said that Plaintiff had marked limitations in social functioning and maintaining concentration, but that the "big problem" was that Plaintiff's alcohol use was material to the finding. (R. 29-30).  Following this testimony, the ALJ said that she was going to get Plaintiff's records from his psychiatrist and seek a medical source statement as well. (R. 30).  Dr. Wagman testified that he believed Plaintiff maintained an RFC for normal activities given "his medicals overall." (R. 32).

The vocational expert Mr. Vaughan testified next.  The ALJ asked Mr. Vaughan to consider the following hypothetical: an individual of the same age, education and work experience as Plaintiff, with the following limitations: no exposure to temperature extremes or excessive humidity; can occasionally interact and socialize with the general public, supervisors and coworkers; can only occasionally tolerate changes in the work place; and is capable of simple and repetitive tasks. (R. 34).  He clarified that the hypothetical covered people at all exertional strengths. (R. 34).  With that hypothetical person in mind, Mr. Vaughan opined that this hypothetical person could not do Plaintiff's prior relevant work, which involved temperature

extremes. (R. 34-35).  Instead, he named three jobs in the local, regional, or national economy

that such a person could perform: kitchen porter or dishwasher; packager or hand packager; and

silver wrapper. (R. 36).

Plaintiff concluded his testimony by explaining to ALJ Shire that his concern with going

back to work was based on his fear that he would catch a cold with his immunity impaired from

his HIV positive status. (R. 38).  ALJ Shire commented that she was sure Plaintiff's doctors had

counseled him to stop drinking. (R. 38).  He responded that he was "working on that," but that he

still suffered from depression. (R. 39).

**E. ALJ Shire's January 29, 2014 Decision**

ALJ Shire applied the five-step approach in her January 29, 2014 decision. (R. 48-58).

At the first step, ALJ Shire found that Plaintiff had not engaged in "substantial gainful activity

since January 1, 2011, the alleged onset date." (R. 50).[2]  At the second step, ALJ Shire

determined that Plaintiff had the following severe impairments: HIV positive status, anxiety

disorder and depression. (R. 51).  She noted that Plaintiff had non-severe impairments of

hypertension, which was controlled by medication, and right shoulder pain, which was

unsupported by the medical evidence in the record. (R. 51).  At the third step, ALJ Shire held

that Plaintiff did not have a medically determinable impairment or a combination of impairments

that were listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 52).  With regard to listings

12.04 and 12.06, the ALJ noted her consideration of the "paragraph B" criteria and her findings

that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in social

functioning, moderate difficulties with regard to concentration, persistence or pace, and no

_____

[2] With regard to Plaintiff's DIB claim, ALJ Shire also found that Plaintiff met the insured status requirements
through June 30, 2013. (R. 50).

episodes of decompensation of extended duration. (R. 52-53).  ALJ Shire also found that the evidence failed to establish the presence of "paragraph C" criteria. (R. 53).

ALJ Shire then concluded that Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), with the further limitation that he could have no exposure to temperature extremes and excessive humidity. (R. 53).  The ALJ's RFC finding also took into account Plaintiff's mental limitations, which she found allowed for occasional social interaction with the general public, supervisors and coworkers, occasionally tolerating changes in the workplace, and the performance of a simple repetitive job. (R. 53).

In determining Plaintiff's RFC, ALJ Shire held that Plaintiff's allegations as to the intensity, persistence and limiting effects of his symptoms were not entirely credible. (R. 55). She noted some inconsistencies in his testimony, saying that although he said that he had problems remembering appointments and completing tasks, he had previously asserted that he was able to perform activities of daily living, such as cleaning, cooking, shopping, watching television, and doing math in his head. (R. 55).  She also pointed out that although he said that he tried to stay away from people due to his low immunity from HIV, he also stated at the consultative examination that he spent his days visiting friends. (R. 55).

ALJ Shire reviewed the records from the internal medical examination done by Dr. Mescon, at which Plaintiff reported a history of HIV, high blood pressure and right shoulder arthralgia, and symptoms of fatigue, and memory and concentration problems. (R. 54).  Dr. Mescon noted that Plaintiff appeared to be in no acute distress, had a normal gait, could walk on his heels and toes without difficulty, could squat halfway, had a normal stance and demonstrated no difficulty changing for the examination or getting on or off the table. (R. 54).  She took into account that Dr. Mescon had assessed that Plaintiff's physical examination was within normal

limits and he had no limitations for sitting, standing, climbing, pushing, pulling, or carrying heavy objects. (R. 54). Regarding Plaintiff's treatment notes from Woodhull Medical and Mental Health Center through August 2013, ALJ Shire noted that Plaintiff was found to have decreased range of motion in his left shoulder on July 7, 2011, had PHQ scores ranging from 0 to 2 and showed no cognitive deficits in 2011 and 2012, and that he continued to drink and use crack cocaine. (R. 54). Regarding his HIV positive diagnosis, ALJ Shire reported that Plaintiff had not had any hospitalizations, history of myalgia, or opportunistic infections. (R. 55). Although he reported symptoms of fatigue, she noted that he was able to perform activities of daily living such as cooking, cleaning, laundry, shopping, and socializing with friends. (R. 55). She discredited his claim of sleep disruption because he attributed it, in part, to the fact that he used to work the night shift. (R. 55). She also noted that Plaintiff's poor memory and concentration could be in part be attributed to poor sleep from the sleep reversal, or from Plaintiff's alcohol or cocaine use. (R. 55).

Regarding opinion evidence, the ALJ said that she gave some weight to Dr. Wagman's opinion that Plaintiff would meet Listing 12.04, but that drugs and alcohol were material to that finding. (R. 56). She gave varying weight to the opinions of Dr. Kushner: she gave great weight to Dr. Kushner's opinion that Plaintiff could perform simple tasks independently, but only some weight to the opinion that Plaintiff could not maintain attention and concentration, learn new tasks, relate adequately with others or appropriately deal with stress, because of her own determination that Plaintiff was continuously abusing alcohol and perhaps cocaine as well. (R. 56). She noted that Plaintiff testified that he had been drinking 80 ounces of beer a day and one pint of brandy, and that he had recently cut back to 40 ounces of beer and half of a pint of brandy. (R. 56). She concluded that "it is feasible to believe that the claimant's drinking

contributes to his complaint of fatigue (psychomotor retardation), excessive worry, paranoia, or delusions that people were talking about him, and his claimed decreased concentration and memory." (R. 56).

At the fourth step, ALJ Shire determined that Plaintiff was not capable of performing his past relevant work. (R. 56).  ALJ Shire noted that Plaintiff was a younger individual on the alleged disability onset date, that he subsequently changed age category to closely approaching advanced age, that he had at least a high school education and was able to communicate in English. (R. 56).  At the fifth step, ALJ Shire noted that Plaintiff's additional limitations impeded his ability to perform all or substantially all of the requirements of medium work, and she, therefore, consulted the vocational expert's testimony to determine whether jobs existed in the national economy that Plaintiff could perform. (R. 57).  Based on the vocational expert's testimony that an individual with Plaintiff's age, education, work experience, and RFC as stated by ALJ Shire in the hypothetical at the hearing would be able to perform jobs such as kitchen porter/dishwasher, hand packager and silver wrapper, ALJ Shire concluded that Plaintiff was not disabled. (R. 57-58).

## II.  DISCUSSION

The Commissioner seeks remand of this case on the ground that the ALJ improperly considered Plaintiff's alcohol dependence before making a finding of disability. (Docket No. 20). Moreover, the Commissioner contends that the ALJ failed to sufficiently develop the record regarding Plaintiff's mental health treatment. (*Id.*).  Finally, the Commissioner asserts that a remand for further consideration is warranted, rather than for the calculation of benefits, because the record does not compel the conclusion that Plaintiff is disabled. (*Id.*).

Plaintiff's complaint summarily argues that ALJ Shire's decision "was erroneous, not supported by substantial evidence in the record, and/or contrary to law." (Docket No. 2 at ¶ 9). As noted above, Plaintiff did not file a motion for judgment on the pleadings, or an opposition to the Commissioner's motion.  On January 20, 2016, Plaintiff wrote to inform the Court that he had been incarcerated and would be released on May 31, 2016, and he sought an adjournment until that date. (Docket No. 21).  The Court granted Plaintiff's request, and adjourned the deadline for Plaintiff to respond to the Commissioner's motion to June 30, 2016. (Docket No. 23).  The clerk's office mailed this order to Plaintiff at his place of incarceration, and this mail was not returned.  Nonetheless, to date, Plaintiff has not filed an opposition or cross motion. Plaintiff has clearly been made aware of the deadlines for responding to the Commissioner's motion or for filing his own motion, and did not respond.

## A.  Legal Standards

A claimant is disabled and entitled to disability benefits if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)).  The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "'and bears the burden of proving his or her case at steps one through four.'" *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128). At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (citation omitted).

**B. Standard of Review**

When reviewing an appeal from a denial of Social Security benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quotation marks and citations omitted); *see also* 42 U.S.C. § 405(g). The Court does not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quotation marks and citations omitted). However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quotation marks and citation omitted). "Where there are gaps in the administrative record or the ALJ has applied an improper legal standard" remand to the Commissioner "for further development of the evidence" is appropriate. *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999) (internal quotation marks and citations omitted).

## C. ALJ's Consideration of Plaintiff's Alcohol Dependence

Where the record shows evidence of an applicant's drug addiction or alcoholism, "the 'disability' inquiry does not end with the five-step analysis." *Cage*, 692 F.3d at 123 (citing 20 C.F.R. § 416.935(a)).   "'An individual shall not be considered . . . disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled.'" *Cage*, 692 F.3d at 123 (quoting 42 U.S.C. § 1382c(a)(3)(J)). Accordingly, if the ALJ determines that a claimant is disabled, and has "medical evidence of [his] drug addiction or alcoholism, [the ALJ] must determine whether [his] drug addiction or alcoholism is a contributing factor material to the determination of disability[.]" 20 C.F.R. §§ 404.1535(a), 416.935(a).   The key factor in this determination is "whether [the ALJ] would still find [the claimant] disabled if [he] stopped using drugs or alcohol." 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1).   The claimant bears the burden of proving that the drug addiction or alcoholism is immaterial to the disability determination. *Cage*, 692 F.3d at 123.

The Eighth Circuit has interpreted these regulations to require that the ALJ's determination of disability be based on plaintiff's medical limitations, free of "deductions for the assumed effects of substance use disorders." *Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003).   Where an ALJ has made references to a claimant's substance addiction in determining whether a claimant is disabled in the first instance, and has appeared "to conflate the substance abuse analysis with the disability determination" courts in this Circuit have found legal error warranting remand. *See Morales v. Colvin*, No. 13 Civ. 06844(LGS)(DF), 2015 WL

2137776, at *27 (S.D.N.Y. May 4, 2015)[3]; *Piccini v. Comm'r of Soc. Sec.*, No. 13-cv-3461

(AJN)(SN), 2014 WL 4651911, at *15 (S.D.N.Y. Sept. 17, 2014).

Here, the record contains substantial evidence of Plaintiff's alcoholism.  He reported to

Dr. Mescon at the independent medical examination that when he was drinking he "was drunk

every day[.]" (R. 238).  He told Dr. Kushner at the psychiatric evaluation that he often needed

alcohol to sleep. (R. 241).  Dr. Kushner diagnosed Plaintiff with alcohol dependence/abuse,

among other diagnoses. (R. 244).  At the hearing before ALJ Shire, Plaintiff said that he was let

go from his position at Western Beef because of his excessive alcohol consumption. (R. 11).  He

also said that he was still drinking. (R. 19).  When ALJ Shire asked him if his doctors had

counseled him to stop drinking, he responded that he was "working on that" but continued to

struggle with depression. (R. 38-39).

Despite the substantial evidence in the record that Plaintiff suffered from alcoholism, the

ALJ did not follow the procedures dictated in 20 C.F.R. §§ 404.1535 and 416.935 of first

determining whether Plaintiff was disabled and then deciding whether Plaintiff's impairments

would remain if he stopped using alcohol.  Instead, ALJ Shire conflated the two steps.  She noted

that Plaintiff's reported difficulties with memory and concentration could be attributed, at least in

part, to his alcohol or cocaine use. (R. 55).  She gave less weight to Dr. Kushner's opinion that

Plaintiff could not maintain attention and concentration, learn new tasks, relate adequately with

others or appropriately deal with stress, because of her own determination that Plaintiff was

continuously abusing alcohol, and perhaps cocaine as well. (R. 56).  Finally, she concluded that

Plaintiff's drinking contributed to his excessive worry, paranoia, and his delusions that people

---

[3] In accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009), and Local Rule 7.2 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, a copy of this case and any others cited herein, only available by electronic database, accompany this Report and Recommendation and shall be simultaneously delivered to *pro se* Plaintiff.

were talking about him. (R. 56).  In taking Plaintiff's alcohol dependence into account in

determining whether Plaintiff had particular impairments for purposes of assessing whether he

was disabled in the first instance, the ALJ deviated from the procedure required in the

regulations.  This legal error warrants remand.

**D.  ALJ's Duty to Develop the Record**

The ALJ has an affirmative obligation to develop the record due to the nonadversarial

nature of the administrative proceeding. *Burgess*, 537 F.3d at 128 (citations omitted).  This duty

to develop the record remains where the claimant is represented by counsel, *Shaw v. Chater*, 221

F.3d 126, 131 (2d Cir. 2000), and is heightened where the claimant is unrepresented at the

administrative hearing, *Rivera v. Barnhart*, 423 F. Supp. 2d 271, 277 (S.D.N.Y. 2006).  The ALJ

must seek additional evidence or clarification where the documentation "from a claimant's

treating physician, psychologist, or other medical source is 'inadequate . . . to determine whether

[the claimant] is disabled.'" *Antoniou v. Astrue*, No. 10-CV-1234 (KAM), 2011 WL 4529657, at

*13 (E.D.N.Y. Sept. 27, 2011) (alterations in original) (citations omitted).  "This duty to develop

the record is particularly important where an applicant alleges he is suffering from a mental

illnesses, due to the difficulty in determining whether these individuals will be able to adapt to

the demands or 'stress' of the workplace." *Hidalgo v. Colvin*, No. 12CV9009-LTS-SN, 2014 WL

2884018, at *4 (S.D.N.Y. June 25, 2014) (internal quotation marks and citations omitted).

The Commissioner concedes that the ALJ erred by failing to satisfy her duty to develop

the administrative record when she did not request either psychiatric records or a medical source

statement from Plaintiff's psychiatrist, Dr. Chauhdry, when she did not request a medical source

from Plaintiff's psychologist, Dr. Gottfried, and when she ultimately obtained no records

regarding Plaintiff's mental health treatment. (Docket No. 20 at 12).  In reviewing the

administrative record, it is clear that there are gaps regarding Plaintiff's mental health treatment, which the ALJ had a duty to develop further.  At the hearing before ALJ Shire, Plaintiff testified that he had been seeing a therapist for three months, and that he had seen a psychiatrist on one occasion in which he had been prescribed BuSpar. (R. 15-16, 18).  He said that he had reported experiencing depression, stress and paranoid thoughts. (R. 16-17).  The medical expert, Dr. Wagman, also found that Plaintiff met the listing for depression based on his marked limitations in social functioning and maintaining concentration. (R. 29-30).  Admittedly, the ALJ attempted to develop the record by issuing a subpoena seeking medical records from Dr. Gottfried. (R. 103).  However, the records received in response only corroborated Plaintiff's account that he was seeking mental health services from Dr. Gottfried and the psychiatrist, Dr. Chauhdry, but did not fully develop the record regarding the services that Plaintiff had received, or regarding any assessment these providers had of Plaintiff's impairments.  The ALJ erred in not seeking additional medical records regarding these mental health services, or a medical source statement from either of these treating sources.

## E.  Remand

Finally, the Commissioner argues that the case should be remanded for further administrative proceedings because the record does not compel a conclusion that Plaintiff is disabled. (Docket No. 20).  Courts "have opted simply to remand for a calculation of benefits" where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision[.]" *Rosa v. Callahan*, 168 F.3d at 83; *see also Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980) (reversing and ordering that benefits be paid where "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose.").  On the other hand, "remand for further development of the evidence" may

be appropriate "where there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa*, 168 F.3d at 82-83 (citations omitted).

Here, ALJ Shire failed to follow the regulations when considering Plaintiff's alcohol dependence in assessing whether Plaintiff was disabled, and failed to develop the record fully regarding Plaintiff's mental health.  Where "further findings will plainly help to assure the proper disposition of the claim" and "it is entirely possible that a complete record would justify the SSA's current conclusion that plaintiff was not disabled at the relevant time, remand for calculation of benefits is not appropriate[.]" *Lugo v. Barnhart*, No. 04 Civ. 1064(JSR)(MHD), 2008 WL 515927, at *25 (S.D.N.Y. Feb. 8, 2008), *report and recommendation adopted*, No. 04 Civ. 1064 (JSR), 2008 WL 516796 (S.D.N.Y. Feb. 27, 2008).  Consequently, I recommend that the case be remanded for further administrative proceedings.

## III. CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that the Commissioner's motion for a remand should be granted and this case should be remanded for further administrative proceedings.

## IV. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time).  If copies of this Report and Recommendation are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written objections. *See* Fed. R. Civ. P. 6(d).  Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable

Kenneth M. Karas at the United States District Court, Southern District of New York, 300

Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at

said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Kenneth

M. Karas and not to the undersigned.  Failure to file timely objections to this Report and

Recommendation will preclude later appellate review of any order of judgment that

will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v.*

*Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:   August 2, 2016
       White Plains, New York

**RESPECTFULLY SUBMITTED,**

_____
JUDITH C. McCARTHY
United States Magistrate Judge

2011 WL 4529657
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Lefkios ANTONIOU, Plaintiff,

v.

Michael ASTRUE, Commissioner
of Social Security, Defendant.

No. 10–CV–1234 (KAM).
|
Sept. 27, 2011.

**Attorneys and Law Firms**

Herbert S. Forsmith, Office of Herbert S. Forsmith, New
York, NY, for Plaintiff.

Arthur Swerdloff, United States Attorney–EDNY,
Brooklyn, NY, for Defendant.

*MEMORANDUM & ORDER*

MATSUMOTO, District Judge.

**\*1** Pursuant to 42 U.S.C. Section 405(g), plaintiff
Lefkios Antoniou ("plaintiff") appeals the final decision
of defendant Commissioner of Social Security Michael
Astrue ("defendant" or "Commissioner") denying
plaintiff's application for Social Security Disability
Insurance Benefits ("SSD") under Title II of the Social
Security Act (the "Act"). Plaintiff, who is represented
by counsel, contends that he is disabled and therefore
entitled to receive SSD benefits due to a combination
of severe impairments of "medical, orthopedic, and
psychiatric" natures, which have prevented him from
obtaining gainful employment since August 16, 2006.
(ECF No. 1, Complaint, dated 3/18/2010 ("Compl.")
¶¶ 5–6.) Presently before the court are plaintiff's and
defendant's cross-motions for judgment on the pleadings
pursuant to Federal Rule of Civil Procedure 12(c). For the
reasons set forth below, both plaintiff's and defendant's
motions are denied and the case is remanded for further
proceedings.

**BACKGROUND**

**I. Plaintiff's Personal and Employment History**
Plaintiff was born on April 12, 1946 in the Republic of
Cyprus and moved to the United States on December 6,
1975. (Administrative Transcript ("Tr.") at 26.) Plaintiff
obtained his high school education in Cyprus, where he
also received vocational training in air conditioning and
heating work. (*Id.* at 26–27.) Plaintiff reported that he
ran his own air conditioning and heating system repair
business in the United States for 25 years. (*Id.* at 27.) His
job often involved climbing through "moving ladders,"
working on roofs, and lifting heavy objects. (*Id.* at 27–
28, 36.) Plaintiff testified that he regularly lifted 40 to 50
pounds in this capacity and that, depending on the job,
"[he] need[ed] a lot of help" to lift some of the objects,
which were "really heavy." (*Id.* at 27–28, 36.)

On or about August 16, 2006, plaintiff stopped working
in air conditioning and heating repair after reportedly
experiencing several instances of choking feelings,
disorientation, and fear while working on rooftops. (*See
id.* at 27–28, 39.) Plaintiff testified that from the time he
stopped working until he turned 62 and began to collect
retirement benefits, he lived off his savings. (*Id.* at 39.)
When his savings ran out, he terminated his insurance plan
and, as a result, could not afford to obtain treatment for
any of his medical conditions. (*Id.* at 30, 39.)

In 2007, at his therapist's suggestion, plaintiff traveled to
Cyprus, where he believed the cost of living would be
cheaper and he could receive free medical treatment. (*Id.*
at 33, 39–40.) In Cyprus, plaintiff lived with his mother.
(*Id.* at 40.) On a typical day, his brother drove him to the
beach, where plaintiff would swim and relax. (*Id.*) Plaintiff
testified that he lived in Cyprus for a year and a half, but
traveled back and forth between the United States and
Cyprus during that time. (*Id.* at 39–40.) Plaintiff married
his second wife in Cyprus in 2007, but the couple divorced
in 2009.[1] (*See id.* at 40, 308.)

**\*2** Plaintiff testified that he currently lives in his
daughter's home in Whitestone, New York, where his
bedroom is on the second floor. (*Id.* at 1, 35, 38.) The
stairway to the second floor has ten steps that plaintiff
walks up and down once per day. (*Id.* at 38.) His daughter
cooks and cleans, and plaintiff occasionally goes shopping

Antoniou v. Astrue, Not Reported in F.Supp.2d (2011)
Case 7:15-cv-04704-KMK   Document 25   Filed 08/02/16   Page 22 of 108
2011 WL 4529657, 170 Soc.Sec.Rep.Serv. 653

alone. (*Id.* at 35.) When the shopping bags are "too much then [his daughter] goes with [him]." (*Id.* at 36.)

## II. Plaintiff's Medical History

### A. January 31, 2005: Cardiac Stent Replacements

In 2005, plaintiff was referred to the New York Hospital Medical Center of Queens ("Medical Center") by his primary care physician, Dr. Daniel Byrns, after experiencing acute dyspnea while swimming. (*Id.* at 232.) On January 31, 2005, plaintiff underwent a dual-isotope exercise myocardial perfusion imaging study and a cardiac stress test at the Medical Center. (*Id.* at 230–32.) Dr. David Schechter, plaintiff's treating cardiologist at the Medical Center, noted that plaintiff had a history of hypertension, remote small CVA with chronic neck discomfort, and rare ventricular couplets during stress. (*Id.* at 232.) The test results showed that plaintiff had a normal exercise capacity, but also revealed myocardial ischemia. (*Id.* at 230, 232.) A coronary angiogram and catheterization, also performed on January 31, 2005, confirmed that plaintiff suffered from triple vessel coronary heart disease. (*Id.* at 42, 58, 239–40.)

At Dr. Schechter's recommendation, on January 31, 2005, plaintiff underwent a procedure to place three stents in his heart. (*Id.* at 240–41.) On May 6, 2005, two more stents were inserted. (*Id.* at 243.) Dr. Schechter's final diagnosis on May 6, 2005 was two-vessel coronary artery disease, with intervention attempted in two lesions present in both vessels, and both lesions dilated. (*Id.* at 244.) Plaintiff was to undergo a follow-up catheterization in three months. (*Id.*)

### B. August 1, 2005 to August 11, 2006: Follow-up Catheterizations and Cardiac Examinations

On August 1, 2005, a cardiac catheterization revealed that plaintiff had non-significant coronary artery disease ("CAD") and patent stent sites. (*Id.* at 172.) Continuing medical therapy was recommended. (*Id.*) On a post-stent placement follow-up appointment on September 29, 2005, Dr. Schechter reported that plaintiff presented with diagnoses of arteriosclerotic heart disease, lipidemia, hypertension, and impotence. (*Id.* at 277.) Plaintiff's medications included Viagra, Ecotrin, Plavix, Zocor, and Niaspan. (*Id.*) Plaintiff informed Dr. Schechter that he was asymptomatic and had good functional capacity. (*Id.*) Dr. Schechter also noted that plaintiff was comfortable

and in good spirits and his heart sounds were normal. (*Id.*) In addition, an examination of plaintiff's extremities revealed no edema. (*Id.*) Dr. Schechter opined that there was no evidence of recurrent angina or congestive heart failure. (*Id.*) Dr. Schechter cleared plaintiff for airplane travel and told him to return for a follow-up appointment in three months. (*Id.*)

**\*3** At his next appointment with Dr. Schechter on January 10, 2006, plaintiff reported that he continued to have good functional capacity without any chest pain, dyspnea, palpitations, or syncope. (*Id.* at 279.) Plaintiff's cardiac examination was normal. (*Id.*) Plaintiff reported that he sometimes skipped his Plavix medication because he believed it upset his stomach. (*Id.*) Dr. Schechter instructed plaintiff that he should not stop taking Plavix and that, if his stomach continued to bother him, he should decrease his daily aspirin dosage. (*Id.* at 280.) Dr. Schechter also instructed plaintiff to take Protonix in the morning. (*Id.*) Dr. Schechter diagnosed status-post eluting stents, elevated lipoprotein (a) and lipidemia with adequate control, and controlled hypertension. (*Id.* at 279.) Dr. Schechter's impression was that plaintiff remained asymptomatic following the multi-vessel stenting in May 2005. (*Id.* at 280.)

In a letter addressed to Dr. Byrns dated July 18, 2006, Dr. Schechter noted that although plaintiff's blood pressure was borderline elevated, plaintiff had normal heart sounds, patent vessels with no significant obstructive disease, an absence of edema, and that plaintiff was "feeling well and living an active life without symptomatology." (*Id.* at 278.) In addition, Dr. Schechter wrote that he advised plaintiff to lose weight in order to lower his blood pressure prior to starting an anti-hypertensive medication. (*Id.*) Dr. Schechter noted that a catheterization was planned for early August to reassess whether there was any in-stent stenosis. (*Id.*)

On August 11, 2006, a follow-up left heart catheterization, left ventriculography, aortogram, and coronary angiography were performed at the Medical Center. (*Id.* at 167–68.) These tests showed non-significant vessel disease with previous PCI and patent stent RCA, CFX and LAD and normal left ventricular function. (*Id.*) Continued medical therapy and secondary prevention measures were recommended. (*Id.*)

2011 WL 4529657, 170 Soc.Sec.Rep.Serv. 653

## C. March 21, 2006 to March 20, 2007: Early Visits with Dr. Byrns

On March 21, 2006, plaintiff saw Dr. Byrns, his internist, with complaints of dizziness and weakness. (*Id.* at 290.) He stated that he was not taking his Plavix due to gastrointestinal side effects, but that he was taking aspirin at a dose of 325 mg. (*Id.*) Plaintiff was also taking Zocor, Viagra, Cozaar, and Protonix. (*Id.*) Dr. Byrns suspected that plaintiff's symptoms might be due to low blood pressure. (*Id.*) Dr. Byrns instructed plaintiff to discontinue Cozaar for two weeks, at which time he would be re-evaluated. (*Id.*)

In a follow-up visit on April 18, 2006, plaintiff complained of episodes of right upper quadrant pain radiating to his back. (*Id.*) Dr. Byrns noted minimal tenderness in the right quadrant, (*id.*), but an abdominal ultrasound performed on April 26, 2006 revealed unremarkable results, (*id.* at 284).

*4 A routine check-up by Dr. Byrns on December 11, 2006 was unremarkable. (*Id.* at 291.) Dr. Byrns instructed plaintiff to continue with his medications, including taking Plavix on a daily basis, and to follow-up with his cardiologist. (*Id.*)

On March 2, 2007, plaintiff saw Dr. Byrns on an emergency basis, reporting that he was not feeling well and experiencing problems with forgetfulness. (*Id.*) Plaintiff stated that he had "for the most part retired from his job because of his feelings." (*Id.*) A mini-mental state evaluation ("MMSE") and clock-face drawing test, however, revealed normal cognitive functioning. (*Id.*) Dr. Byrns attributed any dysfunction to depression, noting that plaintiff was "making some difficult decisions in his life at this point." (*Id.*) Dr. Byrns prescribed plaintiff Lexapro and stated that he would reevaluate plaintiff when he returned from Cyprus in two months.[2] (*Id.*)

Two weeks later, on March 20, 2007, plaintiff again saw Dr. Byrns on an emergency basis for an upper respiratory tract infection. (*Id.* at 292.) During that visit, there was no follow-up regarding depression or mention of it. (*Id.*)

## D. February 15, 2007: Physical Therapy Appointment

On February 15, 2007, plaintiff saw Dr. Mark Mabida, a physical therapist, complaining of intermittent dull aching pain on his cervical spine radiating down his left shoulder and arm, numbness in his left hand, and decreased functional mobility and strength. (*Id.* at 286–88.) Dr. Mabida treated plaintiff with moist heat, electrical stimulation, trigger point and myofacial stretching, therapeutic massage, therapeutic exercise, and neuromuscular reeducation. (*Id.*) Dr. Mabida observed that plaintiff experienced pain with AROM testing and noted that plaintiff's cervical spine exhibited a limited active range of motion as follows: flexion to 15 degrees, extension to 20 degrees, lateral flexion to 15 degrees, and rotation to 30 degrees. (*Id.*) Dr. Mabida further noted that plaintiff's neurological status was intact throughout. (*Id.*) Dr. Mabida identified the following problems that required skilled therapy services: pain that limits function, decreased range of motion, decreased strength, decreased independence with ADLs, and a lack of a home exercise program. (*Id.* at 287.)

## E. September 25, 2007: Consultative Examination

On September 25, 2007, plaintiff was referred by the Division of Disability Determination in the New York State Office of Temporary and Disability Assistance ("Division of Disability Determination") to Dr. David Guttman for a consultative internal medicine examination. (*See id.* at 191–220.) Dr. Guttman noted that plaintiff's chief complaint was hypertension since 1998 and that he also complained of cardiac disease. (*Id.* at 191.) In addition, plaintiff complained of pressure in his abdomen and chest and neck pain. (*Id.*) Plaintiff's medications were Plavix, Cozaar, Niaspan, Protonix, Zocor, aspirin, and Lexapro. (*Id.*) As an initial matter, Dr. Guttman observed that plaintiff appeared to be in no acute distress, had a normal gait and stance, could squat and "walk on [his] heels and toes without difficulty," needed no help changing for the exam or getting on and off the exam table, used no assistive devices, and was able to rise from his chair without difficulty. (*Id.* at 192.) Dr. Guttman assessed plaintiff's health as "fair" with hypertension, atherosclerotic heart disease post stent replacement, and a history of transient ischemic attack. (*Id.* at 193.)

*5 Dr. Guttman performed a stress test, an internal medicine examination, and a physical examination. (*See id.* at 191–95.) During the stress test, plaintiff exercised to 85 percent of the MVHR for his age. (*Id.* at 195.) Dr. Guttman observed an absence of ischemic changes after seven minutes of exercise and recorded plaintiff's blood pressure as 198/117. (*Id.*) Dr. Guttman also noted that

plaintiff's heart had a "regular rhythm" and lacked an audible murmur, gallop, or rub. (*Id.* at 192.)

In addition, Dr. Guttman found that plaintiff's cervical spine and lumbar spine showed full flexion, extension, and full rotary movement bilaterally. (*Id.* at 193.) Dr. Guttman further found that plaintiff did not have scoliosis, kyphosis, or abnormalities in his thoracic spine. (*Id.*) Additionally, Dr. Guttman recorded that plaintiff had full range of motion of his shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally. (*Id.*) Dr. Guttman also noted that plaintiff had "[s]trength 5/5 in upper and lower extremities, joints [that were] stable and non-tender ... [and] no redness, heat, swelling, or effusion." (*Id.*)

### F. October 16, 2007: Residual Functional Appraisal by Medical Consultant

Dr. P. Seitzman, a medical consultant with the Division of Disability Determinations, reviewed the medical record on October 16, 2007. (*Id.* at 221.) Dr. Seitzman opined that plaintiff could perform medium work, lift 50 pounds occasionally and 25 pounds frequently, and sit, stand, and/or walk for six to eight hours per day. (*Id.*) Dr. Seitzman noted that a treadmill exercise test revealed no ischemic changes and that plaintiff reached his target heart rate. (*Id.*) Dr. Seitzman also noted that plaintiff's most recent catheterization showed no obstructions. (*Id.*)

### G. March 17, 2009 to March 26, 2009: Later Visits with Dr. Byrns and Dr. Byrns's Medical Source Statement

Plaintiff met with Dr. Byrns on March 17, 2009 to renew his medications, which included Plavix, Micardis, Zocor, Lisinopril, and Ecotrin. (*Id.* at 292.) Dr. Byrns noted that plaintiff was no longer taking Niaspan and instructed plaintiff to discontinue using Lisinopril, which had been prescribed by a doctor in Cyprus while plaintiff was living there between 2007 and 2009. (*Id.*) Dr. Byrns further noted that plaintiff was going through a divorce, was running out of medications, and had lost his insurance. (*Id.*) Although plaintiff had gained ten pounds since his last visit in March 2007, he had no complaints of chest pain or shortness of breath and his heart sounds were regular with a 2/6 systolic ejection murmur. (*Id.*)

Plaintiff saw Dr. Byrns again on May 18, 2009 with complaints of pain in his neck, jaw, and back. (*Id.* at 307; *see also* ECF No. 11, Memorandum of Law In Support Of the Defendant's Motion for Judgment on the Pleadings, dated 9/15/2010 ("Def.Mem.") at 9.) Plaintiff asked Dr. Byrns to fill out "disability papers." (Tr. at 307.) In his progress notes, Dr. Byrns diagnosed plaintiff with a history of coronary artery disease, hypertension, hyperlipidemia, erectile dysfunction, and depression. (*Id.*) Dr. Byrns prescribed plaintiff aspirin, Plavix, Mycardis, and Lisinopril. (*Id.*) Although Dr. Byrns noted that plaintiff did not present with suicidal ideations, he called plaintiff's daughter and advised her that plaintiff should be evaluated for depression. (*Id.*)

**\*6** Dr. Byrns completed a Medical Source Statement at the request of plaintiff's attorney on May 26, 2009. (*Id.* at 302–05, 313–16.) Dr. Byrns stated that plaintiff could sit continuously for two hours before needing to stand or walk about for one hour. (*Id.* at 302.) In addition, Dr. Byrns stated that plaintiff could sit for up to two hours out of an eight-hour workday. (*Id.*) Dr. Byrns recorded that plaintiff could lift/carry only ten pounds occasionally, and would need to rest four hours a day. (*Id.* at 304.) Dr. Byrns marked on the statement that plaintiff could rarely or never flex his neck and could occasionally rotate his neck. (*Id.*) Dr. Byrns further stated that plaintiff's condition had existed with these restrictions since August 16, 2006. (*Id.*) However, Dr. Byrns left blank the space in his report for recording which diagnostic techniques were used and the clinical basis for his findings. (*Id.* at 304–05.)

### H. May 23, 2009: Dr. Bamji's Psychological Evaluation

On May 23, 2009, plaintiff met with Dr. Dinshaw Bamji, a psychiatrist, for a psychological evaluation after being referred by Dr. Byrns. (*See id.* at 308–11.) Plaintiff reported feeling depressed, "like a boat in the middle of the ocean—buffeted by waves in all directions," and reported a two and a half year history of panic attacks, agoraphobia, claustrophobia, and fear of having a heart attack. (*Id.* at 308–09.) Plaintiff also told the doctor that he was having financial problems due to his first wife's medical expenses and that he was in the process of divorcing his second wife, with whom he had had "two years of misery." (*Id.* at 308.) Dr. Bamji noted that plaintiff had no formal thought or language disorders, delusions, suicidal ideas, or homicidal ideas and found plaintiff's global assessment of functioning (GAF) to be 50, which the doctor noted was "fair." [3] (*Id.* at 310; *see also* ECF No. 11, Def. Mem. at 10.) Nevertheless, the doctor diagnosed plaintiff with major depressive disorder, panic disorder, and mild agoraphobia, noting

severe psychosocial stressors, including "marital/divorce issues" and financial difficulties. (Tr. at 310.) He opined that plaintiff suffered from prolonged repeated anxiety attacks, was acutely depressed, and was unable to be gainfully employed. (*Id.* at 311.) Dr. Bamji recommended a treatment plan that included Lexapro and individualized psychotherapy. (*Id.*) He noted that plaintiff's "care should be re-evaluated in 12 months." (*Id.*)

### III. Procedural History

On May 17, 2007, plaintiff applied for SSD benefits under the Act alleging disability beginning August 16, 2006 due to a heart condition and neck and back problems. (*Id.* at 108–11, 127.) The Commissioner denied plaintiff's claim on October 18, 2007. (*Id.* at 62, 66–69.) Plaintiff then requested and obtained a hearing before ALJ Jeffrey M. Jordan ("ALJ"). (*See id.* at 20, 70–71.) The ALJ hearing took place in Jamaica, New York on June 4, 2009, at which time plaintiff testified and was represented by counsel. (*See id.* at 20.)

### A. June 4, 2009 ALJ Hearing

**\*7** At the ALJ hearing on June 4, 2009, plaintiff testified that he stopped working in 2006 because he began to experience choking sensations and be afraid while he was working on rooftops. (*Id.* at 28.) He stated that he began experiencing panic attacks and feeling shortness of breath after his first wife's death in 2001. (*Id.* at 32.) He stated that after she died, his "business went bad" and "that's [when] it started ... after that I start[ed] having all these complications." (*Id.*) In addition, plaintiff testified that he had pains in his knees, back, and neck that made it uncomfortable to sit on a straight chair for a long time and had gotten worse over time. (*Id.* at 30, 34.) As to his heart condition, plaintiff stated that he tires easily and sometimes his heart races, making it difficult for him to sleep. (*Id.* at 29.) With respect to his functional capabilities, plaintiff stated that he could sit for no longer than two hours in a regular chair because of his neck, right knee, and lower back pain, and that he could stand for up to two hours at a time. (*Id.* at 30, 33.) Plaintiff reported that he feels exhausted and out of breath after walking for two blocks, spends four hours a day resting, and needs to spend twelve hours a day sleeping. (*Id.* at 34–35.) Plaintiff further reported that he could not continue his prior work because he could no longer lift heavy weights, could not climb, feared falling from the roof, and was forgetful. (*Id.* at 37.)

Dr. Gerald Galst, a cardiologist, also testified at the June 4, 2009 hearing as a medical expert after reviewing plaintiff's medical records. (*See id.* at 42–45.) Dr. Galst concluded that the evidence showed that plaintiff's cardiac vessels were "patent without any significant obstructive disease." (*Id.* at 42–43.) In addition, Dr. Galst observed that plaintiff's electrocardiograms and stress tests revealed consistently normal results, and that plaintiff's cardiac function was also normal. (*Id.* at 43.) Regarding plaintiff's allegations of spinal problems, Dr. Galst stated that although there were "some notes from a physical therapist," there were no x-rays, no detailed findings, and no notations from Dr. Byrns suggesting that plaintiff had any orthopedic and/or musculoskeletal complaints. (*Id.* at 43–44.) Dr. Galst concluded that plaintiff's cardiac and orthopedic conditions did not meet or equal any of the Listings in the regulations. (*Id.* at 45.) He opined that the only functional limitations plaintiff might have, based on plaintiff's testimony at the hearing, would be psychological. (*Id.*)

Donald Silve, a vocational expert, also testified at the June 4, 2009 hearing. (*See id.* at 47–52.) Mr. Silve stated that plaintiff's past work as a heating and air conditioner installer-servicer is exertionally medium work. (*Id.* at 47.) *See* U.S. Dep't of Labor, Dictionary of Occupational Titles ("DOT") No. 637.261–014, *available at* http:// www.oalj.dol.gov/public/dot/references/dot06c.htm (last visited Sept. 27, 2011). Mr. Silve also testified that plaintiff's prior work experience equipped plaintiff with transferable skills, such as the ability to compare and compile information regarding the function, structure, composites, and amounts of material needed for a job. (Tr. at 48–49.) The ALJ asked Mr. Silve to consider a hypothetical individual of plaintiff's age, educational background, and past work experience who could lift/ carry 50 pounds occasionally and 25 pounds frequently, and who could sit/stand and walk about for six hours out of an eight hour workday. (*Id.* at 48.) The ALJ also stated that this hypothetical individual would need to avoid climbing ropes and performing other postural movements frequently, but that he had no fine or gross manipulation limitations. (*Id.*) Mr. Silve opined that without the limitations with respect to climbing, the individual would be able to plaintiff's prior work. (*Id.*)

**\*8** Mr. Silve also opined that the same hypothetical individual, with the additional limitation that he could

only perform simple, routine, low-stress work, would be unable to perform plaintiff's past work, but could perform other medium work existing in significant numbers in the national economy. (*Id.* at 48–49.) Mr. Silve cited machine feeder, DOT No. 699.686–010, machine finisher, DOT No. 690.685–170, and hand packager, DOT No. 920.587–018, as examples of other work such an individual could perform. (*Id.* at 49–50.) Mr. Silve also testified that, at that time, there were 32,520 machine feeder jobs nationally and 2,148 regionally; 8,520 machine finisher jobs nationally and 459 regionally; and 32,170 hand packager jobs nationally and 2,369 regionally. (*Id.*)

At the conclusion of the aforementioned testimony, the ALJ stated that he believed that "the records have not been fully developed" with respect to plaintiff's complaints of neck and back pain and his psychological impairments. (*Id.* at 54.) The ALJ concluded that he did not have "sufficient evidence to form an opinion" and stated that he planned to refer plaintiff for two consultative examinations by doctors to determine the extent of his musculoskeletal and psychological impairments. (*Id.* at 53–54.) The ALJ informed plaintiff that if he could not attend the examinations, plaintiff should notify "the people ... who send [the examination] information to [him] to explain the reason why [he] can't attend." (*Id.* at 54.)

On June 13, 2009, the Social Security Administration ("SSA") sent plaintiff appointment letters informing him that consultative examinations had been scheduled for June 18 and June 20, 2009. (*See id.* at 328–29.) On June 18, 2009, plaintiff's counsel called the SSA requesting to reschedule the examinations because plaintiff was in Cyprus. (*Id.* at 163.) The SSA cancelled the scheduled examinations and instructed plaintiff's counsel to inform the Bronx Office of Disability Adjudication and Review ("ODAR") when plaintiff became available. (*Id.*) On October 6, 2009, an SSA employee called the office of plaintiff's counsel and told them to inform plaintiff that he was required to return by November 2009 and that the "[ODAR] is inquiring." (*Id.* at 164.) On October 16, 2009, plaintiff's attorney wrote to the SSA requesting a further postponement of the examinations. (*Id.* at 165.) The letter requested that the ALJ wait to make a decision in the case, explaining that plaintiff was still in Cyprus attending to "private matters" but that he would return "soon." (*Id.*) Nothing in the record indicates whether the ALJ or the SSA responded to the October 16, 2009 letter.

**B. The ALJ's Decision**

On October 23, 2009, the ALJ issued a decision denying plaintiff's claims after *de novo* review pursuant to the five-step sequential analysis for determining whether an individual is disabled under the Act. (*Id.* at 8.) In his decision, the ALJ noted that although "every reasonable effort was made to develop the medical history of this claimant," the ALJ was "unable to obtain" additional evidence from consultative examinations because "the claimant returned to Cyprus after the hearing and did not come back to the United States in September 2009 to attend the examinations as promised." (*Id.*)

**\*9** According to the ALJ, under step one, plaintiff had not engaged in substantial gainful activity since August 16, 2006. (*Id.* at 9.) Under step two, the ALJ found that plaintiff's only severe impairments were coronary artery disease and hypertension. (*Id.*) The ALJ noted that although the record contained some evidence of a spinal disorder, pleural plaque thickening in plaintiff's chest cavity, diverticulosis, depression, and anxiety, these impairments were not severe because they did not "significantly limit [plaintiff's] ability to perform basic work activities." (*Id.* at 10.) With respect to plaintiff's spinal problems, the ALJ explained that there was "no diagnostic imaging demonstrating specific pathology" and that, while the plaintiff's treating physician, Dr. Byrns, purportedly referred plaintiff to physical therapy, Dr. Byrns's "scant records make absolutely no mention of this condition." (*Id.*) Regarding plaintiff's pleural plaque thickening condition, the ALJ explained that while a 2004 CT scan demonstrated multiple plaque thickening in plaintiff's chest, plaintiff "made no allegation of any symptoms" related to such a condition. (*Id.*) Additionally, the ALJ found that there was "next to no medical evidence with reference to the [plaintiff's] depression and anxiety." (*Id.*) The ALJ noted that while Dr. Byrns had prescribed an anti-depressant in March 2007, there was no mention of this medication in Dr. Byrns's notes from plaintiff's May 18, 2009 visit when his medications were discussed. (*Id.*) Further, although Dr. Bamji's report reflected a two and a half year history of panic attacks, agoraphobia and claustrophobia, plaintiff had not received treatment for these conditions, and other than a "depressed mood," plaintiff's mental status examination was normal. (*Id.*)

Under step three, the ALJ found that plaintiff's impairments or combination of impairments did not meet

or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 11.) The ALJ then found under step four that plaintiff had the residual functional capacity ("RFC") to perform his past relevant work as a heating and air conditioning installer-servicer and the full range of medium work as defined in 20 C.F.R. § 404.1567(c). (*Id.* at 12, 17–18.)

In particular, the ALJ noted that he placed significant weight on Dr. Galst's opinion that the only functional limitations that plaintiff might have, based on plaintiff's testimony and a review of plaintiff's medical records, would be psychological. (*Id.* at 17, 45.) In addition, the ALJ considered but assigned little weight to plaintiff's subjective testimony regarding his pain and functional limitations and to Dr. Byrns's Medical Source Statement. (*Id.* at 16–17.) The ALJ also stated that Dr. Seitzman's opinion "did not form the basis of this decision" even though he determined that Dr. Seitzman's opinion was supported by the medical evidence and consistent with the claimant's residual functional capacity. (*Id.* at 17.) In light of the record evidence, the ALJ concluded that plaintiff "can sit for six hours, stand/walk for six hours, lift/carry and push/pull fifty pounds occasionally and twenty-five pounds frequently, and has no restrictions in climbing ropes, ladders, and scaffolding or using his hands for fine and gross dexterous activities." (*Id.*)

**\*10** Under step five, the ALJ found, upon considering plaintiff's age, education, work experience, and residual functional capacity, that plaintiff was not disabled and would be able to perform medium work involving low stress jobs that did not require climbing of ladders, ropes and scaffolding. (*Id.* at 18–19.) The ALJ noted that plaintiff could perform the occupations of machine feeder, machine finisher, and hand-packer. (*Id.* at 19.)

**C. Plaintiff's Request for Further Review**
On February 26, 2010, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review. (*Id.* at 1–3.) Proceeding with new counsel, plaintiff filed the instant action on March 17, 2010, alleging that he is entitled to receive SSD benefits due to "a combination of medical, orthopedic, and psychiatric impairments." (Compl.¶ 5.) In his Complaint, plaintiff alleged that the ALJ's decision was "erroneous" and "contrary to law." (*Id.* ¶¶ 10–11.)

On September 15, 2010, defendant served plaintiff with a copy of its motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (*See* ECF No. 8, Letter to Plaintiff's Counsel, dated 9/15/2010; *see also* ECF No. 10, Notice of Motion for Judgment on the Pleadings, dated 9/15/2010; ECF No. 11, Def. Mem.) On October 15, 2010, plaintiff served defendant with a cross-motion for judgment on the pleadings. (*See* ECF No. 12, Notice of Cross–Motion for Judgment on the Pleadings; ECF No. 13, Memorandum of Law In Opposition To Defendant's Motion for Judgment on the Pleadings, and In Support of Plaintiff's Cross–Motion for Judgment on the Pleadings, dated 10/15/2010 ("Pl.Mem.").) Defendant opposed plaintiff's motion on October 29, 2010. (*See* ECF No. 14, Memorandum of Law In Further Support Of Defendant's Motion for Judgment on the Pleadings and In Opposition To Plaintiff's Cross–Motion for Judgment on the Pleadings dated 10/29/2010 ("Def.Reply").) The fully-briefed motions were filed with this court on November 30, 2010. (*See* ECF No. 16, Letter to the Honorable Kiyo A. Matsumoto, dated 11/30/2010.)

Plaintiff presently alleges that the ALJ erred by (1) failing to re-contact plaintiff's treating and consulting physicians where the ALJ admitted that the record was inadequate with regard to plaintiff's psychological and orthopedic impairments; (2) failing to afford plaintiff an opportunity to reschedule or provide good cause for canceling his consultative examinations; (3) failing to give sufficient weight to the medical opinion of plaintiff's treating physician; (4) failing adequately to assess plaintiff's credibility; (5) failing to set forth an adequate function-by-function analysis of plaintiff's residual functional capacity; and (6) improperly relying on a non-treating medical expert's assessment of plaintiff's residual functional capacity. (*See generally* ECF No. 13, Pl. Mem.) [4]

## LEGAL STANDARDS

### I. Standard of Review

**A. Legal Standards Governing Agency Determinations of Eligibility to Receive Benefits**
**\*11** Pursuant to the Social Security Act, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." *Id.* at § 423(d) (2)(A).

In evaluating whether a claimant is disabled, the SSA requires the ALJ to conduct a five-step sequential analysis finding each of the following: (1) that the claimant is not working; (2) that the claimant has a medically determinable impairment or a combination of impairments that is "severe;" (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability; (4) that the claimant is not capable of continuing in his prior type of work; and (5) there is no other type of work that the claimant can do. *Burgess v. Astrue,* 537 F.3d 117, 120 (2d Cir.2008); *see* 20 C.F.R. § 404.1520(a)(4). An impairment or combination of impairments is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(c).

During this five-step analysis, the Commissioner must " 'consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity' to establish eligibility for Social Security benefits." *Burgin v. Astrue,* 348 F. App'x 646, 647 (2d Cir.2009) (quoting 20 C.F.R. § 404.1523). In cases where "the disability claim is premised upon one or more listed impairments ... the [Commissioner] should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment." *Berry v. Schweiker,* 675 F.2d 464, 469 (2d Cir.1982).

In steps one through four of the five-step evaluation process, the claimant bears the general burden of proving disability. *Burgess,* 537 F.3d at 128. In step five, the burden shifts from the claimant to the Commissioner, requiring the Commissioner to show that in light of plaintiff's residual functional capacity, age, education, and work experience, plaintiff is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel,* 985 F.Supp. 300, 310 (E.D.N.Y.1997).

## B. The Substantial Evidence Standard for Federal Court Review of Agency Determination

A district court reviews the Commissioner's decision to "determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart,* 388 F.3d 377, 384 (2d Cir.2004) (citing *Machadio v. Apfel,* 276 F.3d 103, 108 (2d Cir.2002)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

**\*12** After reviewing the Commissioner's determination, the district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Butts,* 388 F.3d at 384 (quoting 42 U.S.C. § 405(g)). "Remand is 'appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would ... plainly help to assure the proper disposition of [a] claim.' " *Lackner v. Astrue,* No. 09–CV–895, 2011 WL 2470496, at *7 (N.D.N.Y. May 26, 2011) (quoting *Kirkland v. Astrue,* No. 06–CV–4861, 2008 WL 267429, at *8 (E.D.N.Y. Jan.29, 2008)).

### *DISCUSSION*

## I. The ALJ Failed to Fully Develop the Administrative Record.

Plaintiff argues that the ALJ erred by (1) failing to re-contact plaintiff's treating physician and other medical sources to obtain additional information concerning plaintiff's orthopedic and psychological impairments, (ECF No. 13, Pl. Mem. at 12–13); (2) failing to re-contact plaintiff's treating physician to determine the diagnostic basis for his Medical Source Statement, (*id.* at 10–11, 13); and (3) failing to inquire whether plaintiff had good cause for not attending his scheduled consultative examinations, (*id.* at 7–9). The court agrees and remands accordingly.

## A. The ALJ Erred by Failing to Re–Contact Plaintiff's Treating Physician, Psychologist, and Other Medical

**Sources Concerning Plaintiff's Alleged Orthopedic and Psychological Impairments**

At the conclusion of the June 4, 2009 hearing, the ALJ acknowledged that the record was incomplete and required further development. Specifically, the ALJ stated:

> I don't have sufficient evidence to ... make a decision in this case.... I don't have sufficient evidence to form an opinion.... [T]he recent evidence in the case that you have additional impairments that have not been fully developed. So what I'm going to do is refer you for some consultative examinations by doctors, an orthopedist and a psychiatrist or psychologist.

(Tr. at 52–53.) Despite this statement, without gathering additional information from any sources, on October 23, 2009 the ALJ issued a decision finding that plaintiff was not disabled. In particular, the ALJ concluded, "[a]lthough the record contains some indication that the claimant has spinal disorder, pleural plaque thickening, diverticulosis, depression and anxiety, the undersigned finds that these impairments do not significantly limit the claimant's ability to perform basic work activities." (*Id.* at 10.) With respect to plaintiff's alleged orthopedic impairments, the ALJ stated that although Dr. Byrns referred plaintiff to a physical therapist, Dr. Byrns's "scant records" do not mention any spinal condition. (*Id.*) In addition, the ALJ noted that "the only record in evidence" regarding plaintiff's spinal impairment was the single report from Dr. Mabida, which contains "no diagnostic imaging demonstrating specific pathology." (*Id.* at 10, 14.) With respect to plaintiff's alleged psychological impairment, the decision stated, "there is next to no medical evidence with reference to the claimant's depression and anxiety." (*Id.* at 10.) The ALJ acknowledged that Dr. Byrns noted plaintiff's memory problems, prescribed him Lexapro, and later referred plaintiff to a psychiatrist, Dr. Bamji, but concluded that such "scant evidence" was insufficient to establish a severe impairment. (*Id.* at 14–15.)

**\*13** Generally, an ALJ has an affirmative duty to develop the administrative record. *Anderson v. Astrue,* No. 07–CV–4969, 2009 WL 2824584, at \*12 (E.D.N.Y. Aug.28, 2009) (quoting *Tejada v. Apfel,* 167 F.3d 770,

774 (2d Cir.1999)). This is true regardless of whether a claimant is represented by counsel. *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999). Pursuant to 20 C.F.R. § 404.1512(e), when the evidence received from a claimant's treating physician, psychologist, or other medical source is "inadequate ... to determine whether [the claimant] is disabled," the ALJ has an obligation to seek additional information to supplement the record. *See Mantovani v. Astrue,* No. 09–CV–3957, 2011 WL 1304148, at \*3 (E.D.N.Y. Mar.31, 2011) (holding that ALJ should have requested "additional evidence or clarification" from treating physician where physician's opinion was not supported by "objective diagnostic tests or clinical signs"). Although the duty does not arise where there are no obvious gaps in the administrative record, *Rosa,* 168 F.3d at 79 n. 5, or where the medical record is simply inconsistent with a treating physician's opinion, *Rebull v. Massanari,* 240 F.Supp.2d 265, 273 (S.D.N.Y.2002), the ALJ must seek additional evidence or clarification when a report from a medical source contains a conflict or ambiguity, lacks necessary information, or is not based on medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1512(e)(1). The regulations provide that the first step in developing an inadequate record is to "recontact [the claimant's] treating physician[5] or psychologist or other medical source[6] to determine whether the additional information [the ALJ] need [s] is readily available." *Id.* § 404.1512(e)(1).

Here, the ALJ expressly concluded that he lacked sufficient evidence concerning plaintiff's orthopedic and psychological impairments to decide whether plaintiff was disabled. Nevertheless, contrary to his duty under the regulations to develop the record, the ALJ did not re-contact Dr. Mabida, Dr. Byrns, or Dr. Bamji to obtain additional information concerning these alleged impairments. His failure to do so was error. *See, e.g., Calzada v. Astrue,* 753 F.Supp.2d 250, 264 n. 35, 275 (S.D.N.Y.2010) (remanding because the ALJ failed to "address a clear gap in the record regarding plaintiff's mental status" where the ALJ noted a "lack of any medical records or clinical findings evidencing plaintiff's alleged depression" despite physicians' notes indicating plaintiff was taking prescription depression medications and plaintiff's claims of depression).

Contrary to defendant's assertions, this is not a scenario where the record was complete and the doctors' reports were "contradicted by substantial evidence" in the

administrative record. (*See* ECF No. 11, Def. Mem. at 19.) The ALJ did not identify any evidence in the record to contradict plaintiff's claims of orthopedic and psychological impairments. Indeed, the only arguably contrary evidence the ALJ mentioned was that plaintiff had received no psychiatric treatment and that his mental status examination was normal. (Tr. at 10.) This lack of evidence, however, is not a sufficient basis on which to conclude that plaintiff is not disabled. *See Rosado v. Barnhart,* 290 F.Supp.2d 431, 440 (S.D.N.Y.2003) ("The ALJ cannot rely on the *absence* of evidence, and is thus under an affirmative duty to fill any gaps in the record.").

**\*14** Further, there is no evidence to suggest the ALJ knew from past experience that Dr. Byrns, Dr. Mabida, or Dr. Bamji either could not or would not provide the information needed. *See* 404 C.F.R. § 1512(e)(2) ("We may not seek additional evidence or clarification from a medical source when we know from past experience that the source either cannot or will not provide the necessary findings."). *Cf. Blanda v. Astrue,* No. 05–CV–5723, 2008 WL 2371419, at \*10 (E.D.N.Y. June 9, 2008) (excusing ALJ's failure to obtain additional information from plaintiff's treating physicians where two of the doctors did not respond to requests for information and the third doctor provided *"three* conclusory statements in response to *three* separate requests for information"). Indeed, in light of the fact that plaintiff's last appointments with Drs. Bamji and Byrns were less than two weeks before the hearing and only five months before the ALJ rendered his decision, it is likely that the information the ALJ needed concerning plaintiff's alleged impairments would have been readily available.

Accordingly, the ALJ's failure to re-contact Drs. Mabida, Byrns, and Bamji to obtain additional information concerning plaintiff's alleged orthopedic and psychological impairments requires remand. *See Calzada,* 753 F.Supp.2d at 275 (remanding case for further development of record regarding mental impairment).

**B. The ALJ Erred by Failing to Re–Contact Dr. Byrns Concerning the Medical Source Statement.**
Plaintiff further asserts that the ALJ had a duty to re-contact plaintiff's treating physician, Dr. Byrns, to seek additional information concerning the clinical and diagnostic basis for his Medical Source Statement. (*See* ECF No. 13, Pl. Mem. at 10, 12–13.) Because the ALJ found that Dr. Byrns's Medical Source Statement did not

indicate the basis for his opinion, but did not re-contact Dr. Byrns to ascertain the basis for his opinion, remand is required.

Where a report received from a medical source "does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques, an ALJ has an obligation to re-contact the physician to seek additional evidence or clarification. 20 C.F.R. § 404.1512(e)(1). *See Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte."* ); *Taylor v. Astrue,* No. 07–CV–3469, 2008 WL 2437770, at \*3 (E.D.N.Y. June 17, 2008) (where the ALJ found that the treating physician's opinion was not supported by objective clinical findings, the ALJ should have "attempt[ed] to elicit further supporting information directly from [the treating physician] before choosing not to assign controlling weight to [the physician's] opinion"); *Mortise v. Astrue,* 713 F.Supp.2d 111, 123 (N.D.N.Y.2010) (where the ALJ afforded little weight to physician's opinion because he found it was not based on clinical and diagnostic techniques, the ALJ "had an obligation to re-contact [the physician] to assess on what those opinions were based"). "The duty of the ALJ to develop the record is particularly important when it comes to obtaining information from a claimant's treating physician." *Devora v. Barnhart,* 205 F.Supp.2d 164, 172–73 (S.D.N.Y.2002). *See also Rosa,* 168 F.3d at 79–80 (stating that the ALJ may not rely on sparse notes or conclusory assessments from a treating physician).

**\*15** Plaintiff saw Dr. Byrns on May 18, 2009 complaining of neck, jaw, and back pains, and asked Dr. Byrns to fill out "disability papers." (Tr. at 307.) On May 26, 2009, Dr. Byrns completed a Medical Source Statement indicating that, *inter alia* (1) plaintiff could sit continuously for two hours before needing to stand or walk about for one hour; (2) plaintiff could sit for up to two hours out of an eight-hour work day; (3) plaintiff could stand or walk about for 30 minutes before needing to recline or lie down for 30 minutes; (4) plaintiff could stand or walk around for up to two hours out of an eight-hour work day; (5) plaintiff would need to rest for four hours out of an eight-hour work day; (6) plaintiff could lift/carry only ten pounds occasionally; and (7) plaintiff could rarely or never flex his neck and could occasionally rotate his neck. (*Id.* at 302–04.) In addition, Dr. Byrns noted that plaintiff's condition

had existed within these restrictions since August 16, 2006. (*Id.* at 304.) Dr. Byrns, however, did not document any clinical findings and left blank the space in his report for recording the diagnostic basis for his assessment. (*Id.* at 304–05.)

In his decision, the ALJ determined that Dr. Byrns's Medical Source Statement was entitled to little weight because it was "not well supported by or consistent with the record as a whole." (*Id.* at 17.) In addition, the ALJ noted that "Dr. Byrns provided no justification, by way of diagnostic test results or findings on examination, for the extreme degree of limitation he noted." (*Id.*)

Defendant argues that the ALJ was not required to re-contact Dr. Byrns because "in addition to Dr. [Byrns'] assessment, the record contains [Dr. Byrns's] notes detailing plaintiff's complaints, clinical findings, and treatment" and therefore the record was fully developed with no obvious gaps. (ECF No. 14, Def. Reply at 4.) Although the record does contain Dr. Byrns's "progress notes," which summarize plaintiff's complaints, list his medications, record his vital signs, and note any recommended treatment, (Tr. at 290–92, 307), these notes do not mention any clinical findings or diagnostic techniques that Dr. Byrns used to assess plaintiff's ability to sit, stand, or walk, carry items, or rotate his neck. *Cf. Mortise,* 713 F.Supp.2d at 122–23 (noting that "objective medical evidence" of plaintiff's impairments included a diminished knee/ankle jerk, tenderness upon palpation of the lumbar spine, and decreased sensation in both lower extremities, and the doctor's clinical diagnostic techniques included having plaintiff ascend and descend stairs, and complete a push test).

Further, although the ALJ stated that Dr. Byrns's Medical Source Statement was not "consistent with the record as a whole," the ALJ did not identify, and the court cannot locate, any other medical opinions in the record that address the issues contained in Dr. Byrns's Medical Source Statement. *Cf. Gonzalez v. Chater,* No. 96–CV–6250, 1998 WL 398809, at *1 (2d Cir. June 8, 1998) (finding that ALJ did not have to re-contact treating physician where he "did not discredit the opinions of [plaintiff's] treating physicians solely because they were not based on clinical findings but rather gave them 'little weight' on this basis combined with the finding that these treating physicians' opinions were inconsistent with several other medical opinions in the record"); *Robertson*

*v. Astrue,* No. 09–CV–0501, 2011 WL 578753, at *5 (W.D.N.Y. Feb.9, 2011) (where "the record was fully developed and contained comprehensive reports from all three doctors," no additional evidence was needed for the ALJ to determine whether the plaintiff was disabled, and it was within the ALJ's discretion to reject the physician's estimates of the plaintiff's residual functional capacity).

**\*16** Thus, the ALJ erred by failing to re-contact Dr. Byrns to determine whether his report was based on "medically acceptable clinical and laboratory diagnostic techniques" before choosing not to assign controlling weight to his opinion. Accordingly, remand is appropriate. [7]

### C. The ALJ Erred by Denying Plaintiff an Opportunity to Attend or Reschedule the Consultative Examinations.

Plaintiff alleges that the ALJ erred by issuing a decision without giving plaintiff an opportunity to reschedule his consultative examinations or give good reasons for failing to attend them at the originally scheduled time. (ECF No. 13, Pl. Mem. at 6–9.) The court agrees.

Pursuant to the regulations, if necessary additional information is not readily available from a claimant's physicians or other medical sources, the ALJ "will ask [the claimant] to attend one or more consultative examinations at [the SSA's] expense." 20 C.F.R. § 404.1512(f). *See also Sarago v. Shalala,* 884 F.Supp. 100, 106 (W.D.N.Y.1995). Nevertheless, "when despite efforts to obtain additional evidence the evidence is not complete, [the ALJ] will make a determination or decision based on the evidence [he has]." 20 C.F.R § 404.1527(c)(4). Accordingly, if a claimant fails or refuses to take part in a scheduled consultative examination and has no good reason for the failure or refusal, a finding of not disabled may be rendered. *Id.* § 404.1518(a). *See also Kratochvil v. Comm'r of Soc. Sec.,* No. 06–CV–1535, 2009 WL 1405226, at *4–5 (N.D.N.Y. May 18, 2009) (where plaintiff's proffered "good reasons" for failing to attend either of two scheduled consultative examinations were contradicted by the record, plaintiff could not prevail based on a challenge to the adequacy of the record). The regulations instruct claimants, "if you have any reason why you cannot go for the scheduled appointment, you should tell us about this as soon as possible before the examination date." 20 C.F.R. § 404.1518(a). Good reasons for failing to appear at a consultative examination include, but are not limited

2011 WL 4529657, 170 Soc.Sec.Rep.Serv. 653

to (1) illness on the date of the scheduled examination; (2) not receiving timely notice of the scheduled examination or receiving no notice; (3) being furnished incorrect or incomplete information, or being given incorrect information about the physician involved or the time or place of the examination; (4) having a death or serious illness in claimant's immediate family; or (5) claimant's treating physician objecting to the examination. *Id.* § 404.1518(b)-(c). The regulations also note that an ALJ "will consider [a claimant's] physical, mental, educational, and linguistic limitations (including any lack of facility with the English language) when determining if [the claimant has] a good reason for failing to attend a consultative examination." *Id.* § 404. 1518(a).

During the June 4, 2009 hearing, the ALJ acknowledged that he lacked sufficient evidence regarding the severity of plaintiff's orthopedic and psychological impairments to decide whether plaintiff was disabled, and informed plaintiff that he planned to schedule two consultative examinations in order to more fully develop the record. (Tr. at 53–54.) The consultative examinations were subsequently scheduled and appointment letters were sent to plaintiff on June 13, 2009. (*Id.* at 328–29.) On June 18, 2009, plaintiff's counsel notified the SSA that plaintiff could not attend the examinations on the scheduled dates because he was out of the country and would return in September. (*Id.* at 163.) The SSA cancelled the consultative examinations and no further examinations were scheduled. (*See id.* at 163–65.) On October 6, 2009, the SSA contacted plaintiff's counsel's office and stated that plaintiff should contact the SSA as soon as he returns, but in any event no later than November. (*Id.* at 164.) The examinations still were not rescheduled. (*See id.*) On October 16, 2009, plaintiff's counsel sent a letter to the ALJ asking him to postpone making a decision in the case. (*Id.* at 165.) The letter explained that plaintiff was still in Cyprus attending to "private matters" but that he "plan[ned] on returning to New York soon in order to attend his consultative examination appointments." (*Id.*) On October 23, 2009, one week after plaintiff's counsel's October 16 letter, ALJ Jordan issued a decision denying benefits. With respect to the consultative examinations, the decision stated, "the claimant returned to Cyprus after the hearing and did not come back to the United States in September 2009 to attend the examinations as promised .... As such, the undersigned was unable to obtain this additional evidence." (*Id.* at 7.)

**\*17** The court finds that the ALJ denied plaintiff a meaningful opportunity to reschedule the consultative examinations or offer good reasons for his failure to attend the originally scheduled examinations. This is not a case where plaintiff missed scheduled consultative examinations without explanation. *See, e.g., Stephens v. Astrue,* No. 6:08–CV–0400, 2009 WL 1813258, at \*8 (N.D.N.Y. June 25, 2009) (rejecting plaintiff's claim that the ALJ failed to develop the record where plaintiff refused to acknowledge that a consultative examination was arranged and did not argue that she had a good reason for her failure or refusal to attend). To the contrary, plaintiff's attorney contacted the SSA to cancel the scheduled appointments because plaintiff was out of the country, and told the SSA that plaintiff would reschedule the examinations when he returned to the United States.

Nor is this a case where plaintiff refused to cooperate or attend the examinations. *See, e.g., Cornell v. Astrue,* 764 F.Supp.2d 381, 392 (N.D.N.Y.2010) (finding ALJ fulfilled his duties to develop the record where consultative examinations were scheduled, but plaintiff was unwilling to travel to attend them and declined to do so after being informed that "her non-compliance with the request would result in a decision based upon the evidence already in her file"); *Walker v. Barnhart,* 172 F. App'x 423, 426–28 (3d Cir.2006) (noting that plaintiff missed rescheduled consultative examinations and repeatedly failed to cooperate with the SSA's scheduling attempts with no indication of better future compliance). Instead, plaintiff's counsel's October 16 letter specifically indicated that plaintiff planned to return to New York soon in order to attend the examinations. (Tr. at 165.) Although plaintiff's failure to return in September as initially expected suggests a lack of urgency on plaintiff's part to reschedule the consultative examinations, he was not actually non-compliant. Indeed, the last notification he received from the SSA instructed him to return by November, presumably so he could proceed with the examinations at that time.

Further, the ALJ's decision makes no mention of whether he found plaintiff lacked good reasons for his failure to attend the scheduled examinations. [8] The Commissioner argues that the ALJ was justified in issuing a decision on October 23, 2009 without further delay because plaintiff left for Cyprus despite having been informed that consultative examinations would be scheduled and

failed to provide a definite return date. (ECF No. 14, Def. Reply at 3–4.) However, the ALJ did not offer these or any other reasons in his decision. In failing to do so, the ALJ precluded meaningful review of the ALJ's decision to make a determination based on incomplete evidence. *See Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999) ("A reviewing court 'may not accept appellate counsel's *post hoc* rationalizations for agency action.' " (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962))); *Grosse v. Comm'r of Soc. Sec.,* No. 08–CV–4137, 2011 WL 128565, at *5 (E.D.N.Y. Jan.14, 2011) (remanding where ALJ's cursory analysis of claimant's residual functional capacity "does not subject the ALJ's opinion to meaningful review"); *Fordham v. Astrue,* No. 309–CV–003, 2010 WL 2327633, at *5 (S.D.Ga. May 13, 2010) ("The Court cannot second-guess what the ALJ may have been thinking or may have intended to consider when he found that Plaintiff had not established a good reason for failing to attend the consultative examination. While the Court is making no determination as to whether Plaintiff failed to show good cause for not attending the scheduled consultative examination, the ALJ's decision does not adequately explain his reasoning or provide the Court with the means to determine whether the correct legal standards were applied.").

 **\*18** Accordingly, because the ALJ erred by not allowing plaintiff to reschedule the examinations in November, as expected, and by failing to explain in his decision whether plaintiff provided good reasons for his failure to attend the originally scheduled examinations, remand is appropriate.

## II. Other Challenges to the ALJ's Decision

In addition to the infirmities in the ALJ's decision already discussed, plaintiff presents a number of other challenges. In particular, plaintiff argues that (1) the ALJ failed to properly evaluate the credibility of plaintiff's testimony about his subjective pain, symptoms, and functional limitations, (ECF No. 13, Pl. Mem. at 13–18); and (2) the ALJ erred in setting forth plaintiff's function-by-function abilities, (*id.* at 5–6).

Because the ALJ did not have a complete and comprehensive medical record before him when he determined that plaintiff was not disabled, it necessarily affected both his analysis of plaintiff's credibility and

his assessment of plaintiff's residual functional capacity. On remand, the ALJ shall consider any additional evidence obtained from plaintiff's treating and consulting physicians and shall reevaluate plaintiff's credibility and RFC based on a complete record.

### *CONCLUSION*

For the foregoing reasons, the court denies plaintiff's and defendant's cross motions for judgment on the pleadings and remands this case for further proceedings consistent with this opinion. On remand, the ALJ shall:

(1) Re-contact Dr. Bamji and Dr. Mabida to request additional information regarding plaintiff's psychological and orthopedic impairments;

(2) Re-contact Dr. Byrns to ascertain the clinical basis of the doctor's May 26, 2009 Medical Source Statement and to obtain additional information regarding plaintiff's psychological and orthopedic impairments;

(3) Provide plaintiff with a meaningful opportunity to reschedule the missed consultative examinations;

(4) Re-evaluate the weight that should be assigned to the medical opinions from plaintiff's treating physicians in light of any new evidence obtained;

(5) Re-evaluate plaintiff's testimonial credibility, subjective complaints of pain and functional limitations, employability, and disability in light of any newly obtained information relevant to plaintiff's claims; and

(6) Re-evaluate plaintiff's residual functional capacity in light of any newly obtained information relevant to plaintiff's claims.

The Clerk of the Court is respectfully requested to close the case.

### SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 4529657, 170 Soc.Sec.Rep.Serv. 653

Footnotes

1    Plaintiff's first wife passed away from cancer in 2001. (Tr. at 32, 308.)

2    Lexapro is used to treat anxiety and major depressive disorder. http://www.drugs.com/lexapro.html (last visited Sept. 27, 2011).

3    A GAF of between 41–50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.2000).

4    The court notes that plaintiff's counsel, Herbert S. Forsmith, has routinely submitted stream-of-consciousness, incomprehensible filings in this court. *See, e.g., Grosse v. Comm'r of Soc. Sec.,* No. 08–CV–4137, 2011 WL 128565, at *2 (E.D.N.Y. Jan.14, 2011). This case is no different. Mr. Forsmith's 21–page brief contains little organization and primarily cites case law from other Circuits. Once again, Mr. Forsmith is advised to make discrete, sensible arguments in his future moving papers. In the instant case, the court will address Mr. Forsmith's arguments as best it can comprehend them.

5    A "treating source" is defined by the regulations as a "physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502; *see also Callanan v. Astrue,* No. 10–CV–1717, 2011 589906, at *3 (E.D.N.Y. Feb. 10, 2011). Dr. Byrns was plaintiff's primary care physician during the relevant time period and thus qualifies as a treating physician.

6    "The term 'medical sources' refers to both 'acceptable medical sources' and other health care providers who are not 'acceptable medical sources.' " Soc. Sec. Ruling 06–03p, 2006 WL 2329939, at *1 (Aug. 9, 2006) (citing 20 C.F.R. § 404.1502). Acceptable medical sources include licensed physicians, psychologists, optometrists, podiatrists, and speech language pathologists. *Id.;* 20 C.F.R. § 404.1513(a). Although the record indicates that Dr. Bamji only saw plaintiff on one occasion and is therefore not a "treating source," as a psychiatrist, he is considered an acceptable medical source. *See* 20 C.F.R. § 404.1513(a)(2). Although a physical therapist such as Dr. Mabida is not an "acceptable medical source," *Carway v. Astrue,* No. 06–CV–13090, 2011 WL 924215, at *3 (S.D.N.Y. Mar.16, 2011), a physical therapist is an "other source" from whom an ALJ has a duty to seek additional information when the record is incomplete. *See* 20 C.F.R. § 404.1513(d)(1) ("Other sources include, but are not limited to—(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists)"). While the regulations provide that other sources may provide evidence of the severity of a claimant's impairment or how a claimant's impairment affects his ability to work, only an acceptable medical source such as a medical doctor may establish whether a claimant has a medically determinable impairment. 20 C.F.R. § 404.1513(a), (d); *Coscia v. Astrue,* 2010 WL 3924691, at *8 (E.D.N.Y. Sept.29, 2010).

7    Plaintiff further argues that the ALJ erred in not assigning controlling weight to Dr. Byrns's opinion. (*See* ECF No. 13, Pl. Mem. at 10.) On remand, the ALJ shall reassess the weight assigned to Dr. Byrns's opinion in light of any new evidence the ALJ receives after re-contacting the doctor.

8    Plaintiff also argues that the Hearings, Appeals and Litigation Law Manual ("HALLEX") Regulation I–2–5–32 required the ALJ to obtain a medical expert's opinion regarding the possible effect of plaintiff's mental impairment on his failure to undergo the examinations. (ECF No. 13, Pl. Mem. at 8.) In this Circuit, failure to follow HALLEX regulations does not amount to legal error. *See Grosse,* 2011 WL 128565, at *5. *But see McClean v. Astrue,* 650 F.Supp.2d 223, 228 (E.D.N.Y.2009) (remanding where ALJ failed to set forth an explanation of how plaintiff's failure to attend a consultative examination affected the ALJ's final decision and the Commissioner conceded that the failure to provide such an explanation was legal error).

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2884018
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Carlos Manuel HIDALGO, Plaintiff,
v.
Carolyn W. COLVIN, Commissioner
of Social Security, Defendant.

No. 12CV9009–LTS–SN.
|
Signed June 25, 2014.

*MEMORANDUM OPINION AND ORDER
ADOPTING REPORT AND RECOMMENDATION*

LAURA TAYLOR SWAIN, District Judge.

**\*1** On August 19, 2013, Magistrate Judge Sarah Netburn issued a Report and Recommendation ("Report") recommending that the Court: (1) deny the motion of the Commissioner of Social Security ("Commissioner") for judgment on the pleadings, (2) grant Plaintiff's motion for judgment on the pleadings, and (3) remand the case for further development of the administrative record. The Commissioner filed a timely objection to the Report on September 12, 2013 (the "Objection"). Plaintiff filed a response to Defendant's objections on September 24, 2013.

The Court has considered thoroughly each of the Commissioner's objections and Plaintiff's responses and, for the following reasons, the Court adopts the Report in its entirety.

*BACKGROUND*

Plaintiff applied to the Social Security Administration ("SSA") for Disability Insurance Benefits and Supplemental Security Insurance benefits on July 29, 2009, based on his depression, anxiety, and auditory hallucinations associated with post-traumatic stress disorder ("PTSD"). Plaintiff was diagnosed with PTSD in 2009 after, he alleges, he was injured when he was knocked to the ground by police, hitting his face on the

concrete and a broken beer bottle. SSA denied his claim on initial review on September 18, 2009. A hearing before an Administrative Law Judge ("ALJ") was conducted on January 27, 2011. The ALJ found on July 1, 2011, that Plaintiff was not disabled.

In denying Plaintiff's application for disability benefits, the ALJ relied on the opinions of three physicians —Plaintiff's treating physician and two consultant physicians. Hidalgo began treatment with psychiatrist Dr. Marc Vital–Herne, on April 16, 2009. Over the next year, Dr. Vital–Herne met with Plaintiff approximately every one to two months. Dr. VitalHerne diagnosed Plaintiff with PTSD and prescribed medication. The doctor also concluded that Plaintiff has a mood disorder and associated issues. "His perception is impaired due to auditory hallucinations and paranoid ideas. These among other symptoms plus side-effects of medications make it very difficult for [Plaintiff] to function in the work setting." (R. 289.) However, because the ALJ determined Dr. Vital–Herne's report was "not fully consistent with treating source records," (R. 25,) the ALJ did not afford the treating physician's opinion controlling weight. The ALJ concluded that Dr. Vital–Herne's report was not entitled to controlling weight because it was inconsistent with the record in that 1) the report states that Plaintiff had an inability to function outside of a highly-supportive environment, yet he lives alone; 2) Plaintiff indicated that he does socialize at times, 3) Dr. Vital–Herne's clinical notes refer to improvement over time with medication; and 4) despite a low Global Assessment of Functioning ("GAF") score, Dr. Vitale–Herne's notes do not reflect a recommendation of more frequent visits. (R. 21–22.).

The ALJ relied on the opinions of two consultant physicians. On September 2, 2009, upon the request of the SSA, Dr. Herb Meadow examined Plaintiff. Dr. Meadow diagnosed Plaintiff with PTSD; however, he concluded that Plaintiff "would be able to perform all tasks necessary for vocational functioning." (R. 257.) Also, on September 17, 2009, after Plaintiff applied for benefits, his record was reviewed by Dr. R. Altmansberger, a State Agency psychologist, who concluded that Plaintiff was capable of functioning in a vocational setting and was not significantly limited in his day to day life.

**\*2** On October 22, 2012, Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council, making the ALJ's decision a final decision of the

Hidalgo v. Commr. of Social Security, Not Reported in F.Supp.3d (2014)
Case 7:15-cv-04704-KMK   Document 25   Filed 08/02/16   Page 36 of 108
2014 WL 2884018

Commissioner. Proceeding pro se, Plaintiff commenced this action for judicial review of the final decision on December 10, 2012. The Commissioner moved for judgment on the pleadings pursuant Federal Rule of Civil Procedure 12(c) on May 3, 2013. Plaintiff cross-moved for judgment on the pleadings and, in the alternative, requested remand to the Commissioner for further proceedings.

Judge Netburn issued the Report on August 19, 2013, recommending that the Court deny the Commissioner's motion, grant Plaintiff's motion, and remand the case to the ALJ for further development of the administrative record. Judge Netburn concluded that the ALJ erred as a matter of law in failing to apply the treating physician rule properly. Judge Netburn further concluded that this error led to inadequate development of the record because, while he found gaps in the record, the ALJ failed in his affirmative duty to further develop the record. For example, Judge Netburn pointed to the ALJ's finding that Dr. Vital–Herne's treatment notes apparently do not recommend more frequent visits despite Plaintiff's low GAF score. Judge Netburn also held that the ALJ erred because, to the extent he afforded Dr. Meadow's findings relatively greater weight than Dr. Vital–Herne's findings, he failed to state "good reasons" for so doing.

The Commissioner's objections focus principally on Judge Netburn's determination that remand to the Commissioner is warranted because the ALJ failed to develop the record and improperly relied on Dr. Meadow's and Dr. Altmansberger's reports. The Commissioner argues that the regulations permit the ALJ to give greater than limited weight to the report of consultative examiners, and that the record was fully developed. (Docket entry no. 24 at 2–4.) The Commissioner also argues that the ALJ's decision not to give the treating physician's opinion controlling weight was supported by substantial evidence because there were inconsistencies in the treating physician's statements. The Commissioner also argues that the ALJ was not required to seek clarification or additional information concerning those inconsistencies. Finally, the Commissioner argues that the Report errs insofar as it holds that the ALJ may afford "only limited weight [to the opinions of consultative examiners] because of their typically superficial exposure to the plaintiff." (Docket entry no. 24 at 5–6.)

## DISCUSSION

When reviewing a magistrate judge's report and recommendation, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C.S. § 636(b)(1)(C) (LexisNexis 2012). The district court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate judge's finding. *Id.; see also United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997). Courts may set aside a decision of the Commissioner if it is based on legal error, or if it is not supported by substantial evidence. *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998). On review of a negative determination by the Commissioner on an application for disability benefits, the district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing." 42 U.S.C.S. § 405(g) (LexisNexis 2012). The Commissioner's factual findings are conclusive if supported by substantial evidence. *Id.*

### The Treating Physician Rule

**\*3** The Commissioner objects to Judge Netburn's recommendation that the opinion of Plaintiff's treating physician Dr. Vital–Herne should have been given controlling weight. Specifically, the Commissioner argues (1) that Dr. Vital–Herne's treatment notes contained inconsistencies concerning whether Plaintiff showed improvement and was able to live alone, and (2) that the Report sets forth an incorrect standard when it recommends that it was legal error for the ALJ to give the consultative examiner's report more than limited weight.

The "treating physician rule" is a common law rule that was codified in slightly modified form as a series of regulations set forth by the Commissioner detailing the weight to be accorded a treating physician's opinion. *Schisler v. Sullivan,* 3 F.3d 563, 567 (2d Cir.1993). Specifically, the Commissioner's regulations provide that an applicant's treating source's opinion will receive controlling weight when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record ." 20 C.F.R. § 404.1527.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Although the treating-physician rule generally requires deference to the medical opinion of a plaintiff's treating physician, *Schisler,* 3 F.3d at 567–68, a treating physician's opinion need not be given controlling weight if it is inconsistent with other substantial evidence in the record, including the opinions of other medical experts. *Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir.2008). When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable ... report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not." *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999), *Zabala v. Astrue,* 595 F.3d 402, 409 (2d Cir.2010) (Commissioner's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to Snell).

Regardless of whether the ALJ based his decision to give controlling weight to the consultative physicians on substantial evidence, the ALJ failed to adequately analyze and explain the appropriate weight to give to Dr. Vital–Herne's opinion. The ALJ must consider the following factors in determining the weight to be given a treating physician's opinion: (1) "[l]ength of the treatment relationship and the frequency of examination;" (2) "[n]ature and extent of the treatment relationship;" (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the type of condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(c)(1)(6). The ALJ failed to conduct this analysis of the treating physician's opinion and remand is thus necessary.

### Affirmative Duty to Develop the Record

**\*4** When presented with inconsistencies between the treating physician's report and the reports of consulting physicians, the ALJ failed to develop the record in determining that Plaintiff's treating physician's opinion was inconsistent with substantial evidence in the record.

The Commissioner has a duty "to make every reasonable effort to obtain from the individual's treating physician (or other treating health care provided) all medical evidence including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence obtain from any source on a consultative

basis." 42 U.S.C. S. § 423(d)(5)(B) (LexisNexis 2012). The ALJ must contact medical sources and gather additional information if the ALJ believes that the record is inadequate to make a determination. When the ALJ has failed to develop the record adequately, the District Court must remand the case to the Commissioner for further development. *See, e.g., Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996).

"[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record" and, "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history...." *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999) (citations omitted); *accord Duncan v. Astrue,* 09 Civ. 4462 KAM, 2011 WL 1748549, at \* 21 (E.D.N.Y. May 6, 2011) (Where gaps in the record are present, "the ALJ must affirmatively seek out clarifying information from physicians whose opinions the ALJ discounts.") This duty to develop the record is particularly important where an applicant alleges he is suffering from a mental illnesses, due to the difficulty in determining "whether these individuals will be able to adapt to the demands or 'stress' of the workplace." *See Lacava v. Astrue,* 11 Civ. 7727, 2012 WL 6621731 (S.D.N.Y. Nov. 27, 2012) (noting an "enhanced obligation to obtain a broad view of the claimant's history and abilities" for mental health disorders) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E)), *report and recommendation adopted,* 11 Civ. 7727, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

Here, the administrative record contains insufficient information regarding the alleged inconsistencies between Dr. Vital–Herne's report and the treatment notes the ALJ relied upon to discredit Dr. Vital–Herne's report. For instance, while Dr. Vital–Herne's treatment notes contain no prescription for more frequent appointments. Dr. Vital–Herne's notes also do not include a statement that more frequent visits would or would not have aided Plaintiff's recovery. The Report also points to evidence contradicting the ALJ's finding of an inconsistency with respect to Dr. Vital–Herne's report in that Dr. Vital–Herne noted that Plaintiff had improved over-time with Medicine. The Report indicates that Dr. Vital–Herne's report contains information which indicates that the improvement could be associated with Plaintiff's modified behavior to limit social exposure which would be incompatible with many work environments; for instance,

although Dr. Vital–Herne noted on January 3, 2011, that Plaintiff felt "calm," he also indicated that Plaintiff had "stayed home from the holiday to prevent problems." (R. 277.) Without further information from Dr. Vital–Herne, it is unclear what effect, if any, the gaps in the record should have on the weight afforded his opinion. The failure to complete the record is more troubling because the ALJ specifically found that Plaintiff is suffering from mental illness, and his determination goes to whether he can function in work setting. *See Lacava v. Astrue,, 2012 WL 6621731, at 12.* The Court finds, therefore, that on remand the Commissioner has an affirmative duty to seek clarification to fill the alleged inconsistences in the record cited by seeking further information from Dr. Vital–Herne.

*The Weight Afforded to Dr. Meadow's Findings*

**\*5**  Finally, the Commissioner's objection to the Report's recommendation regarding Dr. Meadow's report is meritless because it is premised on a mis-characterization of the report. Although the Commissioner argues that the Report errs because it holds that the ALJ may only grant limited weight to a consulting physician, actually, the Report notes only that the ALJ erred to the extent he relied on Dr. Meadow's findings without explicitly stating reasons for the relative greater weight accorded Dr. Meadow's findings as opposed to Dr. Vital–Hernes' findings. (Report at 28 ("While it is within the ALJ's discretion to conclude that the weight of the evidence supported Dr. Meadow's findings and not Dr. Vital–Herne's, the ALJ must be explicit about the relative weight of the opinions. To the extent that the ALJ actually relied on Dr. Meadow's opinion to reach his determination without providing "good reasons" for doing so—which the final outcome suggests—this was legal error.") This finding is appropriate given the above determination that the ALJ failed to follow the proper six-factor analysis required under 20 C.F.R. § 404.1527(c)(1)(6) to determine the proper weight to grant Dr. Vital–Herne's findings, and given that a consulting physician is generally afforded more limited weight than a treating physician, *see Gonzalez v. Apfel,* 113 F.Supp.2d 580, 589 (S.D.N.Y.2000) (noting that a consulting physician's findings "deserve limited weight" due to a single examination of a plaintiff).

*CONCLUSION*

For the foregoing reasons, the Report is hereby adopted in its entirety. This case is remanded to the Social Security Administration pursuant to sentence six of 42 U.S.C. § 405(g), for further proceedings consistent with the Report and this Memorandum Opinion and Order. The Clerk of Court is respectfully requested to effectuate the remand, and to close this case in the District Court subject to reopening upon the completion of proceedings on remand.

This Memorandum Opinion and Order resolves docket entries numbers 17 and 19.

SO ORDERED.

### *REPORT AND RECOMMENDATION*

SARAH NETBURN, United States Magistrate Judge.

**TO THE HONORABLE LAURA TAYLOR SWAIN:**
Plaintiff Carlos M. Hidalgo brings this action pursuant to 42 U.S .C. § 405(g) and 42 U.S.C. § 1383(c), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance and Supplemental Security Insurance ("SSI") benefits. The Commissioner moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Plaintiff cross-moved for judgment on the pleadings and, in the alternative, requested remand to the Commissioner for further proceedings.

Because the Administrative Law Judge misapplied the treating physician rule when he denied the plaintiff's application for benefits, I recommend that the Commissioner's motion for judgment on the pleadings be DENIED. I further recommend that the plaintiff's motion to remand the case to the Commissioner for proper application of the treating physician rule and further development of the record be GRANTED.

### PROCEDURAL BACKGROUND

**\*6**  Carlos M. Hidalgo applied to the Social Security Administration ("SSA") for disability benefits on July 21, 2009, alleging disability from June 5, 2008. When the SSA denied initial review on September 18, 2009, Hidalgo requested a hearing before an Administrative Law Judge

("ALJ"). On January 27, 2011, Hidalgo, represented by an attorney, appeared before ALJ Selwyn Walters, who reviewed the application *de novo.* On July 1, 2011, the ALJ found that Hidalgo was not disabled within the meaning of the Act during the period under review. The Appeals Council denied Hidalgo's request for further review on October 22, 2012, making the ALJ decision final and reviewable by this Court under 42 U.S.C. § 405(g) and § 1383(c)(3).

Proceeding *pro se,* Hidalgo filed a timely complaint in this Court on December 10, 2012. The case was referred to my docket for a report and recommendation on January 14, 2013. Counsel appeared on March 25, 2013. On May 3, 2013, the Government filed a motion for judgment on the pleadings. On June 6, 2013, plaintiff filed an opposition and cross-motion for judgment on the pleadings.

## FACTUAL BACKGROUND

### I. Non–Medical and Testimonial Evidence

Hidalgo, who was born in 1961 in the Dominican Republic, was 48 years old on the date of the hearing. He alleges that he suffers from depression, anxiety, and auditory hallucinations associated with post-traumatic stress disorder ("PTSD"). His allegations of depression extend back to 2008, but he was diagnosed with post-traumatic stress syndrome ("PTSD") in 2009. The condition stems from an incident on January 30, 2009 when, Hidalgo testified, he was arrested by the police, struggled, and injured his face when he fell to the ground and landed on a broken bottle. Hidalgo was taken to the emergency room at Jacobi Medical Center until the bleeding stopped. CT scans taken the next day showed pre-orbital soft tissue swelling on the left, with metallic densities within the soft tissue swelling. He was seen by a plastic surgeon and received five sutures.

The psychological trauma from this event eclipsed Hidalgo's physical injuries and prior reports of depression. Hidalgo feels nervous and unable to walk in the streets for fear of the police. He often hears calling or knocking at his door and is afraid to go outside. He has frequent crying spells that last for twenty or thirty minutes a day, seven or eight days a month. He has nightmares that keep him up at night; he frequently feels lonely. In addition, Hidalgo experiences panic attacks and depression several

times a week that last for several hours. These symptoms have increased since the arrest.

Hidalgo lives alone. He prepares simple meals for himself: rice, chicken, and sandwiches. When he is not too depressed, he is able to do laundry, cleaning, and basic errands. He generally maintains his hygiene and medical reports consistently describe him as well-groomed. He can pay his bills when he has enough money, but several family members help him with rent and basic needs. Hidalgo watches about two to three hours of television each day. He does not go to social functions, and he attends church once a week for an hour-long service. He has a close relationship with his mother and siblings.

**\*7** Hidalgo completed seventh grade and has moderate abilities in reading and writing in Spanish. He has only limited English reading and writing abilities that enable him to carry out basic tasks such as paying his bills. From 1984 until 2008, Hidalgo worked in housekeeping for various companies. This work included cleaning floors, tables, windows, rugs, and collecting garbage. In these jobs, he was required to walk and stand for three hours at a time, sit for one hour, lift up to 50 pounds, and frequently lift 25 pounds. Hidalgo last worked in June 2008, when he was terminated. After this, his depression worsened, and he found he could not concentrate enough to work.

### II. Medical History

Hidalgo's medical records begin after he was admitted to the hospital in January 2009. The records show he had a follow-up visit at Jacobi Medical Center on February 12, 2009, when he complained of blurry vision and consulted with an ophthalmologist. The ophthalmologist diagnosed post-trauma to the left side of the face and good visual acuity.

Hidalgo has seen a psychiatrist consistently since early 2009. He has been prescribed numerous medications, including Pristiq (depression), Trazadone (depression), Lexapro (anxiety and major depressive disorder), Zyprexa (manic depression), Wellbutrin (depression), Amandatine (neurological disorders), Prozac (depression), and Klonopine (sleep and panic disorders).

#### A. Treating Physician Records

Hidalgo began treatment with Dr. Marc Vital–Herne, a psychiatrist, on April 16, 2009. Hidalgo reported that he

felt nervous, preoccupied, and apprehensive, and that he had trouble sleeping at night and experienced nightmares. He said all this began after he was arrested and beaten by the police in January 2009. He had no history of suicide attempts and no history of psychiatric evaluations.

Over the next year and a half, Dr. Vital–Herne met with Hidalgo approximately every one to two months. The sessions reveal continuous, though fluctuating, anxiety, nightmares, and auditory hallucinations, and a slight upward trend in his condition overall. A brief summary of the meetings follows.

On May 7, 2009, Dr. Vital Herne met with Hidalgo for supportive therapy and prescribed him medication and monthly treatment. On July 6, 2009, Hidalgo indicated that one medication, Pristiq, did not sufficiently control his symptoms—he still felt anxious and depressed—so Dr. Vital–Herne decreased the Pristiq dosage and prescribed Lexapro, Trazadone, and Zyprexa. On August 10, 2009, Dr. Vital–Herne extended the prescription of these medications because Hidalgo complained of continued nightmares and hearing voices. On September 10, 2009, Hidalgo reported to Dr. Vital–Herne that he stopped taking Lexapro because it caused blurry vision and because he had continued to hear voices and knocking at his door. Dr. Vitale–Herne decreased the dosage of Lexapro and prescribed Wellbutrin, Trazadone, and Zyprexa. On October 8, 2009, Hidalgo reported feeling "slightly better," but that the voices, knocking, and nightmares continued. (R. 282.) Dr. Vital–Herne provided therapy and continued the medications. On November 7, 2009, Hidalgo again reported feeling "slightly better," "less depressed," and that he was hearing voices less frequently; however, he reported feeling very sleepy in the morning. (Id.) On December 7, 2009, Hidalgo said that he had been feeling "very nervous" and depressed; he was about to lose his apartment due to back rent. (R. 281.) He admitted to drinking when he felt overwhelmed. He again was hearing voices and knocking at his door. Dr. Vital–Herne prescribed Wellbutrin, Zyprexa, Amandatine, Klonopin, and also added a trial of Prozac.

**\*8** When Dr. Vital–Herne saw Hidalgo on January 20, 2010, he had recently been in a hit and run accident and was on crutches. Hidalgo reported that he was feeling traumatized from the accident and was having nightmares; he felt "depressed" and "emotional" when he "th[ought] about the things that happen to him." (R.

281.) His level of anxiety, however, had gone down. Dr. Vital–Herne prescribed Klonopin. On February 17, 2010, Hidalgo reported feeling better and that he was hearing voices less frequently, but that his nightmares had continued. On March 17, 2010, Hidalgo reported that the voices had continued, and that he had been experiencing flashbacks when he saw policeman and cars. Dr. Vital–Herne described his mood as "down" and noted that Hidalgo described himself as "depressed." (R. 280.)

On April 29, 2010, Dr. Vitale–Hern noted that some of Hidalgo's anxiety had lessened but that the nightmares and voices had continued. On May 27, 2010, Dr. Vital–Herne noted that the anxiety had returned, and the auditory hallucinations had continued. In addition, Hidalgo had resorted to drinking heavily on a daily basis to control his nerves. On July 12, 2010, Hidalgo reported that he had started to feel better; he did complain of recent auditory hallucinations but denied any suicidal thoughts. Dr. Vital–Herne noted that his "affect" was "appropriate." Hidalgo reported that he still felt "worried." (R. 278.)

On August 9, 2010, Hidalgo reported feeling "somewhat better," though they spent a lot of time discussing his alcohol consumption. (Id.) On October 25, 2010, Hidalgo reported that he had been "doing better in the sense that he doesn't drink every day," and instead was drinking five to six beers a month. (Id.) The nightmares had continued, as well as his hallucinations of knocking at his door.

On January 3, 2011, the last appointment in the record, Dr. Vital–Herne met with Hidalgo who reported that he felt "calm." (R. 277.) His nightmares had lessened; he had only had one bad dream in the past week.

**B. Mental Impairment Questionnaire**
On January 13, 2011, Dr. Vital–Herne completed a "Mental Impairment Questionnaire," which detailed Hidalgo's impairment and functioning. He diagnosed Hidalgo with PTSD and assessed his Global Assessment Functioning score at 45, noting that his highest score that year was 35. [1] His clinical findings included that Hidalgo was "depressed and [had an] anxious mood, fear, paranoia, apprehension, frequent nightmares, [and] auditory hallucinations." (R. 286.) His prognosis was "poor."

The questionnaire provided Dr. Vital–Herne with an extensive check list of symptoms. He was asked to identify those experienced by Hidalgo. Dr. Vital–Herne indicated that Hidalgo suffers from: generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience; persistent disturbances of mood or affect; change in personality; apprehensive expectation; paranoid thinking or inappropriate suspiciousness; substance dependence; emotional withdrawal or isolation; perceptual or thinking disturbances; hallucinations or delusions; emotional lability; vigilance and scanning; pathologically inappropriate suspiciousness or hostility; sleep disturbance; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; and persistent irrational fear of a specific object, activity, or situation that results in a compelling desire to avoid the dreaded object, activity or situation.

**\*9** When asked to comment on Hidalgo's mental abilities and aptitude in connection with unskilled work, Dr. Vital–Herne concluded that Hidalgo had "limited but satisfactory" abilities to understand and remember very short and simple instructions, to carry out short and simple instructions, and to ask simple questions or request assistance. He noted that Hidalgo was "seriously limited, but not precluded" from: making simple, work-related decisions; accepting instructions and responding appropriately to criticism; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; understanding and remembering detailed instructions; and carrying out detailed instructions.

Dr. Vital–Herne indicated, however, that Hidalgo was "unable to meet competitive standards" in the following areas: remembering work-like procedures; maintaining attention for a two-hour segment; maintaining regular attendance and being punctual within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; completing a normal workday and workweek without interruptions from psychologically-based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; dealing with normal

work stress; setting realistic goals or making plans independently of others; and dealing with stress of semiskilled and unskilled work. He concluded that Hidalgo had "no useful ability to function" when faced with normal hazards and would not take appropriate precautions.

Explaining these findings, Dr. Vital–Herne wrote that Hidalgo has a "mood disorder and labile affect. His perception is impaired due to auditory hallucinations and paranoid ideas. These among other symptoms plus the side-effects of medications make it very difficult for Pt. to function in the work setting." (R. 289.)

Regarding Hidalgo's mental abilities and aptitude needed to do particular types of jobs, Dr. Vital–Herne indicated that Hidalgo has "limited but satisfactory" abilities to travel to unfamiliar places and use public transportation. He noted that Hidalgo has "seriously limited, but not precluded," abilities to interact appropriately with general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness.

When assessing Hidalgo's functional limitation, Dr. Vital–Herne noted that Hidalgo had "moderate" restriction of activities of daily living, "marked" difficulties in maintaining social function and concentration, persistence, or pace," and that he experienced "one or two" episodes of decompensation within a 12–month period that are at least two weeks' duration. He further predicted that Hidalgo's impairments would cause him to be absent from work more than four days per month. He indicated that Hidalgo's impairment can be expected to last at least 12 months; that he is "constantly anxious and psychotic," (R. 291), and that his symptoms have caused him to abuse alcohol more than before.

**D. SSA Psychiatric Evaluation**
**\*10** On September 2, 2009, upon the request of the SSA, Dr. Herb Meadow of Industrial Medicine Associates, P.C. in the Bronx examined Hidalgo. Dr. Meadow diagnosed Hidalgo with PTSD. He found Hidalgo to be "cooperative," dressed appropriately, and well-groomed. (R. 256.) He indicated that Hidalgo's thought processes were "coherent and goal directed," and there was "no evidence of hallucinations, delusions, or paranoia." (*Id.*) Dr. Meadow found Hidalgo's memory to be "intact," as well as his attention and cooperation. He found his

cognitive functioning to be "low average," and his insight and judgment to be "fair to poor." (R. 256–57.)

Dr. Meadow concluded that Hidalgo "would be able to perform all tasks necessary for vocational functioning." (R. 257.) He added, "the results of the examination appear to be consistent with psychiatric and possible cognitive problems, but in itself does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (*Id.*) He concluded that Hidalgo's prognosis was "fair." (*Id.*) Dr. Meadow's form included the statement, "No doctor-patient relationship exists or is implied by this examination." (R. 258.)

**E. State Agency Psychologist Review**

On September 17, 2009, after Hidalgo applied for Title II and Title XVI benefits, his record was reviewed by Dr. R. Altmansberger, a State Agency psychologist. Dr. Altmansberger concluded that Hidalgo suffered from an anxiety-related disorder, but one that "does not precisely satisfy the diagnostic criteria" required by the SSA. When assessing Hidalgo's functional limitations, he found that Hidalgo had "mild" restrictions in activities of daily living, "moderate" difficulties in maintaining social functioning, and "moderate" difficulties maintaining concentration, persistence, or pace. Dr. Altmansberger found that Hidalgo "never" experienced repeated episodes of deterioration of extended duration.

When assessing his mental residual functional capacity, Dr. Altmansberger noted that Hidalgo was "not significantly limited" in his understanding and memory or in his ability to maintain concentration and persistence. He further found that Hidalgo was "moderately limited" in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; in his ability to work in coordination or proximity to others without being distracted by them; and in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.

When evaluating Hidalgo's social interaction skills, he described Hidalgo as "moderately limited" in his ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors; and "not significantly limited" in his ability to ask simple questions or request assistance, get along with coworkers or peers without distracting them, or maintain socially appropriate behavior.

**\*11** Regarding Hidalgo's adaptation abilities, Dr. Altmansberger described him as "moderately limited" in his ability to respond appropriately to changes in the work setting and set realistic goals or make plans independently of others. But he described him as "not significantly limited" in his ability to be aware of normal hazards, take appropriate precautions, and travel in unfamiliar places. Dr. Altmansberger noted that Hidalgo "denied depression," appeared to be independent in daily living and household chores, "capable of all tasks necessary for vocational functioning," and has friends. (R. 275.) He further commented that "his condition does not significantly interfere with his ability to function on a daily basis." (*Id.*)

**DISCUSSION**

**I. Standard of Review**

A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." *Fed.R.Civ.P. 12(c).* A *Rule 12(c)* motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Dargahi v. Honda Lease Trust,* 370 F. App'x 172, 174 (2d Cir.2010). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." *42 U.S.C. § 405(g).*

A determination of the ALJ must be supported by substantial evidence. *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala,* 59 F.3d 307, 312 (2d Cir.1995). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan,* 904 F.2d 122, 126 (2d

Cir.1990). This means that if there is sufficient evidence to support the final decision, a district court must grant judgment in favor of the Commissioner.

If the Court finds that the ALJ decision is not supported by substantial evidence, there are gaps in the administrative record, or the ALJ has applied the improper legal standard, the court should remand the case for further development of the evidence. *See, e.g*., *Rosa,* 168 F.3d at 82–83 (citations omitted). If the record provides "persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the court may reverse and remand solely for the calculation and payment of benefits. *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980); *Rosa,* 168 F.3d at 83.

## II. Definition of Disability

A claimant is disabled under the Social Security Act if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2) (A). The disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d) (3).

**\*12** Under the Act, the Social Security Administration has established a five-step sequential evaluation process when making disability determinations. See 20 C.F.R. §§ 404.1520, 416.920. The steps are followed in order; if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals for the Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do

basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart,* 341 F.3d 182, 183–84 (2d Cir.2003) (citation omitted). A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the final step. *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998). Thus, in order to support a finding that the claimant is not disabled at the fifth step, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform, given the claimant's residual functional capacity, age, education and past relevant work experience. 20 C.F.R. §§ 404.1512(f), 404.1560(c), 416.912(f), 416.960(c).

The Code of Federal Regulations provides additional guidance for evaluations of mental impairments. Calling it a "complex and highly individualized process," 20 C.F.R. § 404.1520a(c)(1), the section focuses the ALJ's inquiry on determining how the impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis," 20 C.F.R. § 404.1520a(c)(2). The main areas that are assessed are: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. The first three are rated on a "five-point scale:" none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The last area, episodes of decompensation, is rated on a "four-point scale:" none, one or two, three, and four or more. *Id.* If an impairment is given the rating of "severe," then the ALJ is instructed to determine whether the impairment qualifies as a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2).

**\*13** A mental disorder will qualify as a "listed impairment" if it is "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. To reach the required severity requirement, the individual must (A) show signs of depressive, manic, or bipolar syndrome, and *either* (B) experience "marked restriction" in two of the following: (i) activities of daily living; (ii) maintaining social functioning; (iii) maintaining concentration, persistence, or pace; or (iv) repeated episodes of decompensation (the so-called "B Criteria"); *or* (C) "have a medically documented history of chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support" (the so-called "C Criteria"). *Id.*

An anxiety-related disorder will qualify as a "listed impairment" if it is "the predominant disturbance or ... the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders." 20 C .F.R. Pt. 404, Subpt. P, App. 1 § 12.06. To reach the required severity level, the individual must have: generalized persistent anxiety; a persistent irrational fear of a specific object, activity, or situation that results in a compelling desire to avoid it; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom; recurrent obsessions or compulsions which a source of marked distress; or recurrent and intrusive recollections of a traumatic experience. These symptoms must either (A) result in "marked restriction" in two of the following: (i) activities of daily living; (ii) maintaining social functioning; (iii) maintaining concentration, persistence, or pace; or (iv) repeated episodes of decompensation; or (B) result in complete inability to function independently outside the area of one's home. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06.

### III. The ALJ's Determination
To assess Hidalgo's claim of disability, the ALJ followed the five-step analysis required by the Code of Federal Regulations. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).

Beginning with step one, the ALJ found that Hidalgo had not engaged in substantial gainful activity during the relevant period.

At step two, the ALJ concluded that Hidalgo had a severe impairment within the meaning of the Act arising from his PTSD and alcohol abuse. He noted the trauma to Hidalgo's face, but determined that this did not significantly limit his ability to perform basic work activities.

At step three of the analysis, the ALJ determined that the impairment did not met or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. When examining the requirements of the "B Criteria," for mental disorders (see 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04), the ALJ concluded that Hidalgo had only moderate restrictions in his activities of daily living and social functioning and his concentration, persistence, and pace. He found that Hidalgo had experienced no episodes of decompensation. The ALJ found that Hidalgo also did not satisfy any of the "C Criteria." The ALJ also concluded that Hidalgo did not present the requirements of 20 C .F.R. Pt. 404, Subpt. P, App. 1 § 12.06, which describes anxiety related disorders, but he did not explain this finding.

**\*14** Before continuing to step four of the analysis, the ALJ assessed Hidalgo's residual functional capacity ("RFC"), which evaluates the applicant's exertional limitations. The ALJ determined that Hidalgo had no exertional limitations and remained capable of performing a full range of work with several nonexertional limitations: "simple, routine, repetitive tasks in a work environment free of fast-paced production requirements involving only simple work-related decisions with few, if any, workplace changes. The work is isolated with only occasional supervision, occasional interaction with coworkers, and no public contact." (R. 18.)

In reaching this conclusion, the ALJ claimed to have considered all symptoms, "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," and opinion evidence, as required by 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96–2p, 96–6p, and 06–3p. (R. 18.) Then the ALJ outlined a twostep process. First, the ALJ considered whether there was an underlying medically determinable impairment that could have produced the

claimant's symptoms. Second, the ALJ evaluated the intensity, persistence, and limiting effects of the symptoms to determine how they limited the claimant's functioning. The ALJ explained that, whenever a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on the entire case record.

The ALJ acknowledged the extensive treating notes from Dr. Vitale–Hern that reported Hidalgo's anxiety, depression, nightmares, and auditory hallucinations, and Dr. Vital–Herne's assessment that Hidalgo was unable to meet the competitive standards of work-related activities. But he perceived a disparity between the information contained in Dr. Vital–Herne's treating notes and the assessment of his residual functional capacity. While he believed that Hidalgo experienced the symptoms described, he did not believe that they were debilitating to the extent alleged. The ALJ paid particular attention to the fact that his symptoms seemed to improve with medication, that he maintains relationships with family members, and that he is able to go out of the house and attend social functions, albeit on a very limited basis.

The ALJ noted that, by contrast, Dr. Meadow, the consultative physician, opined that Hidalgo would be able to perform all tasks necessary for vocational functioning. He also noted that Dr. Altmansberger, the State Agency analyst, considered Hidalgo to be suffering from only mild restrictions and limitations in his daily activities, social functioning, and work-related activities. Given "the record as a whole," the ALJ chose not to give Dr. Vital–Herne's report "controlling weight." (R. 22.)

At step four of the analysis, the ALJ assessed whether Hidalgo's RFC allowed him to perform the requirements of his past relevant work. The ALJ, relying on the opinion of the vocational expert, Raymond Cestar, determined that Hidalgo could not perform his past relevant work as a house cleaner, because his "mental capacity is too diminished to permit [him] to return to his past impairment." (R. 22.)

**\*15** At step five of the analysis, the ALJ considered Hidalgo's age, linguistic abilities, work experience, and residual functional capacity, and referred to the Medical–Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2. The ALJ found that Hidalgo was considered a younger

individual, between the ages of 18 and 49, on the alleged disability onset date, according to 20 C.F.R. § 404.1563. He also considered Hidalgo to be illiterate in English, according to 20 C.F.R. §§ 404.1564, 416.964. To assess Hidalgo's ability to engage in the national economy, the ALJ relied on the opinion of Mr. Cestar, who concluded that Hidalgo was capable of working as a mid-level kitchen helper, packager, or cook helper.

After weighing these factors with the testimony of the vocational expert, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Hidalgo could perform. The ALJ concluded that Hidalgo work as a kitchen helper, a packager, and a cook helper.

Referencing section 204.00 of the Medical–Vocational Guidelines, the ALJ found Hidalgo "not disabled" as defined in the Social Security Act.

On appeal to this Court, Hidalgo challenges the ALJ's disregard for the treating physician's opinion, the ALJ's assessment of his residual functional capacity and, by extension, the ALJ's conclusion that there are jobs in significant numbers in the national economy that Hidalgo could perform.

## IV. Statement of Law

### A. The Treating Physician Rule
The "treating physician rule" instructs the ALJ to give controlling weight to the opinions of a claimant's treating physician, as long as the opinion is well-supported by medical findings and is not inconsistent with the other evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c). While the decision on the ultimate issue of disability is one reserved for the Commissioner, 20 C.F.R. § 404.1527(d)(2); *Snell v. Apfel,* 177 F .3d 128, 133 (2d Cir.1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."), the ALJ cannot substitute his own expertise or view of the medical proof for the treating physician's opinion, *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000).

Even when a treating physician's opinion is not given controlling weight, it is still entitled to "significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources." *Santiago v. Barnhart,* 441 F.Supp.2d 620,

627 (S.D.N.Y.2006) (citations omitted). To determine its precise value, the regulations instruct the ALJ to evaluate the following six factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. 20 C.F.R. § 404.1527(c)(2)-(6). This process must be transparent: the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 404.1527(c) (2). Indeed, where an ALJ does not credit the findings of a treating physician, the claimant is entitled to an explanation of that decision. *Snell,* 177 F.3d at 134; *Shaw,* 221 F.3d at 134 ("The regulations ... require the ALJ to set forth her reasons for the weight she assigns to the treating physician's opinion."). In this Circuit, the requirements of the rule are rigorously applied; they are not simply a "bureaucratic box to check." *Ellington v. Astrue,* 641 F.Supp.2d 322 (S.D.N.Y.2009) As the Court of Appeals has explained:

> **\*16** The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even-and perhaps especially-when those dispositions are unfavorable. A claimant ... who knows that her physician has deemed her disabled, might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.

*Snell,* 177 F.3d at 134 (*citing* Jerry L. Mashaw, *Due Process in the Administrative State,* 175–76 (1985)).

## B. The Duty to Develop the Record

Inextricably linked to the treating physician rule is the ALJ's duty to develop the administrative record. Before a district court can evaluate the ALJ's conclusions, the court must ensure that the claimant received a full hearing. *Echevarria v. Sec'y of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir.1982) (citing *Gold v. Secretary of HEW,* 463 F.2d 38, 43 (2d Cir.1972) (holding that an ALJ

must ensure that the claimant had a "full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act")). Due to the "non-adversarial nature" of social security proceedings, a full hearing requires the ALJ to "affirmatively develop the record" to reflect the claimant's medical history for at least a twelvemonth period. 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 404.1512(d); *Echevarria,* 685 F.2d at 755. The ALJ must contact medical sources and gather any additional information if the ALJ believes that the record is inadequate to make a determination, and is authorized by the Act to "issue subpoenas requiring the attendance and testimony of witnesses and the production of any evidence that relates to any matter under investigation." 42 U.S.C. § 405(d). The Court of Appeals considers this statutory authorization to impose an affirmative duty on the ALJ to develop the record, whether or not the claimant is represented by counsel. *Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir.1999).

The ALJ's duty to develop the record is enhanced when the disability in question is a psychiatric impairment. The Regulations articulate that claims concerning mental disorders require a robust examination that is sensitive to the dynamism of mental illnesses and the coping mechanisms that claimants develop to manage them:

> Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. For instance, if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case, you may be much more impaired for work than your symptoms and signs would indicate. The results of a single examination may not adequately describe your sustained ability to function. It is, therefore, vital that we review all pertinent information relative to

your condition, especially at times of
increased stress.

**\*17**  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E).
Similarly, Social Security Ruling 85–15 directs the
Commissioner to consider that "determining whether
these individuals will be able to adapt to the demands
or 'stress' of the workplace is often extremely difficult."
The Ruling explains that this difficulty arises because
individuals with mental illnesses "adopt a highly restricted
and/or inflexible lifestyle within which they appear to
function well." SSR 85–15. The Rulings point out that,
when claimants are in structured settings, they are able to
function adequately "by lowering psychological pressures,
by medication, and by support from services." *Id.*

The duty to develop the administrative record includes
the specific obligation to seek clarifying information from
the treating physician. If a physician's report is believed
to be insufficiently explained, lacking in support, or
inconsistent with the physician's other reports, the ALJ
must "affirmatively seek out clarifying information from
the doctor" before discrediting the opinion. *Duncan v.
Astrue,* 09 Civ. 4462(KAM), 2011 WL 1748549, at \*
19 (E.D.N.Y. May 6, 2011); *see also Rosa,* 168 F.3d
at 79–80 (determining that ALJ committed legal error
by failing to request supplemental information from
treating physicians to explain gaps in the record); *Clark v.
Comm'r of Social Security,* 143 F.3d 115, 118 (2d Cir.1998)
(remanding because ALJ appeared to violate duty to
develop record by not seeking clarifying information
from treating physician to explain inconsistencies in his
two reports and instead relying on the inconsistencies to
deny benefits); *Malarkey v. Astrue,* 08 Civ. 9049(JCF),
2009 WL 3398718, at \*12–13 (S.D.N.Y. Oct. 20,
2009) (remanding case where ALJ did not attempt to
obtain clarification from treating physician regarding the
perceived inconsistencies in the treating notes).

When the ALJ fails to develop the record adequately,
the district court must remand to the Commissioner for
further development. *See, e.g., Kercado ex rel. J.T. v.
Astrue,* 08 Civ. 478(GWG), 2008 WL 5093381 (S.D.N.Y.
Dec. 3, 2008) (citing cases).

## V. Analysis of the ALJ's Decision
The key to the ALJ's denial of Hidalgo's benefits
application was his decision that the opinion of Dr. Vital–
Herne, the treating physician, should "not [be] given

controlling weight." (R. 22.) As a result, he formulated
his own opinion at two steps in the analysis: at step three,
the ALJ determined that Hidalgo did not meet the listing
requirements for an affective disorder, even though Dr.
Vital–Herne's evaluation indicated that he met the "B
Criteria;" at step four, the ALJ determined that Hidalgo
had the residual functional capacity to perform a full
range of work with certain nonexertional limitations, even
though Dr. Vital–Herne had determined that Hidalgo
would have difficulty functioning in a work setting, was
unable to meet the competitive standard of work-related
activities, and would likely miss "more than 4 days of work
per month." (R. 289–91.) The central issue before this
Court, therefore, is whether the ALJ followed the correct
procedure before finding that Dr. Vital–Herne's opinion
was not controlling.

**\*18**  The Court finds that the ALJ's reasoning suffers
from a number of legal errors that justify remand for
further development of the record and correct application
of the treating physician rule. This position is based on
four related observations: (1) the ALJ's decision that the
treating physician's opinion was not entitled to controlling
weight was not supported by substantial evidence; (2)
after determining that the treating physician's opinion
was inconsistent with the treating records, the ALJ failed
to fulfill his affirmative duty to develop the record; (3)
once he decided that Dr. Vital–Herne's opinion was not
controlling, the ALJ did not properly apply the six-factor
test required by the regulations to explain how he would
weigh the evidence in the record; and (4) in the absence of
clear explanation, the record suggests that the ALJ gave
the opinion of the consultative physician more weight than
is authorized by the regulations.

### A. Substantial Evidence
The ALJ cited four inconsistencies in the record that, in
his view, provided evidence that the opinion of Dr. Vital–
Herne was not entitled to controlling weight. These were
that (1) despite Dr. Vital–Herne's reference to Hidalgo's
inability to function outside a highly supportive living
arrangement, Hidalgo continues to live alone; (2) Hidalgo
indicated at his hearing and at the consultative evaluation
that he socializes sometimes; (3) the clinical notes refer to
some improvement over time; and (4) despite a low GAF
score, Dr. Vital–Herne did not appear to recommend
more frequent visits.

Hidalgo v. Colvin, Not Reported in F.Supp.3d (2014)
2014 WL 2884018
Case 7:15-cv-04704-KMK   Document 25   Filed 08/02/16   Page 48 of 108

The Court disagrees with the ALJ that Dr. Vital–Herne's conclusions regarding Hidalgo's disability were not supported by evidence in the record. *See Santiago,* 441 F.Supp.2d at 628 (the treating physician rule instructs the ALJ to focus on whether the treating physician's opinion was consistent with "substantial evidence" in the record). The ALJ suggested that the fact that Hidalgo lives alone undercuts a finding a disability. But the record and the testimony show that he does so only with difficulty and with support. Hidalgo's nephew helps him pay his rent, and Hidalgo testified that he does "not always" have the mental capacity to clean his home. (R. 38: "There is sometimes [*sic* ] when I say I'm going to clean my home but then I get sort of like a down, the depression, and I don't do it."). He can do errands only when he is "not in a ... depressive state," (R. 40), and he grooms himself only after taking his medication, (R. 39: "Since I am depressed I take the medications and I wait until it comes down a little and then I bathe.").

The ALJ's determination was also based on his observation that Hidalgo "does socialize at times." (R. 22.) But at the hearing, Hidalgo indicated that he "quit" attending social functions, (R. 33), and that he does not go to "barbecues, fiestas, parties, dinners," (R. 33). He testified that he does not have any hobbies and that he is often afraid to go outside. He visits with family and friends and relatives once or twice a week "when [he doesn't] have the depression," but that, when he sees them, he talks "about [his] situation, [his] illness." (R. 34). It appears that Hidalgo's only regular activity is going to church once a week.

**\*19** Further, the ALJ's reference to Hidalgo's improvement over time with medication, (R. 21), must be balanced with other treatment notes that demonstrate continued difficulties and accommodations taken to balance his symptoms. For example, the final entry from January 3, 2011, opens with the report that Hidalgo felt "calm." (R. 277.) But Dr. Vital–Herne went on to note that Hidalgo had "stayed home for the holiday to prevent problems." (*Id.*) This information is especially pertinent in light of the principle reflected in the listings: people who have chronic affective disorders often structure their lives in such a way as to minimize stress and reduce symptoms. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E) (individuals who structure their lives in such a way "may be much more impaired for work than [their] symptoms and signs would indicate").

On the whole, the Court is not convinced that the treating physician's opinion was inconsistent with substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Clark,* 143 F.3d at 118. The alleged inconsistencies cited by the ALJ reflect habits of a person who manages his life in a way that reduces sources of stress and anxiety. Accordingly, the Court cannot affirm the ALJ's decision to disregard the treating physician's opinion. *Wagner v. Sec'y of Health & Human Servs.,* 906 F.2d 856, 862 (2d Cir.1990) ("[C]ircumstantial critique by nonphysicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome a medical opinion.").

## B. The Duty to Develop the Record
Even if the Court agreed that the treating physician's opinion was out of sync with the treating notes, the ALJ "did not have the luxury of terminating his inquiry" at that stage in the analysis. *Morillo v. Apfel,* 150 F.Supp.2d 540, 546 (S.D.N.Y.2001). Instead, each time the ALJ perceived an inconsistency, he had an affirmative duty to "seek clarification and additional information ... to fill any clear gaps before dismissing the doctor's opinion." *Calzada v. Astrue,* 753 F.Supp.2d 250, 269 (S.D.N.Y .2010); *see also Cleveland v. Apfel,* 99 F.Supp.2d 374, 380 (S.D .N.Y.2000) ("When the opinion submitted by a treating physician is not adequately supported by clinical finding, the ALJ must attempt, *sua sponte,* to develop the record further by contacting the treating physician to determine whether the required information is available.").

Here, the ALJ *relied* on the gaps in the record to support his decision to disregard Dr. Vital–Herne's finding of disability. For example, the ALJ effectively faulted Hidalgo when he observed that Dr. Vital–Herne's GAF score was not coupled with a recommendation for more frequent visits. Such gaps reflect deficiencies in the record, not necessarily lack of credibility on the part of the plaintiff or his treating physician. *See, e.g., Calzada,* 753 F.Supp.2d at 275 (the fact that the record did not include information regarding plaintiff's depression to match plaintiff's several prescriptions for anti-depressants, suggests that the absence of any supporting evidence is attributable to "deficiencies in the administrative record rather than fabrication by plaintiff"); *Tornatore v. Barnhart,* 05 Civ. 6858(GEL), 2006 WL 3714649, at \*3 (S.D.N.Y. Dec. 12, 2006) ("The absence of an opinion about specific functions

or limitations is a gap to be filled, not a reason to discredit or disregard [the treating physician's] opinion."). Yet there is no evidence that the ALJ attempted to contact Dr. Vital–Herne to clarify these inconsistencies. Compare *Cruz v. Astrue,* 12 Civ. 953(GWG), 2013 WL 1749364, at *10 (S.D.N.Y. Apr. 24, 2013) (after the ALJ found inconsistencies in the record, he fulfilled his duty to develop the record by contacting the treating physician twice, even though the physician responded with insufficient information).

**\*20** The ALJ committed legal error by failing to contact the treating physician after finding inconsistencies in the record, as was his duty. Accordingly, the case should be remanded for further development of the record.

### C. The Six Factor Test

Moreover, even accepting, *arguendo,* that Dr. Vital–Herne's treatment opinion did not deserve controlling weight, the ALJ was still required to explain what weight he gave to the treating physician and provide "good reasons" for his calculation. *Halloran,* 362 F.3d at 33. The regulations instruct that "good reasons" include application the six factors specified above to determine the degree of weight the treating physician's opinion receives. 20 C.F.R. § 404.1527(c)(2)-(6); *Schall,* 134 F.3d at 505; *see also Ferraris v. Heckler,* 728 F.2d 582 (2d Cir.1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or Secretary, ... but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.") (citations omitted).

Once the ALJ determined that Dr. Vital–Herne's Mental Impairment Questionnaire was not controlling, he simply stated that, "considering the inconsistencies between Dr. Vital–Herne's report and the clinical notes, the report is not given controlling weight." (R. 22.) The ALJ did not specify what weight he attributed to Dr. Vital–Herne's opinion in relation to the other evidence, and he referenced only one of the six factors, the fourth one that refers to the internal consistency of the record. *See* 20 C.F.R. § 416.927(c). In his summary of the Dr. Vital–Herne's treating notes, the ALJ does not mention the length of the treatment relationship between the physicians and Hidalgo, the nature and extent of the treatment relationship, the evidence in the record that supports Dr. Vital–Herne's opinion, or whether Dr. Vital–Herne

specializes in treatment of PTSD and depression. This is inadequate.

The ALJ's explanation of his reasoning did "not comprehensively set forth reasons for the weight assigned to a treating physician's opinion" and did not conform to the requirements of 20 C.F.R. § 404 .1527(c)(2)-(6). *Halloran,* 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); *Lopez v. Barnhart,* 05 Civ. 10635(JSR), 2008 WL 1859563, at *13 (S.D.N.Y.2008) (remanding because it was "far from clear from the record what weight should have been assigned to [the treating physician's] opinion or what the disability determination would have been had the correct legal standards been applied"). Because the ALJ's decision was based on legal error, remand is appropriate.

### D. Use of the Consultative Physician's Opinion

**\*21** As a final point, the ALJ's sparse explanation includes reference to the opinion of Dr. Meadow. The ALJ commented that, in place of the treating physician's opinion, he had looked at "the overall evidence, including the treating notes and the findings of the consultative psychiatrist." (R. 22.) The Court assumes the ALJ refers to Dr. Meadow, the consulting physician who provided favorable reports regarding Hidalgo's appearance and cognitive abilities, and social behavior, and found he had the ability to perform "all tasks necessary for vocational functioning." (R. 257 .)

The Regulations are clear that consulting physicians' opinions are entitled only to limited weight because of their typically superficial exposure to the plaintiff. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E) ("The results of a single examination may not adequately describe your sustained ability to function. It is, therefore, vital that we review all pertinent information relative to your condition, especially at times of increased stress."); *see also Santiago,* 441 F.Supp.2d at 629 ("The Treating Physician Rule recognizes that a physician who has a long history with a patient is better positioned to evaluate the patient's disability than a doctor who observes the patient once for the purposes of a disability hearing. The rule is even more relevant in the context of mental disabilities, which

by their nature are best diagnosed over time.") (citations omitted).

Dr. Meadow met Hidalgo only once, in September 2009. In contrast, Dr. Vital–Herne's notes span a period from April 2009 to January 2011, during which he met with Hidalgo nearly every month. While it is within the ALJ's discretion to conclude that the weight of the evidence supported Dr. Meadow's findings and not Dr. Vital–Herne's, the ALJ must be explicit about the relative weight of the opinions. To the extent that the ALJ actually relied on Dr. Meadow's opinion to reach his determination without providing "good reasons" for doing so—which the final outcome suggests—this was legal error. *See Gonzalez v. Apfel,* 113 F.Supp.2d 580, 588–89 (S.D.N.Y.2000) (the opinion of a physician who saw plaintiff only once deserves limited weight). The sole fact that two opinions contradict each other is not sufficient grounds to disregard that of the treating physician. *Villanueva v. Barnhart,* 03 Civ. 9021(JGK), 2005 WL 22846, at *12–13 (S.D.N.Y. Jan. 3, 2005)

## VI. Use of the Vocational Expert on Remand

Hidalgo argues that one of the ALJ's hypothetical questions posed to the vocational expert did not take into account Hidalgo's full range of impairments and was based on the reports of Dr. Meadow and Dr. Altmansberger, the non-treating physicians.

The Court is not in a position to evaluate this argument. The Court has already recommended that this case be remanded because of an incorrect application of the treating physician rule and for further development of the record. Once the perceived inconsistencies in the record have been cleared and the relative weights of the opinions of Drs. Vital–Herne, Meadow, and Altmansberger are clarified, any hypothetical posed to the vocational expert must be adjusted to match the evidence in the record. *Dumas v. Schweiker,* 712 F.2d 1545, 1554 (2d Cir.1983); *Sanchez v. Barnhart,* 329 F.Supp.2d 445, 449 (S.D.N.Y.2004) ("The ALJ must pose hypothetical questions to the vocational expert which reflect the full extent of the claimant's capabilities and impairments to provide a sound basis for the vocational expert's testimony.").

Footnotes

## CONCLUSION

**\*22** For the foregoing reasons, the Court recommends that the Commissioner's motion for judgment on the pleadings be DENIED, and plaintiff's cross motion for judgment on the pleadings be GRANTED. The Court recommends REMAND for further development of the administrative record.

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed.R.Civ.P. 6(a), (d) (adding three additional days when service is made under Fed.R.Civ.P. 5(b)(2) (C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed.R.Civ.P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Swain. The failure to file these timely objections will result in a waiver of those objections for the purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).

## SO ORDERED.
Filed Aug. 16, 2013.

## All Citations

Not Reported in F.Supp.3d, 2014 WL 2884018

1    "[Global Assessment of Functioning] rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupannical functioning." *Zabala v. Astrue,* 595 F.3d 402, 410 (2d Cir.2010) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM–IV"), at 34 (4th ed. rev.2000)). *See also Briscoe v. Astrue,* 11 Civ. 3509(GWG), 2012 WL 4356732, at *2 (S.D.N.Y. Sept. 25, 2012). A GAF score from 41 to 50 represents "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See* http://www.omh.ny.gov/omhweb /childservice/mrt/global_ assessment_functionin g.pdf (last visited July 2, 2013). A GAF score from 31 to 40 represents "Some impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgement, thinking, or mood (e.g., depressed man avoids friends, neglect [*sic* ] family, and is unable to work ... )." *Id.*

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 515927
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jose LUGO, Plaintiff,
v.
Jo Anne B. BARNHART, Commissioner
of Social Security, Defendant.

No. 04 Civ. 1064(JSR)(MHD).
|
Feb. 8, 2008.

REPORT & RECOMMENDATION

MICHAEL H. DOLINGER, United States Magistrate
Judge.

**\*1  TO THE HONORABLE JED S. RAKOFF,
U.S.D.J.:**
Plaintiff Jose Lugo filed this action pursuant to the Social
Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3). He
seeks review of the December 6, 2003 determination by
the Commissioner of the Social Security Administration
("Commissioner") denying his three merged applications
for Supplemental Security Income ("SSI") benefits-dated
December 22, 1993, November 12, 1997, and August 31,
1999, respectively-based on a finding that he was not
disabled.

The Commissioner has moved to remand this action
for further administrative proceedings. He seeks this
remand to reopen the evidentiary record and to permit
the Administrative Law Judge ("ALJ") to explain how
he weighed the medical evidence and medical opinions to
arrive at his conclusion that plaintiff was able to perform
light work. Plaintiff has cross-moved for remand solely for
calculation of SSI benefits.

For the reasons that follow, we recommend that the
Commissioner's determination be reversed, that his
motion for a remand be granted, that the plaintiff's cross-
motion be denied and that the case be remanded for
further administrative proceedings.

*I. Procedural History*

1. *The December 28, 1993 Application and the First
Federal Court Action*
On December 28, 1993, plaintiff filed his first
application for SSI benefits. (Administrative Record
Transcript ("Tr.") 39-41.) A Disability Determination
and Transmittal form, dated March 30, 1994, indicated
Lugo's primary diagnosis as alcoholism and his
secondary diagnosis as arthralgia. [1]  (Tr. 42.) The
Social Security Administration ("SSA") initially denied
plaintiff's application on April 5, 1994. (Tr. 64.) According
to the SSA, the medical evidence showed that Lugo had
"pain and stiffness with some restriction of [his] activities
and the ability to function normally in every day life," but
that he was capable of performing "medium work." (Tr.
66.) The plaintiff filed for reconsideration (Tr. 67), and on
January 19, 1995, the Commissioner denied the request.
(Tr. 90.) In March 1995, plaintiff requested a hearing
before an ALJ. (Tr. 94.) On December 8, 1995, ALJ Mary
Cerbone presided over a hearing (Tr. 24-38), at which
Lugo was represented by Vivian De La Cruz of Harlem
Legal Services. (Tr. 26.) [2]

On January 5, 1996, ALJ Cerbone issued her decision.
(Tr. 10-18.) She found the plaintiff not disabled and not
eligible for SSI payments despite his alleged drug, alcohol,
kidney and low-back problems. (Tr. 13.) Specifically, she
found that while Lugo could not perform his past relevant
work, he could perform a "wide range of light work,"
that there were no "significant" non-exertional limitations
that would compromise his capacity to perform light
work, and that his testimony regarding constant and
totally disabling pain was "not ... credible to the extent
alleged." (Tr. 17-18.)

Plaintiff subsequently filed a request for review with the
SSA Appeals Council. On April 10, 1997, the Appeals
Council denied plaintiff's request. (Tr. 5-6.)

 **\*2**  On May 30, 1997, Lugo filed a complaint in this
court seeking review of the ALJ's January 5, 1996
decision. The Commissioner moved, in March 1998, for
judgment on the pleadings. In June 1998, Magistrate
Judge Katz issued a Report and Recommendation ("R
& R"), recommending affirmance of the SSA's denial
of benefits. In doing so, he reviewed the treating and
consultative physicians' reports and the ALJ's decision
and found that the Commissioner's determination that
plaintiff was not disabled and was capable of light work

was supported by substantial evidence, that the ALJ had not erred in declining to accord controlling weight to the opinion of Lugo's treating physician and that the ALJ had fulfilled her duty to develop the record. (Tr. 191-211.) In short, Judge Katz recommended that the defendant's motion for judgment on the pleadings be granted and the Commissioner's decision affirmed. (Tr. 191.)

On September 28, 1998, the District Court declined to adopt Judge Katz's R & R and instead remanded the case "to further consider any relevant evidence bearing on plaintiff's claims of severe pain and, if she adheres to her original determination, to set forth the reasons these claims are found incredible." (Tr. 217.) The SSA remanded the case to ALJ Newton Greenberg, who conducted a hearing on August 28, 2000. (Tr. 218-25.) For purposes of that hearing, the ALJ merged Lugo's 1993 application with two subsequent applications-one filed in November 1997, while his lawsuit was pending here, and the other filed in August 1999, after the remand order from this court. The decision by ALJ Greenberg at the 2000 hearing, later affirmed by the Appeals Council, is the subject of this Report and Recommendation.

2. *The November 12, 1997 Application*
While Lugo's lawsuit was pending in federal court, he filed a second application for SSI benefits, on November 12, 1997, alleging disability based on diabetes, arthritis and mental problems. (Tr. 243-45, 260-65.) On February 2, 1998, the SSA denied his application, finding that his condition was not severe enough to keep him from working. (Tr. 228-31.) Lugo filed for reconsideration (Tr. 232-33), and on May 12, 1998, the SSA denied the request. (Tr. 234-37.) In June 1998, plaintiff requested a hearing before an ALJ. (Tr. 238-39.)

On January 13, 1999, ALJ Greenberg presided over a hearing on the 1997 application, at which Lugo was represented by Christopher Bowes, Esq., of the Center for Disability Advocacy Rights. (Tr. 538-50.) In a decision rendered March 17, 1999, ALJ Greenberg denied Lugo's application (Tr. 169-77), finding that while he could not return to his past relevant work (Tr. 175), he retained the ability to perform the full range of light work and that his capacity for light work was not significantly compromised by any non-exertional limitations. (Tr. 177.) In asserting that plaintiff was capable of performing light work, ALJ Greenberg found that while plaintiff's arthritis could cause back pain, "these symptoms are not of such intensity or

frequency to preclude work activity," particularly given that his condition did not require physical therapy or orthopedic surgery, and that Lugo had testified that he could read, watch TV and perform light household chores. (Tr. 175.) In the "Findings" section, ALJ Greenberg opined that Lugo's allegations as to the level of pain he was experiencing were "not consistent with the objective medical evidence and [we]re not credible to the extent alleged." (Tr. 176.) In April 1999, Lugo requested Appeals Council review of the decision. (Tr. 168.)

3. *The September 20, 1999 Application and the August 28, 2000 Hearing*
 **\*3** Lugo filed a third application for SSI benefits in September 1999 (Tr. 422-26), alleging that he was disabled as a result of kidney, spinal and psychiatric conditions. (Tr. 432.) The SSA denied his claim on December 6, 1999 (Tr. 409-13), finding that his condition was not severe enough to keep him from working and that based on his age, education and experience, he could perform a job requiring medium work. (Tr. 413.) Lugo filed for reconsideration (Tr. 414-15), and on April 11, 2000, the SSA denied the request. (Tr. 416-19.) In May 2000, plaintiff requested a hearing before an ALJ. (Tr. 420-21.)

On August 28, 2000, ALJ Greenberg presided over the hearing, in which he "merged" Lugo's December 1993, November 1997 and August 1999 SSI applications. (Tr. 551-59.) Lugo was again represented by Mr. Bowes. (Tr. 553.) In a decision dated November 17, 2000 (Tr. 157-65), ALJ Greenberg reviewed the hearing testimony and the entire body of evidence accompanying plaintiff's three SSI applications and found Lugo's "allegations about his limitations due to pain and psychiatric problems not credible, based on the medical evidence." (Tr. 163.) While acknowledging that Lugo experienced pain, ALJ Greenberg found that the record indicated that it was "manageable with medications, and is not of such severity that it prevents the claimant from working. The claimant is employable, but is not motivated: he is a malingerer." (Tr. 163.) ALJ Greenberg also found that Lugo retained "a residual functional capacity for the full range of light work.... [with] no limita[ti]ons on mental functioning." (*Id.*)

In December 2000, plaintiff's counsel requested an Appeals Council review of the ALJ's decision (Tr. 153) and submitted a letter-brief, dated June 28, 2002, outlining specific objections to that decision. (Tr. 149-51.)

The Appeals Council denied review in a notice dated December 6, 2003. (Tr. 147-48.)

### 4. The Second Federal Court Action

On February 9, 2004, Lugo filed the instant action in federal court, seeking review and reversal of the Commissioner's determination denying all three of his applications for SSI benefits. On July 27, 2004, the Commissioner responded with a motion for remand, seeking reversal of the November 2000 decision and a remand of the case for further administrative proceedings. (Mem. of Law in Supp. of Def.'s Mot. for Remand 1.) Plaintiff has in turn sought an order finding him disabled and remanding solely for calculation of benefits. (Mem. of Law in Supp. of Pl.'s Cross-Mot. for J. on the Pleadings 1.)

### II. Factual Background

#### A. Testimonial Evidence

Lugo was born on April 28, 1953 in the Dominican Republic. (Tr. 26-27.) He testified at his first hearing that he had completed one year of high school in the Dominican Republic (Tr. 28), but testified at his second hearing that he had completed only the sixth grade. (Tr. 541.) He can read and write Spanish, but speaks no English. (Tr. 28.) He arrived in the United States in 1982 and has permanent residency status. (Tr. 27, 246-246a, 541.)

 *4  Lugo lives with his wife. (Tr. 27, 542.) He testified that he is able to take care of his basic personal needs, including dressing and washing himself, but is unable to perform household chores. (Tr. 33-34.) In the past, Lugo worked in a fish market, as a street painter and as a security officer at a supermarket, a job that required him to lift up to eighty pounds. (Tr. 28, 35.) Lugo reported last looking for work sometime between 1989 and 1991 and stated that he was receiving public assistance. (Tr. 541-42.)

Lugo has a history of drug and alcohol abuse. At his first hearing in 1995, he stated that he had last used cocaine three years previously (i.e., in 1992) and had then enrolled in a three-year treatment program, which he had completed. (Tr. 28-29.) At his second hearing, in January 1999, he stated that he had stopped using cocaine "[o]ver five or seven years ago" (Tr. 542) and that he had been a heavy drinker for many years. (Tr. 543.) Lugo's drug and alcohol use were not discussed at his third hearing.

With regard to his physical ailments, Lugo testified that he suffered from pain related to kidney stones and had undergone a lithotripsy [3] in 1994, a procedure that destroys kidney stones with a laser. (Tr. 29, 131.) He asserted that his kidney stone attacks were accompanied by diarrhea, vomiting and pain that lasted, in slightly varying accounts, either two to three hours (Tr. 36) or five to six hours. (Tr. 555.) He stated that painkillers relieved the pain after one to two hours. (Tr. 555-56.) According to Lugo, he passed a kidney stone two weeks prior to the first hearing (Tr. 29) and a month or two before the third hearing, although at the third hearing he reported that he had had pain the week before (though he did not specifically say whether he had passed a stone). (Tr. 556.) He estimated at the third hearing that he felt the pain and vomiting symptoms associated with the stones on a more-or-less monthly basis. (Tr. 556.) As to symptoms, he described "very strong pain" in his back when he passed stones (Tr. 37), accompanied by blood in his urine. (Tr. 29, 37.) He explained that if the stone did not pass on its own, he would see a doctor. (Tr. 556.)

Lugo complained of lower back pain-separate from the pain he experienced from kidney stones-due to arthritis. (Tr. 30-31, 548-49, 557.) He testified that he also had arthritis in his legs, arms and neck, and that these areas would become numb and he would lose strength in his arms approximately two to three times a week. (Tr. 30.) At the third hearing, he stated that he could not move his neck, back and sometimes his hands. (Tr. 557.) At the time of the first hearing, he had been walking with a cane for ten months due to the arthritis (Tr. 30-31) and reported that, although he had taken a subway to the hearing, he experienced difficulty in traveling by public transportation, because the standing and motion caused him pain. (Tr. 27.) Also at the first hearing, he claimed that he could walk only two blocks, could stand for an hour or two, could not bend, could kneel only with difficulty, could sit for up to an hour and could carry five pounds only with difficulty. (Tr. 31-32.) At the second hearing, he asserted that he felt back pain every day and that he took medication daily to relieve the pain, but that the medication was only forty to fifty percent effective. (Tr. 548-49.)

 *5  At the first hearing, in 1995, Lugo did not testify that he suffered from any mental or emotional problems, though his disability examiner did list his alcoholism as

his primary diagnosis on his Disability Determination and Transmittal. (Tr. 42.) At the second hearing, in 1999, he asserted that he had been treated at a psychiatric hospital in the Dominican Republic after having been shot and mugged when was in his twenties. (Tr. 543.) He also claimed at the same hearing that he was seeing a psychiatrist and was taking three medications daily; however, he could remember the name of only one, Ambien, a sleep aid. (Tr. 542, 550.) He also reported that he was afraid to go out because he heard voices calling him at various times during the day (Tr. 543-45), and he alluded to experiencing problems with his memory. (Tr. 549-50.) At his third hearing, in 2000, plaintiff's counsel asserted that Lugo had "significant mental limitations due to major depression." (Tr. 557.)

B. *The Medical Record Before the ALJ*
Plaintiff was regularly treated by Dr. Clayton Natta, an internist and hematologist, since August 14, 1992. (Tr. 128-33.) Dr. Natta provided four reports or summaries between 1993 and 1998. (Tr. 115, 128-31, 133-39, 500.)

According to Dr. Natta, plaintiff suffered from lower back pain after falling twice in the snow in 1992. The pain persisted and required analgesics. Lugo also suffered from periodic kidney stones, which were treated by a lithotripsy at Brooklyn Hospital in 1994. (Tr. 128.) Dr. Natta diagnosed nephrolithiasis (*i.e.,* kidney stones) in the left kidney, Type II diabetes, atopic dermatitis, osteoarthritis of the lumbar spine and respiratory allergies. (Tr. 131, 133.) To treat these conditions, Lugo underwent the 1994 lithotripsy, adopted a 1500-calorie diabetic diet, and received medication for periodic urinary tract infections and analgesics for his lower back pain. (Tr. 131.) According to Dr. Natta, Lugo's back pain persisted despite the use of increasingly powerful analgesics. (Tr. 131, 134.) [4]

Dr. Natta opined on two occasions-September 14, 1995 (Tr. 137) and October 9, 1998 (Tr. 500)-that plaintiff was unable to work, apparently because of his low-back pain. In support of that conclusion, he provided findings of lumbar spine tenderness, 2
☞ muscle spasm, twenty to twenty-five percent loss of motion in the lumbar spine, loss of lumbar curvature and a recurring macular rash. (Tr. 129.) He also mentioned blood in the urine, nocturia [5] and a burning sensation on urination. (Tr. 133.) As for plaintiff's physical limitations,

the doctor opined that Lugo could regularly sit for only one-half hour to one hour daily, that he could stand or walk for only one hour, and that he could not lift or carry, push, pull, bend, squat, climb or reach on a sustained basis, although he could perform grasping and fine manipulation with his hands. (Tr. 135-36.) He further stated that plaintiff could not regularly travel by bus or subway. (Tr. 137.)

**\*6** Dr. Natta's last written statement was dated October 9, 1998. (Tr. 500.) He reported that plaintiff was being treated for degenerative joint disease (specifically sclerosis of the sacroiliac joints) [6] and latent luetic infection, [7] that he was status post-left hydrocelectomy [8] and that he suffered from kidney stones (nephrolithiasis) and Type II diabetes. He also reported that plaintiff continued to take Motrin 600 mg, Tylenol # 3 and Flexeril. He reiterated, however, that plaintiff was "unable to work in any capacity." (Tr. 500.)

Plaintiff was also treated in 1997 by Dr. Joerg Bose for a case of major depression with dysthymic disorder, [9] which Dr. Bose characterized as moderate to severe. (Tr. 325-30.) According to the psychiatrist, Lugo presented as unmotivated and tearful. His mood was sad and his affect restless. (Tr. 327.) Dr. Bose found plaintiff limited in his capacity for understanding and memory but not limited in the areas of sustained concentration and adaptation. (Tr. 329.)

The record also includes documents from Columbia Presbyterian Hospital for the period from March 1994 to September 1997. In March 1994, Lugo was diagnosed with a kidney stone, which caused pain, fever, some bleeding (hematuria) and fever. (Tr. 310.) He passed the stone and was discharged. In June 1994, he had a similar episode and was scheduled for a lithotripsy. (Tr. 303.) Periodic reports of a similar nature are scattered throughout plaintiff's medical records from 1994 to 1996, with reference to a lithotripsy actually having been performed in 1995 at Brooklyn Hospital. (Tr. 298, 300, 393-95.) In 1997, a radiological examination yielded a finding of "sclerosis of the sacroiliac joints bilaterally," probably indicating degenerative joint disease. (Tr. 292, 398, 465.)

The record also contains a host of reports by consulting doctors. We summarize their results in chronological order.

In March 1994, Dr. Alain DelaChapelle, a psychiatrist, conducted a mental-status examination of Lugo. He reported that plaintiff was participating in an alcohol rehabilitation program and did not show any depression or psychotic symptoms. (Tr. 118.) He stated that plaintiff was hoping to "get back on his feet and return to work." The psychiatrist diagnosed alcohol dependence and suggested continuing alcohol counseling. He characterized Lugo's prognosis as "fair." (Tr. 119.)

In March 1994, Dr. A. DeLeon, an internist, examined plaintiff for the SSA. He summarized plaintiff's reported history of kidney stones ("nephrolithiasis"), arthralgia of the neck and back, alcoholism and histories of drug abuse and depression. (Tr. 120.) He then summarized his findings from the physical examination, stating that plaintiff could bend forward to 60 degrees and that no tenderness or muscle spasm was observed at L3-L4 in the lumbar spine. (Tr. 121.) A follow-up x-ray of the cervical spine was found to be normal. (Tr. 123.) Dr. DeLeon found that plaintiff could sit without limitation and was only "slightly limited" in other exertional activities. (Tr. 122.) He offered a prognosis of "fair ." (Tr. 122.)

 *7  On January 5, 1995 plaintiff underwent a consultative physical examination by Dr. Howard Finger, an internist (Tr. 124-26), and another psychiatric examination by Dr. DelaChappelle. (Tr. 116-17.) Dr. Finger mentioned depression and reported that plaintiff had said that he had difficulty sleeping. He stated that plaintiff had reported that he had stopped drinking and using cocaine in the last one to two years. He also noted plaintiff's complaint of kidney stones and back and neck pain. (Tr. 124.)

Based on his physical examination of Lugo, Dr. Finger stated that Lugo's straight leg raising was negative to sixty degrees. Plaintiff reported diffuse low-back pain on flexion of the lumbar spine past seventy to eighty degrees, but the range of motion in his cervical spine was normal. The doctor noted no muscle spasm, although he observed that plaintiff's gait was slow. He determined that Lugo's lower extremity strength and grip strength were reduced to 4 👉/5 bilaterally. (Tr. 125.) Finally, he noted that Lugo's blood tests were normal. The doctor offered a "fair" prognosis. He diagnosed a history of alcohol and cocaine abuse, a history of kidney stones, chronic low-back disorder, arthralgia of the cervical spine and a history of

depression and insomnia. He noted no gross difficulties in sitting and opined that plaintiff "may be mildly limited" in other exertional activities. (Tr. 126.)

During Dr. DelaChappelle's second psychiatric evaluation, he reported Lugo's assertion that he had suffered from depression for about one year, which Lugo attributed to his medical problems. Dr. DelaChapelle observed that Lugo appeared "mildly depressed" on a mental-status exam and was unable to do "serial sevens" accurately. (Tr. 116.) Lugo reportedly told the doctor that he stayed at home, reading or watching television, that he rarely socialized and that he relied on his wife to do most household chores. The doctor diagnosed Lugo with both cocaine abuse in remission and a depressive disorder, for which he recommended psychiatric treatment. He listed Lugo's prognosis as "fair." (Tr. 117.)

On January 7, 1998, Lugo underwent another physical examination by Dr. Finger. (Tr. 319-21.) After summarizing plaintiff's history-including kidney stones, arthritis and low-back pain, diabetes, high blood pressure and a nervous condition, as well as drinking and drug use-the doctor reported his physical findings. Lugo's straight leg raising was negative to sixty degrees bilaterally. He was able to flex the spine to forty fifty degrees before encountering "moderate diffuse low back pain," with no observed muscle spasm. Dr. Finger observed that plaintiff's gait was slow and mildly to moderately stiff. (Tr. 320.) Plaintiff exhibited mild crepitus [10] in the knees. The doctor estimated the strength in his lower extremities at 4 👉/5. (Tr. 321.)

Dr. Finger also ordered radiological studies. These revealed mild scoliosis and minimal osteoarthritis of the lumbosacral spine. (Tr. 323.) The radiological report noted "eburnative changes with both sacroiliac joints, more pronounced on the inferior aspect." (Id.) [11] Dr. Finger diagnosed chronic low-back disorder, non-insulin-dependent diabetes, arthralgias of the hands, knees and shoulders and a history of kidney stones, depression and alcohol abuse. (Tr. 321.) He further concluded that plaintiff was "mildly to moderately limited" in his ability to stand, walk, lift and carry and "mildly limited" in sitting. He opined that plaintiff's prognosis was "guarded." (Tr. 321.)

 *8  Two weeks later, plaintiff underwent another psychiatric exam by Dr. DelaChappelle. (Tr. 334-35.)

Lugo reported experiencing depression, sadness, nervousness, insomnia and suicidal ideation. He also mentioned that he had been in psychiatric treatment for the prior six months with Dr. Chattah, a psychiatrist, and that he was taking Prozac and Ambien, which somewhat improved his condition. [12] (Tr. 334.)

In his mental-status examination, Dr. DelaChappelle found that plaintiff was alert and cooperative and showed good eye contact. Lugo's speech was coherent and relevant, and he was neither anxious nor depressed and was not hallucinating. The doctor judged his intellectual functioning to be average and his insight and judgment to be fair. Plaintiff could also recall three of three objects in three minutes. (Tr. 334.)

Dr. DelaChappelle diagnosed Lugo with dysthymic disorder. He further found that Lugo had a satisfactory ability to understand, remember and carry out instructions, to respond appropriately to supervision and to co-workers and to deal with pressures in a work setting. He characterized Lugo's prognosis as "fair." (Tr. 335.)

Three months later, in April 1998, plaintiff underwent still another psychiatric evaluation, this time by Dr. Richard King, a psychiatrist. (Tr. 344-45.) Lugo described a history of substance abuse, although he stated that he had stopped this habit several years before. He claimed to occasionally hear voices calling his name, and he reported that he was taking Prozac and Ambien. (Tr. 344.)

Dr. King reported that, on examination, Lugo established fair rapport and exhibited no acute distress. His speech was coherent and relevant. He was euthymic [13] and not significantly anxious or depressed. (Tr. 344.) He exhibited no hallucinations, his intellectual functioning was average and he was able to reproduce geometric shapes adequately. (Tr. 344-45.) He exhibited fair judgment and insight and adequate concentration and attention. (Tr. 345.)

Dr. King concluded that plaintiff suffered from a mild dysthymic disorder and suggested ruling out a substance-induced mood disorder. He diagnosed alcohol, cocaine and marijuana dependence, although he noted that Lugo had reported that he no longer used these substances. The doctor concluded that plaintiff had a satisfactory ability to understand, remember and carry out instructions and

to respond to supervision, co-workers and workplace pressures. (Tr. 345.)

In May 1998, plaintiff underwent another physical examination by Dr. Finger. (Tr. 346-48.) The doctor reported that plaintiff's straight leg raising was negative to sixty degrees. His forward flexion of the spine reached fifty degrees with moderate diffuse mid- and low-back pain. His muscle strength in the low extremities, as well as his grip strength, was again measured at 4

/5, and his gait was slow and stiff. He was able to get on and off the examination table without assistance, however, although he did it slowly. (Tr. 347.)

**\*9** Dr. Finger ordered X-rays of plaintiff's knees, which were normal. An x-ray of his lumbosacral spine showed mild L5-S1 osteoarthritis and marked sclerosis of the sacroiliac joints bilaterally. (Tr. 349 .)

Dr. Finger diagnosed plaintiff as suffering from non-insulin-dependent diabetes mellitus, arthralgias in the knees, hands and shoulders, chronic low-back disorder, a history of kidney stones, a history of drug and alcohol abuse and a history of depression. He evaluated plaintiff as mildly limited in the length of time he could sit, mildly to moderately limited in the length of time he could stand and the distance he could walk, and moderately limited in his ability to lift and carry. He evaluated Lugo's overall prognosis as "guarded." (Tr. 348.)

The record contains another residual functional capacity analysis, dated May 11, 1998, by a Dr. B. Reynolds, who apparently reviewed plaintiff's file but did not examine him. Dr. Reynolds concluded that Lugo could lift up to 20 pounds occasionally and up to 10 pounds frequently. He further found that Lugo could stand and walk for as many as six hours in an eight-hour workday, or, alternatively, could sit for as many as six hours in an eight-hour day and do pushing and pulling while seated, including the use of hand or foot controls. He further opined that plaintiff could occasionally climb, balance, stoop, kneel or crawl. (Tr. 382-83.)

Plaintiff underwent another psychiatric evaluation in November 1998, this time by Dr. Luigi Marcuzzo, a psychiatrist. (Tr. 480-81.) Plaintiff reported long-term depression resulting from physical problems and physical abuse by his stepmother. He also reported a history of five suicide attempts, the most recent only three weeks before.

He claimed to hear voices calling his name and reported low energy, poor motivation, insomnia, paranoid ideation and poor concentration. He also mentioned a history of substance abuse and said that he had entered a treatment program the prior year, that is, in 1997. He did believe that the medications he was taking were helping his depression "somewhat." (Tr. 480.)

Based on his examination, Dr. Marcuzzo described Lugo as "rather guarded and suspicious, withdrawn[ ] [and] tearful." Lugo's speech was limited in scope and concrete. The doctor noted no delusions, but observed some instances of paranoid ideation. Plaintiff's mood was depressed and his affect constricted. His short-term memory was intact, but his remote memory was impaired. His attention and concentration were impaired, and he was easily distractible. His insight and judgment were fair, although he could not perform serial sevens. (Tr. 481.)

Dr. Marcuzzo offered a diagnostic impression of major depression. He also viewed Lugo's memory, understanding, sustained concentration, persistence, social interaction and adaptation as impaired. He concluded that his prognosis was "fair." (Tr. 481.)

Two days later, a consulting physician, Dr. E. Cadet, offered a medical assessment of plaintiff. He noted his impressions of plaintiff's ailments, namely depression, diffuse arthralgia and histories of kidney stones and hydrocele repair. On this basis, he opined that plaintiff met the SSI criteria for disability. (Tr. 479 .) [14]

 *10  One year later, Lugo underwent a psychiatric examination by Dr. Geraldo Tapia. (Tr. 502-03.) On this occasion, plaintiff recounted that he had been mugged and shot in the shoulder eighteen years before and had suffered from nervousness ever since. He said that he was sad, sensitive to noises, feared being on the street alone, stayed isolated, had difficulty sleeping and hears voices calling him. He also reported a prior history of marijuana and cocaine use. (Tr. 502.)

Dr. Tapia described plaintiff's speech as relevant and coherent. He found no thought disorder or delusions. He rated Lugo's insight and judgment as fair. (Tr. 502.)

The doctor diagnosed a dysthymic disorder and suggested the need to rule out a post-traumatic stress disorder. He evaluated Lugo as having a good ability to understand,

carry out and remember instructions, and a fair ability to respond appropriately to supervision and co-workers in a work setting. (Tr. 502.)

At about the same time, plaintiff underwent a physical examination by Dr. Babu Joseph. (Tr. 507-08.) He noted that the cervical spine had a full range of motion, and that scoliosis, paraspinal muscle spasm and tenderness were not indicated. He reported that plaintiff had a lumbar ventral flexion of forty degrees and a dorsal flexion of five degrees. (Tr. 507.) An x-ray taken of Lugo's lower back in connection with the examination was normal. (Tr. 505.) Dr. Joseph diagnosed joint and low-back pain, a history of kidney stones, depression and a skin disorder. He concluded also that plaintiff was mildly limited in standing, walking, lifting and carrying. (Tr. 508.)

The remaining two examinations in the record were both conducted on March 2, 2000. Dr. A. Cacciarelli (Tr. 533-35) reported that plaintiff complained of low-back pain, kidney problems, a skin disease and a nervous disorder. Lugo had stated to Dr. Cacciarelli that it was difficult for him to stand for more than fifteen to twenty minutes at a time, and that he could not lift or carry more than five to ten pounds. He reported also that he was taking Celebrex, Flexeril, Risperdal, Prozac and Ambien. (Tr. 533.)

Dr. Cacciarelli found that plaintiff complained of pain at 40 degrees on forward flexion. The doctor also observed eczema on plaintiff's lower extremities. He diagnosed a history of psychiatric disorder, chronic skin disease, a history of kidney stones and joint and back pain. He concluded, based on these findings, that plaintiff had "a limited ability to push, pull or carry heavy objects or stand around for long periods of time." (Tr. 535.)

Plaintiff's final psychiatric evaluation was conducted by Dr. King. (Tr. 531-32.) This time, plaintiff reiterated the incident that he had reported to Dr. Tapia, in which he had been shot eighteen years before, and mentioned that he had been psychiatrically hospitalized at some point in the Dominican Republic. He reported having been depressed since he was shot and said that he had used cocaine and heroin in the past but had stopped around 1993. (Tr. 531.)

 *11  Dr. King indicated that during the exam, plaintiff had a fair rapport and exhibited no acute distress. His speech was relevant and coherent. According to Dr. King,

he was euthymic and not notably depressed or anxious, and he exhibited no hallucinations, delusions or suicidal ideation, among other things. His intellectual functioning was average. His insight and judgment were fair, and his attention and concentration were adequate. (Tr. 531.)

Dr. King diagnosed plaintiff with mild to moderate dysthymic disorder and a history of a major depressive episode (apparently a reference to Lugo's condition when examined by Dr. Marcuzzo). He diagnosed alcohol, cocaine and marijuana dependence, although he noted plaintiff's statement that he had ended his abuse of those substances. He also found that Lugo had a satisfactory ability to understand, remember, carry out instructions, respond to supervision and co-workers and deal with pressures in a work setting. (Tr. 532.)

Dr. Anthony Danza provided the final assessment of plaintiff's exertional capacities found in the record, apparently without examining the plaintiff, on April 4, 2000. [15] Dr. Danza opined that Lugo could lift or carry as much as 50 pounds occasionally and 25 pounds frequently. He also reported that plaintiff could stand and walk for up to six hours in an eight-hour workday, and that he could, alternatively, sit for as many as six hours in a day while performing pushing and pulling, including the operation of hand or foot controls. (Tr. 523.) He further stated that Lugo could frequently climb, balance, stoop, kneel, crouch and crawl. (Tr. 524 .)

C. *ALJ Greenberg's November 17, 2000 Decision*
As noted, ALJ Greenberg "merged" all three of Lugo's applications and considered the entire record when he issued his November 17, 2000 decision finding Lugo ineligible for SSI benefits. (Tr. 157-65.) In his decision, the ALJ applied the five-step evaluation process required by 20 C.F.R. § 416.920 (2005) to determine whether a claimant is disabled. (Tr. 158.) He first found that Lugo had not engaged in substantial gainful activity since 1991. (Tr. 158.) With regard to the severity of his impairments, ALJ Greenberg began by reviewing the May 17, 1999 decision he had authored concerning Lugo's second (November 1997) application.

As summarized by the ALJ, in his 1999 decision he had found: (1) that Lugo could perform light work, lifting and carrying up to twenty pounds and standing and walking for six hours; (2) that while he had a history

of kidney stones, he had tested free of kidney stones in 1997 and 1998; (3) that Lugo had non-insulin-dependent diabetes mellitus that was diet-controlled and had no systemic complications; (4) that he had "very minimal osteoarthritis in the lumbosacral spine, could flex his spine to 50 degrees with no paravertebral muscle spasm, could perform normal side bending and extension in the lumbosacral spine, and had a normal range of motion in the cervical spine," (5) that Lugo had mild crepitus in his knees with no gross swelling; (6) that he was taking Prozac and Ambien for a dysthymic disorder but had no work-related mental limitations; and (7) that Lugo had "clear" attention and concentration, could calculate and do "serial sevens" and was "fully oriented," "had no limitations in sustained concentration" and had a "satisfactory ability to interact with supervisors and co-workers and to handle work pressures." (Tr. 159 .) The ALJ also noted that while Lugo had complained of daily pain in his spine due to arthritis, "no evidence was found to support a claim that this pain was disabling" since, for example, he did not require physical therapy or need orthopedic surgery, and he had reported that he could do light household chores. (Tr. 159.)

**\*12**  At the August 2000 hearing, the ALJ, consistent with the District Court's remand, stated that he had sought additional evidence, particularly with regard to plaintiff's complaints of severe pain, and had reviewed "the entire body of evidence ... related to all three applications." (*Id.*) The ALJ then summarized the medical evidence in the record, which included the more recent of the numerous consultative examinations as well as reports by Lugo's treating physician.

ALJ Greenberg first summarized the findings of Dr. Finger, based on his January 7 and April 21, 1998 examinations. (Tr. 159-60.) He then recited the findings from the November 11, 1999 consultative examination by Dr. Joseph, the March 2, 2000 consultative examination by Dr. Cacciarelli, the consultative psychiatric examination by Dr. DelaChapelle on January 22, 1998, the consultative psychiatric examination by Dr. Tapia on November 15, 1999, the consultative psychiatric examination by Dr. Richard King on March 2, 2000 and the medical and psychiatric evaluations by Dr. Cadet and Dr. Marcuzzo that Lugo had undergone on November 6, 1998 pursuant to his application for public assistance purposes. (Tr. 160-62.)

In addressing Dr. Marcuzzo's finding of a major depression, the ALJ noted that Lugo's condition, when examined by Dr. Marcuzzo, had differed "markedly" from his condition as described in other consultative psychiatric reports both before and after Marcuzzo's examination. (Tr. 161.) Specifically, neither Drs. DelaChapelle and Tapia in 1999, nor Dr. King in 2000, had found major depression or severe impairments in functioning, but, at most, mild to moderate impairments. (Id.) The ALJ concluded that Lugo's symptoms had "worsened temporarily" at the time of his examination by Dr. Marcuzzo, but that this did not reflect "a psychiatric condition that would last 12 months or more," since his psychiatric status, as determined by a series of examinations between January 1998 and March 2000, was "dysthymic disorder imposing mild to moderate limitations." (Tr. 162.)

ALJ Greenberg then turned to the medical reports provided by Dr. Natta, Lugo's treating physician. (Id.) In the doctor's most recent communication, a brief note in October 1998, he had opined that Lugo could not work "in any capacity," citing his Type II diabetes, his 1994 procedure to remove kidney stones, a latent luetic infection, surgery to remove hydroceles in 1997 and degenerative joint disease, including sclerosis of the sacroiliac joints with persistent low-back pain. (Id.) ALJ Greenberg observed that Dr. Natta had cited no clinical or laboratory findings or any other support for such a degree of impairment, that he had provided no indication of the degree of limitation on Lugo's ranges of motion or ability to ambulate and that he had made "essentially the same unsupported statement on December 18, 1993." (Id.) ALJ Greenberg also cited Dr. Natta's September 1995 evaluation form, indicating that Lugo could not work because of "persistent pain, inability to stand for any length of time, and restriction of activities," and his reports from 1992 to 1998 indicating that Lugo was severely disabled and unable to work. (Id.) The ALJ observed that, despite the severity of the conditions described by Dr. Natta, there was no indication from the doctor that he had provided or recommended intensive treatment or monitoring, that he had referred Lugo for pain management, that Lugo had undergone any physical therapy or orthopedic surgery or that there had been any other attempts to provide the kind of pain relief that would have been warranted if Lugo's pain were so extreme as to prevent him from working for six years. (Id.) As a result,

ALJ Greenberg gave "little weight" to Dr. Natta's opinion that Lugo was unable to work. (Id.)

**\*13** Following this review of physician and psychiatrist reports, ALJ Greenberg summarized the medical evidence as showing that Lugo had a history of kidney stones, arthritis-including back pain requiring no surgery or physical therapy-non-insulin-dependent diabetes without systemic complications and a dysthymic disorder. (Id.) While these impairments were "severe within the meaning of the regulations," ALJ Greenberg opined that they were not severe enough to meet or medically equal one of the impairments in Appendix 1, Subpart P, Regulations No. 4. (Id.)

The ALJ then proceeded to analyze whether Lugo retained the residual functional capacity ("RFC") to perform the requirements of his past relevant work or other work existing in significant numbers in the national economy. He considered all of Lugo's symptoms, including the extent to which they were consistent with objective medical evidence, his testimony about pain and the medical opinions, and found that Lugo's allegations about his limitations were "not credible, based on the medical evidence." (Tr. 162-63.) The ALJ concluded that there was "simply no medical support in the record" for his allegations that he has been unable to work since 1993 because of his pain and psychiatric problems, and that, based on a review of the ample evidence in the record, there was "no information concerning the claimant's physical or mental condition that differs from prior evidence of record." (Tr. 163.)

Focusing on Lugo's complaints of pain, ALJ Greenberg noted that Lugo had not been referred for physical therapy or orthopedic surgery for his condition, and that while the evidence indicated that he had some pain, it was manageable with medication and was not so severe that it prevented him from working. (Id.) He found that Lugo was "employable, but [ ] not motivated: he is a malingerer." (Id.) Based on these facts, the ALJ concluded that Lugo retained a RFC for a "full range of light work," which was "consistent with the medical opinions discussed above" indicating "mild to moderate limitations on physical functioning and no limita[ti]ons on mental functioning." (Tr. 163.)

Proceeding along the five-step disability analysis, ALJ Greenberg found that Lugo could not return to his past

relevant work as a shipping clerk, where he had lifted and carried up to fifty pounds. (*Id.*) With the burden shifting back to the SSA to show there were other jobs that Lugo could perform in the national economy consistent with his RFC, age (forty-seven), education and work experience, ALJ Greenberg reviewed the Medical-Vocational Guidelines, which direct a conclusion of "disabled" or "not disabled" depending on the claimant's RFC and vocational profile. (Tr. 163.) Since Lugo was a "younger individual" with limited education, the ALJ noted, the Guidelines could direct a no-disability decision only if Lugo had the exertional RFC to perform the seven primary strength demands at the given level of exertion and if there were no non-exertional limitations. (*Id.*) He explained that jobs were classified as sedentary, light, medium, heavy and very heavy and described the exertional demands of light work: lifting no more than twenty pounds with frequent lifting or carrying of ten pounds, a "good deal" of walking, and standing or sitting most of the time with some pushing and pulling. (Tr. 164.) He concluded, "Because the evidence supports a finding that the claimant can perform the demands of the full range of light work, a finding of 'not disabled' is directed by Medical-Vocational Rule 202 .16." (*Id.*)

### D. *The Parties' Motions*

**\*14** In the Commissioner's moving brief, he seeks an order reversing this decision and remanding the case to the SSA for further proceedings, both to allow further development of the record and to permit the ALJ to provide more detailed findings on several issues. In support of this application, the Commissioner cites two major errors in the ALJ's decision.

The first error concerns how the ALJ arrived at his conclusion that the plaintiff was able to perform light work. That term is defined in 20 C.F.R. § 416.967(b) as the ability to (a) to lift up to ten pounds frequently and up to twenty pounds occasionally, and (b) either to stand and walk, off and on, for a substantial amount of time, or to sit for most of the time coupled with the ability to do pushing and pulling of arm or leg controls. *See, e.g., Vargas v. Sullivan,* 898 F.2d 293, 294 (2d Cir.1990); [16] *see also* Titles II and XVI, Determining Capability to do Other Work-the Medical-Vocational Rules of Appendix 2, 1983-1991 Soc. Sec. Rep. Serv. 24 (SSR 83-10), *available at* 1983 WL 31251, at \*5-6 (1983) . [17] Because the record contained "widely varied assessments" of Lugo's ability to perform

these activities, and because the ALJ did not explain "how he weighed the medical evidence and medical opinions in the record to arrive at his conclusion," the Commissioner seeks remand to correct this error. (*See* Def.'s Mem. 3-4, 6.)

As examples of the "varied assessments," the Commissioner cites not only the reports considered by ALJ Greenberg (including those of Drs. Natta, Finger and Cacciarelli), but also a number of reports not cited by the ALJ that directly addressed the quantifiable physical exertion requirements, including a March 1994 report by Dr. DeLeon (finding no limitation in Lugo's ability to sit, but slight limitation regarding standing, walking, lifting, carrying, pushing and pulling (Tr. 122)); a January 1998 report by Dr. Mason (finding Lugo able to handle twenty-five pounds frequently and fifty pounds occasionally and able to stand or walk for six hours in an eight-hour day (Tr. 337)); a May 1998 report by Dr. Reynolds (finding that Lugo could handle ten pounds frequently and twenty pounds occasionally and that he could stand or walk for six hours in an eight-hour day (Tr. 382)); a November 1999 report by Dr. Joseph (finding that Lugo had no sitting limitation and mild restrictions in prolonged walking, standing and handling heavy objects (Tr. 508)); and a December 1999 report by Dr. Danza (finding that Lugo was able to handle twenty-five pounds frequently and fifty pounds occasionally and that he could stand or walk for six hours (Tr. 523)). (Def.'s Mem. 4-5.) The Commissioner suggests that these reports need to be reconciled with the ALJ's findings. (*Id.* at 3-6.)

The Commissioner also argues that the ALJ erred with respect to Lugo's mental impairments: noting that Dr. Marcuzzo's opinion that Lugo was impaired for all types of mental functioning was inconsistent with that of the other psychiatrists, the Commissioner points out that the ALJ made "inconsistent statements about the severity of the limitations indicated by the other psychiatrists." (*Id.* at 7-8.) The Commissioner observes that at one point the ALJ stated that Lugo had mild to moderate limitations in his mental functioning (Tr. 161-62), but elsewhere in his decision he wrote that Lugo had "no limita[ti]ons on mental functioning" (Tr. 163), and he failed to explain or reconcile these two seemingly inconsistent findings. (Def.'s Mem. 7-8.)

**\*15** The Commissioner points out that an accurate assessment of the severity of the limitations on Lugo's

mental functioning was particularly important because of his "long history of substance abuse," as the statute and regulations provide that an individual cannot be found disabled if it is determined that alcoholism or substance abuse was material to the finding of disability. (Def.'s Mem. 8 (citing 42 U.S.C. § 1382c(a)(3)(J)).) In this regard, the Commissioner notes the inconsistent statements made by Lugo throughout the record as to when he stopped abusing cocaine and alcohol-dates that ranged from 1992 to 1997. (Def.'s Mem. 8.) According to the Commissioner, even if Lugo's mental impairments were severe enough to prevent him from working, before he could be found disabled it would still be necessary to evaluate the evidence to determine whether Lugo would still be disabled if he had stopped using drugs or alcohol. Since the ALJ did not address this question, the issue could only be resolved on remand. (Id. at 8-9, Def.'s Reply Mem. in Further Supp. of Her Mot. for a Remand and in Opp'n to Pl.'s Cross-Mot. 5-6.)

Plaintiff in turn filed a cross-motion for judgment on the pleadings, seeking a reversal of the Commissioner's decision and a remand solely for the purpose of awarding benefits. In his brief, Lugo first argues that reversal and payment of benefits is the appropriate remedy because substantial evidence in the record supports a finding that he is disabled pursuant to the statute. (Pl .'s Mem. 17-23.) Specifically, he contends that every physician who treated or examined him concluded that he has "functional limitations" from low-back pain. (Id. at 17.) Lugo maintains that Dr. Natta's findings that he had substantial limitations were not an aberration, given Dr. DeLeon's opinion that he was "slightly limited" in his ability to walk, stand, lift, carry, push and pull; Dr. Finger's opinion that he was mildly to moderately limited; and Dr. Cacciarelli's opinion that he was "limited" in those abilities. (Id. at 18-19.) Against that backdrop, Lugo argues that his treating physician's opinion should have been accorded "controlling weight," as it was "not inconsistent" with other substantial medical evidence of record; according to plaintiff, even though Dr. Natta's conclusion was not "100% consistent" with the other evidence, it did not have to be. (Id. at 19-20.) He also infers that one reason why the consulting physicians might not have regarded Lugo's limitations as so severe is because they failed to look for lumbosacral tenderness. (Id. at 20.) If Dr. Natta's opinions had been given controlling weight, Lugo claims, he would have been found disabled. (Id. at 20.)

Lugo also argues that the ALJ failed to provide specific reasons for discrediting his testimony concerning pain and that his subjective complaints of pain should have been fully credited. If so, this would have resulted in a finding of disability. (Id. at 21-23.)

**\*16** Finally, Lugo argues that reversal, not remand, is appropriate in his case because his claim for benefits is more than ten years old, and that the Commissioner should not be accorded another opportunity to "shore up" his determination that plaintiff is not disabled, particularly since the ALJ, Appeals Council and Commissioner have ignored the District Court's 1998 order directing the SSA to follow the regulations if Lugo's testimony was to be discredited. (Id. at 23-24.)

In his Reply Memorandum, the Commissioner responds that delay alone is never a sufficient basis for reversing a decision and awarding benefits. (Def.'s Reply Mem. 2.) In addition, the Commissioner argues that remand for calculation of benefits is appropriate only where "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose" (id.) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.1980), and that the medical evidence here is not so clear as to warrant such a conclusion, given the "numerous conflicting assessments of the severity of the functional limitations arising from those conditions." (Id. at 4-5.) Finally, the Commissioner reiterates that even if the medical evidence clearly showed that Lugo could not perform any substantial gainful activity, it would still be necessary to determine whether his history of alcohol and drug abuse was material to the finding of disability in light of the conflicting evidence as to when he stopped abusing those substances. (Id. at 5-6.)

### DISCUSSION

I. *Standards for Review and Remand*
For purposes of SSI eligibility, a person is disabled when he is unable to "engage in any substantial gainful activity [18] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c (a)(3)(B); *see also* 20 C.F.R. § 416.905 (footnote not in original). A

person's physical or mental impairment is not considered disabling under the Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d) (2)(A), 1382c(a)(3)(B). In assessing a claim of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir.1988).

The regulations set forth a five-step sequential process to evaluate disability claims. 20 C.F.R. §§ 404.1520, 416.920. The first step requires the ALJ to determine whether the claimant is presently engaged in substantial gainful activity. 20 C.F.R. §§ 404 .1520(b), 416.920(b). If so, he is not considered disabled; if not, Step Two requires the ALJ to determine whether the claimant has a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from a severe impairment, Step Three requires the ALJ to determine whether the claimant's impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 404.1520(d)-(e), 416.920(d)-(e). If the claimant's impairment meets or equals a listed impairment, the claimant is presumptively disabled; if the claimant is not presumptively disabled, Step Four requires the ALJ to consider whether the claimant's residual functional capacity ("RFC") [19] precludes the performance of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the ALJ so finds, Step Five requires the ALJ to determine whether the claimant can do any other work. 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant retains the burden of proof as to the first four steps, and the Commissioner bears the burden of proving the fifth step. See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir.2004).

**\*17** The Social Security Act authorizes the court, when reviewing decisions of the SSA, to order further proceedings, as expressly stated in sentence four of the statute:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgement affirming, modifying, or reversing the decision

of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. § 405(g); Butts, 388 F.3d at 384. Remand is warranted where "there are gaps in the administrative record or the ALJ has applied an improper legal standard." Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir.1999) (internal quotation marks omitted) (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir.1996)); cf. Butts, 388 F.3d at 384. Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117 (2d Cir.2000)).

In considering whether a remand is appropriate, the court looks to whether the ALJ complied with his affirmative duty to fully develop the record, which applies even when a claimant is represented at the hearing. See Perez v. Chater, 77 F.3d 41, 47 (2d Cir.1996). To that end, the ALJ must seek additional evidence or clarification when the "report from [the applicant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e)(1), 416.912(e) (1); see also Rosa, 168 F.3d at 79 (describing the ALJ's obligation to develop the record). In addition, the ALJ must adequately explain his analysis and reasoning in making the findings on which his ultimate decision rests and must address all pertinent evidence. See, e.g., Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir.1995); Ferraris v. Heckler, 728 F.2d 582, 586-87 (2d Cir.1984); Allen ex rel. Allen v. Barnhart, 2006 WL 2255113, at *10 (S.D.N.Y. Aug. 4, 2006).

If the ALJ failed in his duty to fully develop the record or committed other legal error, a reviewing court

> should reverse the Commissioner's decision and remand the appeal from the Commissioner's denial of benefits for further development of the evidence. If, on the other hand, the district court determines

that there is substantial evidence of disability in the administrative record, it may decide to reverse the Commissioner's decision, make a determination of disability and remand solely for the calculation of benefits. Such a remedy is an extraordinary action and is proper only when further development of the record would serve no purpose.

**\*18** *Rivera v. Barnhart,* 379 F.Supp.2d 599, 604 (S.D.N.Y.2005).

In short, a remand solely for an award of benefits may be justified if the court finds that the Commissioner's decision was not based on substantial evidence and that further development of the record would not change that result. *Id.* at 604. Delay alone, however, is not a valid basis for remand solely for calculation of benefits. *See Bush v. Shalala,* 94 F.3d 40, 46 (2d Cir.1996) (citation omitted).

## II. *Assessment of Defendant's Motion*

The SSA seeks a remand to correct several identified errors of the ALJ. We address these errors and several others that warrant a remand unless there is a basis in the record to order an outright award of benefits.

## A. *The ALJ's Conclusion that Plaintiff Could Perform Light Work*

The Commissioner asserts that the ALJ did not adequately explain how he weighed the medical evidence and medical opinions and arrived at his conclusion that the plaintiff was able to perform light work, particularly given the "widely varied assessments" of Lugo's ability to perform these activities. (Def.'s Mem. 4.) He argues that this error compels remand. We agree.

"It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [his] reasoning to permit the reviewing court to judge the adequacy of [his] conclusions." *Pacheco v. Barnhart,* 2004 WL 1345030, at \*4 (E.D.N.Y. June 14, 2004) (internal quotation marks omitted) (quoting *Rivera v. Sullivan,* 771 F.Supp. 1339, 1354 (S.D.N.Y.1991)). Courts in this Circuit have long held that an ALJ's "failure to acknowledge relevant evidence or explain its implicit rejection is plain error." *Kuleszo F/K/A Dillon v. Barnhart,* 232 F.Supp.2d 44, 57

(W.D.N.Y.2002). Although "every conflict in a record [need not be] reconciled by the ALJ ... the crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris,* 728 F.2d at 587.

While the ALJ stated that he had reviewed "the entire body of evidence" in the record, his decision cited the findings of only a small number of the consultative physicians on the question of Lugo's physical limitations. (Tr. 159.) Further, none of those cited had provided an opinion on Lugo's RFC that quantified how long Lugo could sit or walk, and how much he could lift, findings that would form the basis for a determination of whether a claimant can perform sedentary, light, medium, heavy or very heavy work. (Tr. 159-60.) The ALJ cited two assessments by Dr. Finger, who found Lugo "mildly" limited in sitting, "mildly to moderately" limited in standing and walking and "moderately" limited in lifting and carrying; an assessment by Dr. Joseph, who found that Lugo had "mild" restrictions on walking and prolonged standing, no limitation on sitting and "mild" restrictions on carrying and lifting heavy objects; and an assessment by Dr. Cacciarelli, who found that Lugo had a "limited" ability to push, pull or carry heavy objects or stand for long periods of time. (*Id.*) However, it is not clear from the ALJ's decision how these doctors' assessments of "mild" or "moderate" limitations corresponded with the SSA physical-exertion requirements for light work. Moreover, the three cited doctors differed among themselves as to Lugo's limitations, and it was far from clear whether the use of the word "mild" to describe Lugo's limitations by Drs. Finger and Joseph meant the same thing. While the ALJ did explain the basis for according little weight to the opinion of Dr. Natta-who claimed that plaintiff was "unable to work in any capacity" (Tr. 162)-he apparently used the general and unquantified assessments by Drs. Finger, Joseph, and Cacciarelli to conclude that plaintiff could meet the physical requirements of light work. Moreover, he did not mention, assess or reconcile the reports of other doctors in the record-including Drs. DeLeon, Mason, Reynolds and Danza-who did quantify Lugo's exertional capacities. [20]

**\*19** It is true that we might infer that the conclusions reached by the physicians in the record who quantified Lugo's limitations were not significantly different from the reports, for example, of Dr. Finger, who found mild,

mild to moderate, and moderate limitations in Lugo's exertional requirements. (Tr. 159-60.) Nonetheless, we may not fill in the blanks of the ALJ's reasoning where it is not explicit and on that basis "affirm the ALJ's ruling based upon reasoning attributed to [him] on review but not identified in [his] opinion." (Tr. 216); *Lugo v. Apfel,* 97 Civ. 4942 (S.D.N.Y. Sept. 28, 1998) (JSR) at 3; *see, e.g., Williams,* 859 F.2d at 260-61; *Rivera,* 771 F.Supp. at 1354.

The ALJ similarly did not explain how he weighed the functional-capacity assessments that he noted and those that he did not specifically evaluate, despite the centrality of those assessments to the question of plaintiff's exertional capacity. "[W]here the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate." *Butts,* 388 F.3d at 385. Accordingly, this omission justifies a remand for further proceedings to permit the ALJ to specify how he weighed the medical evidence presented, especially the medical evaluators' quantification of Lugo's RFC, and to explain how he evaluates those varied assessments to arrive at his determination of Lugo's RFC.

2. *Plaintiff's Mental Impairments*
The Commissioner also points out that in assessing the limitations in Lugo's mental functioning, the ALJ arrived at two inconsistent findings in the body of his decision and did not explain or reconcile them. At one point, after reviewing the reports of psychiatrists DelaChapelle, Tapia and King, the ALJ found that Lugo's "overall psychiatric status from January, 1998 to March 2000 was a dysthymic disorder *imposing mild to moderate limitations."* (Tr. 162 (emphasis added).) The ALJ explained that these psychiatrists had examined Lugo both before and after Dr. Marcuzzo and found, at most, "mild to moderate impairments," in contrast to the "major depression" and other serious mental impairments found by Dr. Marcuzzo. The ALJ explained this variance by characterizing Lugo's condition as having "worsened temporarily" when he saw Marcuzzo. (Tr. 161-62.)

The ALJ went on to evaluate Lugo's assertions concerning his psychiatric problems, and found that there was "simply no medical support in the record for these allegations." (Tr. 163.) In doing so, the ALJ did not explain how he arrived at the conclusion in the next paragraph that Lugo retained a RFC for the full range of light work based on his having mild to moderate

limitations on physical functioning and *"no limita[ti]ons on mental functioning." (Id.* (emphasis added).)

This inconsistency is potentially critical in terms of the disability analysis. Mental limitations are considered "nonexertional" for purposes of the fifth step in the disability analysis, *see* 20 C.F.R. § 416.969a(c)(1)(i)-(ii), [21] and, if present, preclude the ALJ's exclusive reliance (as was the case here) on the medical-vocational (or grid) guidelines to dictate whether the applicant is disabled. *See, e.g., Butts,* 388 F.3d at 383-84.

**\*20** Despite the ALJ's reference in his decision to "mild to moderate" limitations in Lugo's mental functioning, he then ignored that finding, stating instead that Lugo had no such limitations. (Tr. 163.) This allowed him to rely exclusively on the grid regulations and to decide that "[b]ased on an exertional capacity for light work, and the claimant's age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 202.16." (Tr. 165.)

"In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids)." *Rosa,* 168 F.3d at 78 (internal quotation marks omitted) (quoting *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986)). However, exclusive reliance on the grids is inappropriate where

> the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform. In these circumstances, the Commissioner must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.

*Id.* (internal quotation marks omitted) (quoting *Bapp,* 802 F.2d at 603).

By seemingly concluding that Lugo's limitations were solely exertional in nature, the ALJ dispensed with the requirement that he consult a vocational expert or look for equivalent evidence. Instead, he made his "not disabled" determination solely by consulting "the Social Security Act's table of medical-vocational guidelines, ...

to conclude that [Lugo] was capable of performing other jobs existing in significant numbers in the national economy and therefore did not meet the requirements for disability status." *Butts,* 388 F.3d at 382; (Tr. 165). By not reconciling his contradictory statements concerning Lugo's limitations on his mental functioning, the ALJ made it impossible for the court to evaluate the role that Lugo's non-exertional limitations (or lack thereof) played or should have played in the ALJ's conclusion that Lugo was not disabled. *See, e.g., Treadwell v. Schweiker,* 698 F.2d 137, 142 (2d Cir.1983) ("[I]t is an elementary rule that the propriety of agency action must be evaluated on the basis of stated reasons.").

Furthermore, even the ALJ's alternative finding of "mild to moderate" mental impairments-which arguably reflect an impairment that is not "significant," *Rosa,* 168 F.3d at 78-cannot stand without further explanation. As noted, Dr. Marcuzzo found that plaintiff was suffering from a "major depression." Although the ALJ opined that the psychiatrist was observing only a transient phenomenon-thus implicitly crediting Dr. Marcuzzo's findings-that determination of transience in a major depression appears to be a medical assessment calling for medical expertise and hence could not be invoked by the ALJ based solely on his lay inference. *See, e.g ., Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir.1998) ("[I]t is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion .... [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who" submitted an opinion to or testified before him.) (internal quotation marks omitted) (quoting *McBrayer v. Sec'y of Health and Human Servs.,* 712 F.2d 795, 799 (2d Cir.1983)); *Filocomo v. Chater,* 944 F.Supp. 165, 170 (E.D.N.Y.1996) (stating that by re-evaluating a doctor's conclusions, the ALJ improperly "engaged in his own evaluations of the medical findings").

**\*21** In sum, because of limitations in the ALJ's analysis and explanations, as well as an apparent gap in the medical record, we are unable to perform a proper review of the ALJ's findings in this respect. It follows that in this case, "further findings would [ ] plainly help to assure the proper disposition of [the] claim," *Rosa,* 168 F.3d at 83, and we believe that remand would be "particularly appropriate" to clarify this matter. *Id.; see also Clark v. Barnhart,* 2003 WL 22139777, at \*2 (E.D.N.Y. Sept. 16, 2003) ("Because

of the inconsistent findings by the ALJ, remand is required for a definitive determination as to whether [claimant] is or is not disabled....").

### 3. *The Role of Alcoholism and Drug Abuse*

The Commissioner also notes that the ALJ never addressed the role that alcoholism and drug abuse played in Lugo's disability determination. As he points out, even if the ALJ found plaintiff to be disabled, he could not award benefits without first addressing the impact of such substance abuse, and for this reason a remand rather than an award of benefits is appropriate. (Def.'s Mem. 8-9, Def.'s Reply Mem. 5-6.) [22]

"[A] person found to be disabled after employment of the five-step sequential evaluation will not be considered disabled within the meaning of the Act 'if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to' a finding of disability." *Orr v. Barnhart,* 375 F.Supp.2d 193, 200 (W.D.N.Y.2005) (quoting 42 U.S.C. § 423(d)(2)(C)). The regulations make clear that the "key factor" in this analysis is whether the Commissioner would still find the claimant disabled if he stopped using alcohol or drugs. *See* 20 C.F.R. §§ 404.1535(b) (1)-(2); 416. 935(b)(1)-(2). "When the record contains medical evidence of substance abuse, the Commissioner should evaluate which of the claimant's 'current physical and mental limitations ... would remain if [he] stopped using drugs or alcohol and then determine whether any or all of [these] remaining limitations would be disabling.' " *Eltayyeb v. Barnhart,* 2003 WL 22888801, at \*4 (S.D.N.Y. Dec. 8, 2003) (alterations in original) (quoting 20 C.F.R. § 404.1535(b)(2) (2003)).

> If the remaining limitations would not be disabling, then drug addiction or alcoholism is a contributing factor material to the determination of disability. 20 C.F.R. § 404.1535(b)(2)(i). When the record reflects drug or alcohol abuse, the claimant bears the burden of proving that substance abuse is not a contributing factor material to the disability determination.

*Id.*

The ALJ found that Lugo's mental impairments were not sufficiently severe to prevent him from working, warranting a finding that Lugo was not disabled. Hence, he never addressed the question of the effect of alcoholism or drug addiction on Lugo's condition. If, however, the

ALJ determined on remand that Lugo became disabled at any relevant time, he would be required to consider the effects of Lugo's alcoholism and drug use on his impairments and limitations. Lugo consistently indicated that his abuse of these substances had been longstanding, which would underscore the need for the ALJ to elicit evidence concerning their effect on Lugo's mental status. (*See* Tr. 118 (heavy drinker since the age of 15); 120 (admitted to snorting cocaine for 10 years); 124 (history of alcohol abuse since his adolescence; used cocaine in the past also); 319 (admitted he was a heavy drinker and cocaine abuser for many years); 334 ("prior history of cocaine abuse for several years"); 480 (admitted to drinking heavily and using cocaine and marijuana for 10 years); 502 (cocaine and marijuana use for 15 years); 531 (alcohol and marijuana dependence since adolescence; cocaine use since age 30).)

**\*22**  Moreover, depending on when the disability began, the assessment could be complicated by the fact that the record provides contradictory statements by Lugo as to when he discontinued abusing these substances. The record as it stands leaves the unanswered question whether Lugo may have been abusing these substances during at least some of the period for which he is seeking SSI benefits and what effect that continued use had on his psychiatric evaluations and the conclusions drawn from them. (*See* Tr. 28 (last used cocaine and alcohol in 1992); 118-20 (still drinking in March 1994 and stopped using cocaine in February 1994); 124 (stopped using cocaine and alcohol in 1993 or 1994); 319 (stopped using alcohol in 1995 and cocaine in 1991); 334 (stopped using cocaine in 1995); 480 (stopped using alcohol, cocaine and marijuana in 1997); 502 (stopped using cocaine in 1995); 531 (stopped using alcohol and marijuana in 1997 and cocaine in 1993).) [23] If the timing of the dependency became relevant, the ALJ would have to make the pertinent findings on this point.

4. *The ALJ's Assessment of Pain*

Apart from the issues that defendant flags as justifying a remand, we note an additional problem with the findings of the ALJ. In making a disability determination, the ALJ must take into account the claimant's assertions of disabling pain, even if the claim is premised on subjective symptoms, so long as the evidence establishes that the claimant has a medical impairment that could "reasonably be expected to produce pain." *See, e.g., Snell v. Apfel,* 177 F.3d 128, 135 (2d Cir.1999). The ALJ is of course

free to discount such testimony if he finds it not to be credible, but in assessing that credibility question he must consider a variety of factors specified in the SSA regulations, and consistent with the general requirement for a clear explanation of his analysis, he must sufficiently articulate his reasoning to demonstrate his compliance with the regulation. *See, e.g., Bush,* 94 F.3d at 46 n. 4. In assessing claims of pain, the ALJ must consider the claimant's daily activities; the location, duration, frequency and intensity of the pain; any precipitating and aggravating factors; the claimant's medications (including type, dosage, effectiveness and side effects); treatments other than medication that claimant uses to relieve pain; any other measures used to relieve pain; and any other factors concerning functional limitations and restrictions due to pain. *See* 20 C.F.R. § 404.1529(c)(3).

In this case, the ALJ, when addressing pain, mentioned but did not evaluate Lugo's medication regime, referred to Lugo's attempts to do light housework and cited the lack of physical therapy or surgery. He erred in failing to discuss most of the regulatory factors and in failing concretely to address evidence supportive of plaintiff's claim. Thus, he did not directly assess plaintiff's detailed descriptions of the pain and the limitations it imposed on his activities-although he concluded that Lugo was not credible-and he failed to address the seeming consistency of the symptoms described by Lugo with the conceded diagnoses of both treating and consulting physicians that he suffers from low-back sclerosis. Furthermore, his reference to the absence of alternative treatment measures-specifically, physical therapy and surgery-appears to have usurped the role of doctors in proffering expert opinions, since the record does not demonstrate (as the ALJ assumed) that plaintiff's diagnosed sclerosis condition could be alleviated by either therapy or surgery.

**\*23**  While the ALJ is permitted to reject subjective testimony concerning pain for lack of credibility, he must provide an explicit and sufficient explanation so that the decision can be reviewed by the court for legitimacy of reasoning and sufficient evidentiary support. *See, e.g., Williams,* 859 F.2d at 260-61; *Rivera,* 771 F.Supp. at 1356 n. 8; *Brandon v. Bowen,* 666 F.Supp. 604, 608 (S.D.N.Y.1987). Particularly since the principal rationale of the plaintiff's disability claim, as reflected in Dr. Natta's reports, is his assertion that he suffers from disabling pain, the failure of the ALJ to lay out a detailed assessment

explaining his rejection of plaintiff's claim requires a remand for correction of this omission.

### B. *Remand for Benefits Is Not Appropriate*

1. *The Current Record Does not Compel a Benefit Award*

In plaintiff's cross-motion, he argues that reversal and remand for payment of benefits is appropriate because substantial evidence in the record supports a finding that he is disabled. (Pl.'s Mem. 17-23.) He suggests that every doctor who examined him concluded that he had some functional limitations due to low-back pain, and he focuses on the reports from his treating physician, Dr. Natta, who found that his pain placed serious limitations on his activities. (*Id.* at 17-18.) He argues that Dr. Natta's findings "were not an aberration," were "well-supported" by his clinical observations and later X-rays and, though not "100% consistent" with the reports of other consulting physicians, did not have to be. (*Id.* at 18-19.) Finally, he claims that if Dr. Natta's opinions were given the "controlling weight" they deserved, a finding of disability would be mandatory. (*Id.* at 20.)

In a proceeding to review a final decision of the Commissioner, the plaintiff bears the burden of establishing the existence of a disability. *See, e.g., Curry,* 209 F.3d at 122. Necessarily, then, in seeking a remand solely to calculate benefits, Lugo must demonstrate that the record so clearly supports his claim of disability that a remand for further consideration of that question would serve no purpose. *See, e.g., Butts,* 388 F.3d at 385-86 (quoting *Rosa,* 168 F.3d at 83). Plaintiff fails to make that case.

Lugo bases his argument primarily on the contention that the ALJ erred in not according the reports of his treating physician, Dr. Natta, controlling weight pursuant to the treating physician's rule. The "treating physician rule" is embodied in a series of provisions found in 20 C.F.R. § 404.1527, which details the weight to be accorded a treating physician's opinion and the opinions of non-treating consulting doctors. The treating doctor's opinions are entitled to "controlling weight" in certain specified circumstances:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

**\*24** 20 C.F.R. § 404.1527(d)(2); *see, e.g., Green-Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003). The regulations further specify that if the SSA does not give controlling weight to the opinions of the treating physician, it must consider a series of specified factors in determining the weight to be given those opinions: (1) the length of the treatment relationship and the frequency of examination, with a treating physician's opinion being given more weight; (2) the nature and extent of the treatment relationship, with a treating physician's opinion being given more weight; (3) the evidence that supports the physician's report; (4) how consistent the opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factor that may be significant. 20 C.F.R. §§ 404.1527(d)(2)-(6).

The ALJ found that Dr. Natta's opinions were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and were "inconsistent with the other substantial evidence" in the record. We find that the ALJ's conclusions in this respect-although not mandated by the record-are supported by substantial evidence.

The most recent submission of Dr. Natta consisted of a one-page letter dated October 9, 1998 in which he asserted that Lugo was "being treated at this facility" for "degenerative joint disease-sclerosis of the sacroiliac joints" with persistent low-back pain; that Lugo had a latent luetic infection and type II diabetes; and that he had undergone surgery to remove kidney stones in 1994 and surgery to remove hydroceles in 1997. He also reported that Lugo's medications included Tylenol # 3 and Flexeril. He concluded that Lugo "is unable to work in any capacity" (Tr. 500), but provided no "medically acceptable clinical and laboratory diagnostic techniques" to support that statement.

The other records from Dr. Natta date from 1993 and 1995. (Tr. 128-39.) They consist principally of doctor's notes indicating that Lugo had "tenderness" in his lumbar spine (Tr. 129), which was apparently diagnosed as "lumbago. R/O [rule out] osteoarthritis of lumbar

spine." (Tr. 131.) He also provided a medical report in 1995 in which he indicated that he was then treating Lugo every three months (Tr. 133), and he offered a "poor" prognosis due to back pain that had persisted and was not controlled by analgesics. (Tr. 134.) [24] In that report, he estimated that Lugo could sit for up to one-half hour to an hour continuously, and stand for a total of one hour in an eight-hour day and sit for a total of one hour in an eight-hour day; that he could "never" lift or carry any weight, and "never" bend, squat, climb or reach; and that he was "unable to work with persistent pain only partly relieved by analgesics." (Tr. 135-37.)

The ALJ's analysis, at least in general terms, followed the contours mandated by the "treating physician" regulation. He observed that Dr. Natta had "report [ed] no clinical or laboratory findings or any other support for such a degree of impairment" (Tr. 162), and that finding is clearly supported by substantial evidence. Although the ALJ did not make a specific finding that Dr. Natta's conclusions were "inconsistent with the other substantial evidence" in the record, he specifically referred to a series of findings by a number of other doctors who found, contrary to Dr. Natta's reports, only mild or moderate limitations. He apparently concluded, based on this discrepancy, that Lugo was capable of substantially greater exertional activity than Dr. Natta had suggested. (Tr. 159-60.)

**\*25** Given the substantial body of medical opinion rejecting the conclusions of the one treating or examining doctor who has unequivocally opined that plaintiff was physically unable to perform work activities, [25] it cannot be said that the evidence of record so clearly points to a physically disabling condition as to justify a judicially mandated award of benefits. *See, e.g., Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004); *Snell,* 177 F.3d at 133. As for plaintiff's psychiatric condition, as we have noted, there is conflicting evidence in the record as to whether Lugo was suffering from an ongoing severe impairment, and the ALJ failed to offer a consistent and clear set of findings about that condition. This omission mandates a remand, but does not-on the current state of the record, and especially given the confusion about plaintiff's substance abuse-justify an award of benefits at this stage.

As noted, a remand for calculation of benefits is required when the court finds that there is "no apparent basis

to conclude that a more complete record might support the Commissioner's decision." *Butts,* 388 F.3d at 385-86 (quoting *Rosa,* 168 F.3d at 83); *see also Parker,* 626 F.2d at 235 (remand for the calculation of benefits is appropriate where "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose"). Because the administrative record and the findings of the ALJ contain significant gaps and further findings will "plainly help to assure the proper disposition of [the] claim," *Rosa,* 168 F.3d at 83, and because it is entirely possible that a complete record would justify the SSA's current conclusion that plaintiff was not disabled at the relevant time, remand for calculation of benefits is not appropriate here. A more complete record, explicit discussion of the weight accorded by the ALJ to the varying assessments of Lugo's functional limitations, clarification of his findings concerning Lugo's mental limitations, more specific findings as to pain and exploration of the relationship between Lugo's substance abuse and his mental limitations are necessary to-once and for all-make a final determination in this case.

### 3. *Extensive Delay Does Not Justify An Award of Benefits*
Plaintiff also asserts that the "extensive delay in the adjudication of Mr. Lugo's claim is extraordinary and would, if standing alone, seriously test [ ] the Second Circuit's pronouncement in *Bush v. Shalala,* that delay alone is not grounds for reversal and payment [of] benefits." (Pl.'s Mem. 1.) In *Bush,* the Second Circuit held that "absent a finding that the claimant was actually disabled, delay alone is an insufficient basis on which to remand for benefits." 94 F.3d at 46. It is uncontroverted that Lugo's three applications have been denied at every level of the administrative process. Moreover, the District Court's remand in 1998 and the recommended remand in this instance do not reflect on the merits of Lugo's applications, but rather are directed principally to the failings of the ALJ in not explaining the basis of his findings. We recommend that the court decline Lugo's invitation to extend the holding of *Bush* to rule that even if the ALJ finds a claimant not disabled and there is substantial evidence to support that finding, the delay in resolution is a sufficient basis to remand for benefits.

### III. *Time Limit for Remand*
**\*26** There remains the question of whether a remand order may and should impose a time limit for the SSA to

complete all further proceedings in this case. We conclude with an affirmative answer on both counts.

The Second Circuit has noted the authority of the court to require, in appropriate circumstances, that the agency adhere to a timetable on remand. The Court noted that 42 U.S.C. § 405(b) provides that

> after an adverse decision on a disability claim, a claimant is entitled to "reasonable notice and opportunity for a hearing with respect to such decision." 42 U.S.C. § 405(b)(1). We have interpreted footnote 33 of [Heckler v.] Day, [467 U.S. 104 (1984) ] to mean that injunctive relief would still be an appropriate remedy for individual cases involving unreasonable delays.

Butts v. Barnhart, 416 F.3d 101, 105 (2d Cir.2004) (internal quotation marks omitted) (quoting Barnett v. Bowen, 794 F.2d 17, 22 (2d Cir.1988)).

In Butts, the Second Circuit observed that it was mindful of the "often painfully slow process by which disability determinations are made, and that a remand for further evidentiary proceedings (and the possibility of further appeal) could result in a substantial, additional delay." 388 F.3d at 387 (internal quotation marks and citations omitted) (quoting Carroll v. Sec' y of Health and Human Servs., 705 F.2d 638, 644 (2d Cir.1983)). In remanding Butts's application, the circuit court instructed the district court "to direct that further proceedings before an ALJ be completed within 60 days of the issuance of the district court's order and, if that decision is a denial of benefits, a final decision of the Commissioner be rendered within 60 days of Butts' appeal from the ALJ's decision. The district court's order should provide that, if these deadlines are not observed, a calculation of benefits owed Butts must be made immediately." Butts, 388 F.3d at 387. The Commissioner sought a rehearing, asserting, inter alia, that the 60-day time limit was not sufficient time for the SSA to render a decision while complying with its own

rules and regulations, and the Court extended the time limit to 120 days. Butts, 416 F.3d at 102.

In light of the fact that more than ten years elapsed between the plaintiff's filing of his initial application and the full briefing of the current motions, we recommend that the District Court require that the proceedings before an ALJ must be completed within 120 days of the issuance of the District Court's remand order. [26]

## CONCLUSION

Based on the foregoing, we recommend that the Commissioner's motion be granted, that plaintiff's cross-motion be denied, and that the case be remanded for further proceedings consistent with this opinion. In addition, we recommend that the remand order require that proceedings before an ALJ be completed within 120 days of the issuance of the order.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Jed S. Rakoff, Room 1340, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

## All Citations

Not Reported in F.Supp.2d, 2008 WL 515927

---

Footnotes

1    Arthralgia is defined as "pain in a joint." Dorland's Illustrated Medical Dictionary 140 (28th ed.1994) [hereinafter Dorland's ].

2    This hearing, like the two subsequent ones, was conducted with the assistance of a Spanish interpreter. (Tr. 26, 540, 553.)

3    Lithotripsy is defined as "the crushing of a calculus within the urinary system or gallbladder, followed at once by the washing out of the fragments; it may be done either surgically or by several different noninvasive methods." Dorland's 952.

4   Plaintiff first received muscle relaxants-100 mg of Maclamen three times a day and 10 mg of Flexeril four times a day. (Tr. 131, 132.) In 1994, Dr. Natta replaced the Meclamen with Indocin, 50 mg three times a day. He later added Tylenol # 3 with codeine four times a day. As of November 1995, Lugo was taking Motrin 600, Tylenol # 3 and Flexeril. (Tr. 132.)

5   Nocturia is defined as "excessive urination at night." *Dorland's* 1142.

6   Sclerosis involves a hardening, in this case at the joints. *Dorland's* 1495-96.

7   "Luetic" means "syphilitic." *Dorland's* 961.

8   A hydrocelectomy is the process of draining excess fluid, especially from the testicles or spermatic cord. *Dorland's* 783.

9   This term refers to a "mood disorder characterized by depressed feeling ... and loss of interest or pleasure in one's usual activities and in which the associated symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depression." *Dorland's* 519.

10  Crepitus is defined as "the crackling sound produced by the rubbing together of fragments of a fractured bone." *Dorland's* 391.

11  This reference is to the gradual conversion of a bone into an ivory-like mass. *Dorland's* 524. In the case of osteoarthritis-which appears to be plaintiff's condition, as the same exam revealed (Tr. 323)-the bone thins and loses cartilage, "resulting in [the] exposure of the subchondral bone, which becomes denser and the surface of which becomes worn and polished." *Dorland's* 524.

12  The record contains no documentation of the treatment by Dr. Chattah.

13  This term refers to a normal psychological state, not manic or depressed. *See, e.g., Santiago v. Barnhart,* 441 F.Supp.2d 620, 624 n. 3 (S.D.N.Y.2006) (citing *PDR Medical Dictionary* 627 (2d ed.2000)); *accord, e.g., Wren v. Astrue,* 2007 WL 1531804, at *5 n. 4 (D.Kan. May 23, 2007).

14  It is not clear whether Dr. Cadet actually examined plaintiff or simply reviewed his medical records.

15  Another physician, Dr. John Cordice, signed a concurring endorsement on Dr. Danza's assessment, on April 5, 2000. (Tr. 529.)

16  The regulation states:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm and leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to substantially all of these activities.

> 20 C.F.R. 416.9267(b).

17  The explanatory statement found in SSR 83-10 is confusing in explaining the standing and walking requirements of the cited regulation. It first states that this portion of the regulation requires "frequent lifting or carrying of objects"-which it notes implies a requirement for extended standing or walking-and it defines "frequent" as "occurring from one-third to two-thirds of the time." It then goes on, however, to state that "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." If, however, "frequent" means "one-third to two-thirds of the time," one might expect a standing/walking requirement of about two and one-half to five hours, but SSA does not address this apparent anomaly. In any event, as noted, light work is defined, alternatively, to encompass mostly sitting if accompanied by a sufficient amount of pushing or pulling with the use of arm or leg controls to a greater degree than required for sedentary work.

18  Substantial gainful activity is defined as work that: "(a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F .R. § 416.910.

19  RFC is defined as the most a claimant can do, despite limitations. In determining a claimant's RFC, all medically determinable impairments will be considered, including those that do not qualify as "severe". 20 C.F.R. § 416.945(a).

20  We do note that Drs. Mason, Reynolds and Danza reviewed plaintiff's medical records but did not examine him. The assessments of such non-examining doctors are entitled to less weight than the findings of treating or examining doctors. 20 C.F.R. § 404.1527(d)(1); *see, e.g., Campagna v. Barnhart,* 2007 WL 1020743, at *5 (D.Conn. Apr. 3, 2007); *Rivera v. Barnhart,* 423 F.Supp.2d 271, 278 (S.D.N.Y.2006); *Steficek v. Barnhart,* 462 F.Supp.2d 415, 419 n. 4 (W.D.N.Y.2006).

21  Pursuant to 20 C.F.R. § 416.969a(c)(1)(i) and (ii), non-exertional limitations include "difficulty functioning because you are nervous, anxious or depressed" or "difficulty maintaining attention or concentration."

22  Plaintiff does not directly address this question in his memorandum of law, suggesting instead that the evidence demonstrates that he is disabled as a result of his physical limitations, thus compelling an award of benefits without reference to his psychological status. (Pl.'s Mem. 23 n. 21.)

23   Note that plaintiff generally frames these estimates in terms of number of years prior to the examination rather than naming a particular year (e.g., "three years ago" rather than "in 1995"); therefore, the dates that we extrapolate are frequently based on a calculation.

24   Natta also referred to plaintiff having undergone a lithotripsy. (Tr. 134.)

25   Although Dr. Cadet also stated that Lugo was disabled, it does not appear that he examined plaintiff. (Tr. 479.)

26   We readily acknowledge that this court's report and recommendation has been a long time (indeed far too long a time) in coming and that our slowness has contributed to the already extended time-line for a final disposition of Lugo's three applications. This part of the delay is of course not attributable to the SSA.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

---

2015 WL 2137776
United States District Court,
S.D. New York.

Luciano MORALES, Plaintiff,
v.
Carolyn W. COLVIN, Defendant.

No. 13 Civ. 06844(LGS)(DF).
|
Signed May 4, 2015.

## OPINION & ORDER

LORNA G. SCHOFIELD, District Judge.

**\*1** Before the Court is the Report and Recommendation of Magistrate Judge Debra Freeman (the "Report"), recommending that Plaintiff's motion for judgment on the pleadings be granted in part, and that Defendant's cross-motion be denied. For the reasons stated below, the Report is adopted in its entirety.

Plaintiff Luciano Morales brings this action against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner"), seeking judicial review of a final decision of the Commissioner denying Plaintiff Supplemental Security Disability benefits under the Social Security Act. The parties filed cross-motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). On February 10, 2015, Judge Freeman issued the Report, to which no objection was filed.

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). The district court "may adopt those portions of the report to which no specific, written objection is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law." Adams v. N.Y.S. Dep't of Educ., 855 F.Supp.2d 205, 206 (S.D.N.Y.2012) (internal quotation marks omitted) (citing Fed.R.Civ.P. 72(b) and Thomas v. Arn, 474 U.S. 140, 149 (1985)).

The factual and legal bases underlying the Report are not clearly erroneous or contrary to law. Accordingly, the Report is ADOPTED in its entirety as the decision of the Court.

Plaintiff's motion for judgment on the pleadings is GRANTED to the extent that Plaintiff requests that his claim be remanded for further consideration of his mental impairments. Defendant's cross motion is DENIED.

The Clerk of Court is directed to close the motions at Docket Nos. 15 and 19 and to close this case.

SO ORDERED.

## REPORT AND RECOMMENDATION

DEBRA FREEMAN, United States Magistrate Judge.

## TO THE HONORABLE LORNA G. SCHOFIELD, U.S.D.J.

Plaintiff Luciano Morales ("Plaintiff") seeks review of the final decision of the Acting Commissioner of Social Security ("Defendant" or the "Commissioner"), denying Plaintiff Supplemental Security Disability benefits ("SSD") under the Social Security Act (the "Act") on the ground that Plaintiff's impairments did not constitute a disability for the purposes of the Act. Plaintiff has moved, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings reversing the decision of the Commissioner. (Dkt.15.) Defendant has crossmoved for judgment on the pleadings affirming that decision. (Dkt.19.)

For the reasons set forth below, I respectfully recommend (a) that Plaintiff's motion be granted, to the extent that Plaintiff requests that his claim be remanded for further consideration of his mental impairments, and (b) that Defendant's cross-motion be denied.

## BACKGROUND

### A. Medical Evidence

**\*2** Plaintiff applied for disability insurance benefits on August 3, 2010 (see R. 126–34[1]), claiming a disability onset sate of March 1, 2009 (id. at 128, 147). Plaintiff asserted that he was disabled due to throat cancer (stage unknown), diabetes, neuropathy, high blood pressure,

high cholesterol, depression, anxiety, insomnia, lower back pain, and arthritis in the right shoulder and arm. (*Id.* at 151.) Despite this array of claimed conditions, though, Plaintiff's current challenges to the denial of his benefits claim are based solely on his alleged mental impairments, and thus this Court's summary of the evidence will focus primarily on those portions of the voluminous Record that relate to Plaintiff's mental health.

### 1. *Montefiore Medical Center*

Although, as described below, Plaintiff made visits and/or was admitted to a number of hospitals in 2010 and 2011, including Lincoln Medical and Mental Health Center, Metropolitan Hospital, Bronx Lebanon Hospital, and Bellevue Hospital, generally following suicide attempts (*see infra* at Background Section A(2)), the healthcare professionals with whom Plaintiff appears to have had the closest treatment relationships, during that same period of time, were affiliated with Montefiore Medical Center ("Montefiore"). These professionals included internist [2] Dr. Bonni Stahl and psychiatrist Dr. Anthony Stern, as well as social worker Jose Rodriguez ("Rodriguez"). Plaintiff's visits with these three individuals at Montefiore overlapped, as, for the most part, he was seeing each of them during the same timeframe. For ease of reference, however, this Court will summarize their records separately-given that one of Plaintiff's arguments before this Court relates to the issue of whether the ALJ assigned the appropriate weight to the opinions of Plaintiff's individual treating sources, particularly the opinion of his treating psychiatrist, Dr. Stern.

#### a. *Evaluation and Treatment by Internist (Dr. Stahl)*

##### i. *Initial Appointment Records* (November 2009– September 2010)

Plaintiff saw Dr. Stahl on November 30, 2009. (*Id.* at 266– 71 .) Plaintiff reported a history of hypertension, diabetes, and foot pain, and disclosed multiple suicide attempts. (*Id.* at 266.) Dr. Stahl noted a history of "heavy use" of alcohol, as well as use of marijuana and cocaine. (*Id.* at 269.) Plaintiff told Dr. Stahl that, at that time, he was only drinking a six-pack of beer on weekends. (*Id.*) Dr. Stahl diagnosed Plaintiff with diabetes mellitus and alcohol abuse/depression, prescribed him Metformin [3] for his diabetes, and noted that Plaintiff might benefit from medication and counseling for his alcohol abuse and depression. (*Id.* at 271.)

On December 16, 2009, Plaintiff arrived at the clinic to see Dr. Stahl again, but left before his appointment. (*Id.* at 264.) He spoke to Dr. Stahl over the phone that evening and told her that he felt very depressed and had been "feeling suicidal since [his] last visit." (*Id.*) He also told Dr. Stahl that he had "[taken] a half bottle of ibuprofen [two] weeks [prior]." (*Id.*) He denied any current feelings of suicidality and agreed to meet with a counselor during his next appointment. (*Id.* at 265.)

**\*3** On December 23, 2009, Plaintiff had another appointment with Dr. Stahl, as well as an appointment with a social worker at Montefiore. (*Id.* at 262–63; *see also id.* at 369, and *infra* at Background Section A(1) (b).) Plaintiff related, to Dr. Stahl, the details of a recent suicide attempt, and the doctor noted that Plaintiff had a restricted affect. [4] (*Id.* at 262.) In addition to depression, Dr. Stahl diagnosed Plaintiff with poorly controlled diabetes and referred Plaintiff to a specialist to evaluate a possibly cancerous "nodule" on his vocal cord. (*Id.* at 263.)

Plaintiff saw Dr. Stahl again on March 3, 2010 (*id.* at 260), as part of a preoperative evaluation for surgery to remove a vocal cord lesion (*id.* at 206). During the evaluation, Plaintiff complained of an increase in right arm pain in the previous three months, after returning to construction work. (*Id.* at 260.) Emotionally, Plaintiff reported moving out of his girlfriend's apartment and said that he felt "great." (*Id.* at 261.) Dr. Stahl noted that Plaintiff continued to see a counselor, and that, at the time, he was stable, without any suicidal ideation. (*Id.*) She diagnosed Plaintiff with diabetes, depression, biceps tendinitis, and hyperlipidemia. [5] (*Id.*)

On September 8, 2010, Plaintiff saw Dr. Stahl and complained of severe foot pain, tingling in both hands, and shoulder pain. (*Id.* at 258–59.) He reported multiple suicidal episodes two months earlier, but reported that he was "stable" at the time of the appointment. (*Id.* at 258.) A monofilament test [6] from that date showed significant loss of sensation in Plaintiff's lower extremities. (*Id.* at 241.) He was subsequently prescribed Gabapentin. [7] (*Id.*) An examination of his shoulder indicated supraspinatus [8] weakness, and Dr. Stahl diagnosed a likely rotator cuff injury. (*Id.* at 258–59.)

### ii. *Medical Report for Determination of Disability* (September 27, 2010)

On September 27, 2010 Dr. Stahl provided a medical report and functional assessment for a determination of disability. (*See generally id.* at 221–46.) She listed Plaintiff's diagnoses as diabetes mellitus, hypertension, hyperlipidemia, laryngeal carcinoma, depressive disorder, severe peripheral neuropathy,[9] and dysarthria[10] secondary to surgery. (*Id.* at 221.) As to Plaintiff's exertional functional capacity, Dr. Stahl opined that Plaintiff could do light work, as he could lift 20 pounds occasionally and 10 pounds frequently, stand and walk for six hours a day, and push and pull with arm or leg controls. (*Id.* at 222.) As to nonexertional limitations, Dr. Stahl noted that, given his prolonged history of depression and multiple suicide attempts, Plaintiff was "abnormal" in his ability to respond to coworkers and supervisors. (*Id.*) Given Plaintiff's medical conditions, his need to make frequent doctor's appointments, and his "significant peripheral neuropathy," Dr. Stahl opined that Plaintiff was also "abnormal" in his ability to maintain adequate work attendance; grasp, release, handle, and finger objects; tolerate dust, fumes, and extremes of temperature; and tolerate exposure to heights or heavy machinery. (*Id.*) She also found that Plaintiff had speaking limitations due to dysarthria. (*Id.*) Dr. Stahl opined that Plaintiff did not have any limitations as to stooping, bending, crouching, squatting, or climbing; that he could operate a motor vehicle; and that he could understand, carry out, and remember simple instructions. (*Id.*) Regarding his shoulder injury, Plaintiff showed full range of motion, with "pain on lifting or extreme range of motion," but Dr. Stahl stated that she expected restored functional use within six months. (*Id.* at 223.)

**\*4** In assessing Plaintiff's psychiatric health, Dr. Stahl noted that Plaintiff had depressive disorder and had been hospitalized three or four times due to suicide attempts. (*Id.* at 242.) She described Plaintiff's most recent mental status exam, conducted in April 2010 (*see infra* at Background Section A(1)(c)(i)), as showing mood lability and angry mood and affect, but also coherent thought organization with no active suicidal ideation or delusions. (*Id.* at 242.) She also noted that Plaintiff had impaired insight and judgment, based on his suicide attempts and cutting behavior. (*Id.* at 243.) Dr. Stahl concluded that Plaintiff was "functional" as to activities of daily living, but that he suffered from "impaired" social

functioning "secondary to mood lability, aggression, and depression." (*Id.*) Dr. Stahl was unable to comment on how Plaintiff would function in a work setting, but mentioned that he did not always keep his mental health treatment appointments. (*Id.* at 244–45.)

### iii. *Further Appointment Records* (June 2011–July 2011)

Plaintiff returned to see Dr. Stahl on June 14, 2011. (*See generally id.* at 621–25.) At that time, Dr. Stahl noted that Plaintiff had had a prolonged lapse in medical treatment, due to insurance problems. (*Id.* at 621.) Plaintiff told Dr. Stahl that he was only drinking and smoking on weekends. (*Id* ) Plaintiff complained of persistent foot pain and reported difficulty swallowing pills, but otherwise did not suffer from dysphagia.[11] (*Id.*) Dr. Stahl also noted that he appeared anxious on examination. (*Id.* at 622.) Dr. Stahl diagnosed Plaintiff with uncontrolled diabetes, alcohol abuse, and vocal cord disease. (*Id* . at 623.) Dr. Stahl stated that she discussed the dangers of alcohol abuse with Plaintiff (*id),* and she prescribed Plaintiff Januvia (*id.*).[12]

Plaintiff saw Dr. Stahl again on July 21, 2011. (*See id.* at 615–19.) Plaintiff asked for a refill of Celexa,[13] which had been prescribed to him at Metropolitan Hospital following a suicide attempt (*see infra* at Background Section A(2)(b).), because he thought it made his mood more stable and helped with his neuropathy (*id.* at 615). Dr. Stahl noted that Plaintiff's diabetes was "poorly controlled on oral therapy" and prescribed Plaintiff a glucometer, so that he could check his blood sugar prior to beginning insulin therapy. (*Id.* at 617.) Regarding Plaintiff's diagnosed bipolar II disorder,[14] Dr. Stahl noted that Plaintiff had been taking his medication, appeared more stable and denied any suicidal ideation. (*Id.*)

### iv. *Treating Physician Wellness Plan Report* July 28, 2011)

On July 28, 2011, Dr. Stahl filled out a Treating Physician Wellness Plan Report. (*Id.* at 437–38.) She stated that Plaintiff was compliant with treatment at that time, but had a history of noncompliance due to lack of insurance. (*Id.* at 437.) She noted Plaintiff's history of diabetes and severe peripheral neuropathy (*id.*), and indicated that his diabetes was previously poorly controlled, likely due to his psychiatric illness and lack of insurance (*id.*). Dr. Stahl opined that Plaintiff was employable with limitations due

to a lack of sensation in his feet. (*Id.* at 438.) As a result of that condition, Dr. Stahl concluded that Plaintiff should avoid physical labor or activities that required him to climb ladders. (*Id.*)

**v.** *Post–Hearing Appointment Record* **(October 27, 2011)**

**\*5** Following his administrative hearing on October 19, 2011, Plaintiff had an appointment with Dr. Stahl on October 27, 2011. [15] (*Id.* at 602–08.) At this appointment Plaintiff reported completely abstaining from alcohol after his hospital admission. (*Id.* at 602.) Plaintiff was diagnosed with diabetes, peripheral neuropathy, a history of mental health disorder, and tobacco use disorder. (*Id.* at 604.) He described his foot pain as 6 out of 10 in severity. (*Id.* at 603.) Dr. Stahl re-filed Plaintiff's Celexa prescription, increased Plaintiff's dose of Gabapentin, and referred him to a podiatrist. (*Id.* at 604.)

**b.** *Plaintiff's Sessions with Social Worker ( Rodriguez)* **(December 2009–April 2011)**

On December 23, 2009, a day on which he also saw Dr. Stahl (*see supra* ), Plaintiff was referred to social worker Rodriguez (R. at 369). Plaintiff reported to Rodriguez that he had a "long history of depression," including multiple suicide attempts; he specifically reported that, just a few days earlier, he had taken "some 20–25 pain pills," which he reportedly "slept off." (*Id* ) He also reported that he and his girlfriend had just broken up. (*Id* ) Rodriguez reported that he "was able to engage [Plaintiff] and have him agree to avoid hurting himself." (*Id* ) He diagnosed Plaintiff with depressive disorder not otherwise specified, and set up an appointment with a psychiatrist (Dr. Stern). (*Id* )

On December 30, 2009, Plaintiff once again met with social worker Rodriguez. (*Id.* at 368.) He explained that he was feeling "much better." (*Id* ) Plaintiff reported that he had first tried to hurt himself when he was 17 years old, following a dispute with his mother. (*Id.*) He also explained that he had first started using drugs at age 15, but that, except for using cocaine once or twice a month "to relax," he had been drug free for three years. (*Id* ) Rodriguez noted that despite Plaintiff's drug use and self-destructive behavior, Plaintiff had not previously sought the help of a psychiatrist, therapist, or drug counselor. (*Id.*) Rodriguez stated that he and Plaintiff "addressed abandonment, loss, unresolved grief, feeling alone, anger, bitterness and resentments." (*Id* ) Rodriguez noted that Plaintiff was "clearly depressed with

most of the depressive symptoms in play," and diagnosed Plaintiff with depressive disorder. (*Id* ) The follow-up plan recorded by Rodriguez was for Plaintiff to see him "twice a month to address the issues and reduce his symptoms [and] identify his core issues and learn new tools to manage his self-destructive tendencies." (*Id.*)

Plaintiff next met with Rodriguez on January 13, 2010. (*Id.* at 367.) Plaintiff explained that, on New Year's Eve, he "had a confrontation" with another man, after which he had contemplated suicide. (*Id.*) He said, however, that, since that day, he had felt "good" and that "[e]very day has been beautiful since then." (*Id.*) Rodriguez noted the Plaintiff was "fully aware that he too impulsively becomes potentially self-destructive." (*Id.*)

**\*6** Plaintiff met with Rodriguez again on February 19, 2010. (*Id.* at 366.) Rodriguez noted that Plaintiff was "in a good mood and positive state of mind." (*Id* ) At that time, Plaintiff reported that he was planning to move out of his girlfriend's apartment, and he described his dedication to a new job. (*Id.*) He also explained that he was reducing the amount of alcohol he consumed, and Rodriguez challenged him to cut down even more. (*Id* ) Rodriguez noted that Plaintiff "was exceptionally alert and engaged in [their] discussion" and that Plaintiff "demonstrated a greater sense of understanding and insight." (*Id* ) Rodriguez again reported his diagnosis of depressive disorder, and noted that an appointment was made for Plaintiff to see Dr. Stern. (*Id* )

On April 12, 2011, Plaintiff saw Rodriguez for the first time since February 2010. (*Id.* at 364.) Plaintiff reported that he had attempted suicide four times since he had last seen Rodriguez, and that he was also not working. (*Id.; see also infra* at Background Section A(2).) Rodriguez described Plaintiff as being "in a very bad way," as he cried throughout the visit and admitted to drinking and smoking "herb." (*Id* ) Plaintiff reported that he had not seen his physician, Dr. Stahl, and that he had "let [him]self go [and] ... did nothing about [his] cancer or diabetes." (*Id* ) He expressed a willingness to return to Dr. Stahl for treatment. (*Id* ) He reported not having had a good experience with his psychiatrist, Dr. Stern, but Rodriguez noted that Plaintiff's "expectations were not reasonable." (*Id.*) Rodriguez also noted that Plaintiff was willing to reconsider medication and scheduled Plaintiff for a follow-up appointment. (*Id.*)

### c. *Evaluation and Treatment by Psychiatrist ( Dr. Stern)*

#### i. *Initial Appointment Records* (April 2010)

Plaintiff first visited his psychiatrist, Dr. Stern, on April 1, 2010. (*Id.* at 365.) At this appointment, Plaintiff explained how he was "all alone," as he "[did not] have any family left." (*Id.*) He stated that he had attempted suicide many times and often "pick[ed] fights with drug dealers and other bad people." (*Id.*) He reported to Dr. Stern that he used "alcohol, marijuana, and occasionally cocaine." (*Id.*) Plaintiff also reported that he used to hear voices, although this was "many years ago." (*Id.*) When Dr. Stern suggested the possibility of prescribing medication, Plaintiff "very clearly rejected the idea." (*Id.*) Plaintiff became "tearful and angry" when Dr. Stern told him that he would see him only occasionally, and that Rodriguez would be Plaintiff's primary contact for therapy. (*Id.*) Dr. Stern noted a "labile, mostly angry affect and mostly angry mood, [thought process] coherent, no active [suicidal or homicidal ideation] at present, no overt delusions/hallucinations ." (*Id.*) The psychiatrist's impressions were that Plaintiff suffered from "characterologic anger, and may suffer from mood [disorder] ...; [rule out] mild schizoaffective [disorder]; [and] intermittent insomnia." (*Id.*)

#### ii. *Treating Physician's Wellness Plan Report* (May 2011)

**\*7** On May 25, 2011, Dr. Stern, together with Rodriguez, filled out a Treating Physician's Wellness Plan Report on behalf of Plaintiff. (*Id.* at 378–80.) In this report, Plaintiff's diagnoses were reported to be major depressive disorder with symptoms of profound characterological anger, insomnia, loss of pleasure, self-destructive and impulsive behavior, hopelessness, mood changes, decreased motivation, irritability, racing and obsessive thoughts, anxiety, difficulty with temper control, and aggressiveness. (*Id.* at 379.) The report noted that Plaintiff had recently restarted treatment after missing scheduled appointments and was scheduled to see a therapist two-to-four times per month and a psychiatrist every two months. (*Id.*) Dr. Stern and Rodriguez opined that Plaintiff would be unable to work for at least 12 months. (*Id.* at 380.) [16]

#### iii. *Further Appointment Records* (June–July 2011)

On June 2, 2011 Plaintiff visited Dr. Stern for the first time since April 2010. (*Id.* at 626.) Plaintiff reported

intermittent feelings of suicidality and sporadic desires to hurt others. (*Id.*) Plaintiff indicated that, in the past, he had used cocaine heavily and had consumed alcohol every day. (*Id.*) He stated, however, that he was currently only drinking alcohol on weekends. (*Id.*) A mental status exam was notable for labile affect and mood, coherent thought process, no active suicidal or homicidal ideation, and no overt delusions or hallucinations. (*Id* .) Dr. Stern diagnosed Plaintiff with bipolar II disorder, with "characterologic anger problems and possible post-traumatic stress disorder] in addition to mood disorder." (*Id.* at 626.) He prescribed Plaintiff Geodon. [17] (*Id.* at 627.)

On July 20, 2011, Plaintiff saw Dr. Stern again. (*Id.* at 620 .) Plaintiff reported feeling better and calmer. (*Id.*) A mental status examination was notable for less anxious affect and "ok" mood, coherent thought process, no active suicidal or homicidal ideation, and no overt delusions or hallucinations. (*Id.*) Dr. Stern recorded the diagnosis of bipolar II disorder, noted that Plaintiff was less depressed and less anxious, and recommended that Plaintiff continue taking Celexa and Geodon. (*Id.*)

#### iv. *First Psychiatricl Psychological Impairment Questionnaire* (August 10, 2011)

On August 10, 2011, Dr. Stern completed a Psychiatric/ Psychological Impairment Questionnaire regarding Plaintiff's mental health. (*See generally id.* at 344–51.) Using the multiaxial method of assessment, [18] Dr. Stern diagnosed Plaintiff, on Axis I, with bipolar disorder, rule out PTSD, and, on Axis II, with borderline personality traits. [19] (*Id.* at 344.) On Axis III, Dr. Stern reported diabetes mellitus and arthritis, and, on Axis IV, he reported "multiple stressors." (*Id.*) As to Axis V, Dr. Stern recorded that Plaintiff's current GAF was 40 and that his lowest GAF in the past year was 35. [20] (*Id.*) Dr. Stern found that Plaintiff's prognosis was guarded and unpredictable. (*Id.*) Dr. Stern noted that the positive clinical findings that supported his diagnoses included Plaintiff's poor memory, appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, anhedonia (pervasive loss of interest), paranoia (inappropriate suspiciousness), feelings of guilt/ worthlessness, difficulty thinking/concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased energy, persistent irrational fears, generalized persistent anxiety, and hostility and irritability. (*Id*

at 345.) He noted that Plaintiff's primary symptoms were depressed mood, loss of pleasure, feeling worthless and hopeless, reduced energy, suicidality, self-destructive behavior, irritability, racing thoughts, sleep disturbance, impaired concentration, anxiety, inability to control temper, aggressiveness, and anger. (*Id.* at 346.) Plaintiff's most frequent and severe symptoms were reported to be his suicidality, his inability to control his temper, his feelings of hopelessness, and his impulsivity. (*Id.*) Dr. Stern reported that Plaintiff had been hospitalized at least four times following suicide attempts. (*Id.; see also infra* at Background Section A(2).)

 **\*8** Dr. Stern found that Plaintiff had some degree of limitation in every domain of mental or social functioning (and in every sub-area of activity) that was listed in the questionnaire. (*See id.* at 347–49.) Dr. Stern found that Plaintiff was "markedly limited" in 10 areas, specifically in his ability to: "understand and remember detailed instructions"; "maintain attention and concentration for extended periods"; "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance"; "sustain an ordinary routine without supervision"; "work in coordination with or proximity to others without being distracted by them"; "complete a normal workweek without interruptions from psychologically based symptoms and ... perform at a consistent pace without an unreasonable number and length of rest periods"; "interact appropriately with the general public"; "get along with co-workers or peers without distracting them or exhibiting behavioral extremes"; "maintain socially appropriate behavior and ... adhere to basic standards of neatness and cleanliness"; and "set realistic goal or make plans independently." (*Id.* at 347–49.) He listed Plaintiff as moderately limited in seven areas, specifically regarding Plaintiff's ability to: "remember locations and work-like procedures"; "understand and remember one or two step instructions"; "carry out detailed instructions"; "make simple work related decisions"; "accept instructions and respond appropriately to criticism from supervisors"; "respond appropriately to changes in the work setting"; and "travel to unfamiliar places or use public transportation." (*Id.* at 347–49 .) Finally, he listed Plaintiff as having mild limitations in the remaining three areas, which included the ability to: "carry out simple one or two-step instructions"; "ask simple questions or request assistance"; and "be aware of normal hazards and take appropriate precautions." (*Id.* at 347–49.)

Dr. Stern also found that Plaintiff would likely experience episodes of deterioration and decompensation in work or work-like settings, due to his "impulsive, reactionary, [and] angry" behavior. (*Id.* at 349.) He reported that Plaintiff was taking Geodon and Celexa. (*Id.*) Dr. Stern also reported that he expected Plaintiff's mental impairments to be ongoing for at least 12 months. (*Id.* at 350.) He opined that Plaintiff could not even handle low stress work, due to a diminished capacity to manage temper and aggression. (*Id.*) He stated that Plaintiff had "good days" and "bad days" and that, as a result of his condition, Plaintiff could be expected to miss work more than three times a month. (*Id.* at 350–51.) Dr. Stern opined that Plaintiff's symptoms and limitations had been present from adolescence, but that Plaintiff could still manage benefits in his own best interest. (*Id.* at 351.)

### v. *Additional Appointment Records* (October 2011)
 **\*9** On October 18, 2011, Plaintiff had an appointment with Dr. Stern, and disclosed that he had tried to kill himself about seven times since his last appointment and that he had been admitted to Bellevue. (*Id.* at 609; *see also infra* at Background Section A(2)(d) .) Upon a mental status examination, Plaintiff was found to have a calm affect, but an "extremely labile mood." (R. at 609.) Plaintiff was reported as having no active suicidal ideations, delusions, or hallucinations at the time of the appointment. (*Id.*) Dr. Stern stated that Plaintiff "[had] been abusing alcohol, which [had] exacerbated [his] suicidality." (*Id.*) He recorded Plaintiff's diagnosis of bipolar II disorder. (*Id.*)

### vi. *Letter Regarding Plaintiff's Ability to Work* (October 2011)
On the same day, October 18, 2011, Dr. Stern, together with Rodriguez, wrote a letter, apparently in support of Plaintiff's claim for disability benefits, describing Plaintiff's problems. (*Id.* at 386.) Dr. Stern and Rodriguez confirmed that Plaintiff was under their care for: hypomagnesaemia, bipolar II disorder, preventive healthcare, peripheral neuropathy, malignant neoplasm of glottis, vocal cord disease, alcohol abuse, tobacco use disorder, mental disorder, hyperlipidemia, and diabetes mellitus. (*Id.*) The letter described Plaintiff's longstanding history of depression with multiple hospitalizations because of suicide attempts or suicidal ideation, and explained that Plaintiff had ongoing problems with

profound characterological anger, insomnia, loss of pleasure, feelings of hopelessness, decreased motivation, irritability, racing and obsessional thoughts, anxiety, impulsivity, and aggression. (*Id.*) The letter also explained that Plaintiff was currently undergoing treatment for major depressive disorder, bipolar disorder, and rule out mood disorder, and was taking Abilify,[21] Celexa and Doxepine.[22] (*Id.*) Dr. Stern and Rodriguez stated that it was "difficult to imagine [Plaintiff] managing the world of work at this time; he will have difficulties managing authority figures, could easily be triggered into confrontations with co-workers and supervisors and will not likely adhere to normal expectations." (*Id.*) They stated that it would take at least a year before they could determine whether Plaintiff "ever" would be able to "manage his condition, reduce his symptoms and be stable enough to tolerate the world of work." (*Id*)

**vii.** *Second Psychiatric/Psychological Impairment Questionnaire* **(December 2011)**
On December 6, 2011 Dr. Stern provided a second Psychiatric/Psychological Impairment Questionnaire, stating opinions were similar to the ones he provided on August 10, 2011. (R. at 1153–60; *see also supra* at Background Section A(1)(c)(iv).) Dr. Stern again opined that Plaintiff was incapable of handling even a low-stress work environment and that Plaintiff would likely miss more than three days of work per month. (*Id.* at 1159–60.)

**viii.** *Letter Regarding Plaintiff's Substance Abuse* **(December 2011)**
 **\*10** On December 23, 2011, Dr. Stern, again together with social worker Rodriguez, submitted a form to the ALJ in which he opined that Plaintiff's use of alcohol and drugs was a symptom of his mental condition, and/or a form of self-medication. (*Id.* at 1173.) Thus, Dr. Stern concluded that Plaintiff's disability was independent of any substance abuse, and that Plaintiff's alcohol consumption was not material to his disability. (*Id.*)

**2.** *Other Hospital Records*
In addition to the Montefiore records described above (from the internist, psychiatrist and social worker whom Plaintiff saw regularly), the Record also contains a number of contemporaneous records from other hospitals, many of them stemming from emergency room visits, following Plaintiff's numerous suicide attempts.

Some of those suicide attempts are mentioned above, in the records of Plaintiff's sessions with the physicians and other staff at Montefiore. The additional hospital records contained in the administrative Record may be summarized as follows:

**a.** *Lincoln Hospital* **(December 3–4, 2010; March 19–21, 2011)**
Records of Lincoln Medical and Mental Health Center ("Lincoln") show that, on December 3, 2010, Plaintiff was brought to the emergency room there, after cutting himself on the abdomen with a razor. (*See generally id.* 923–1152.) Attending physician, Dr. Jorge Otero, diagnosed Plaintiff with depressive disorder with suicidal gestures. (*Id.* at 930.) Tests conducted that day showed that Plaintiff had a blood alcohol level of 355 mg/dL, and his urine test results were positive for THC[23] and cocaine. (*Id.* at 930, 951–52 (unconfirmed), 966.) Dr. Pronoy K. Roy examined Plaintiff on December 4, 2010 and found that Plaintiff had a history of psychiatric and substance abuse issues, and noted that he "presented with depression [and] suicidal ideation," given that he had cut himself. (*Id.* at 928.) Dr. Roy concluded that Plaintiff was a danger to himself and "need[ed] inpatient stabilization." (*Id.*)

When he was first admitted to Lincoln, Plaintiff was combative, so hospital staff had him sedated. (*Id.* at 1140, *see also id.* at 966.) After a later psychiatric evaluation was conducted, Plaintiff was diagnosed, on Axis I, with major depressive disorder (moderate), cannabis dependence, and alcohol abuse. (*Id.* at 1010.) On Axis III, he was diagnosed with throat cancer, high cholesterol and diabetes, and, on Axis IV, the doctor noted that Plaintiff had no family support and suffered from financial problems, including having his Medicaid cut off. (*Id.*) His GAF score was reported to be 40 to 45.[24] (R. at 1011.) Plaintiff reported that he had previously been seeing Rodriguez for therapy, but that he had stopped going after about four or five months because he had lost Medicaid coverage. (*Id.* at 1008.)

According to a Psychiatric Emergency Service Assessment of Plaintiff performed at the hospital, Plaintiff was admitted after he told his girlfriend that he was going to kill himself. (*Id.* at 1007.) When EMS arrived, he was found to have multiple lacerations on his abdomen. (*Id.*) He said that he had cut himself because he was "very stressed out." (*Id*) The records indicate that, at

first, Plaintiff had difficulty identifying the stressors that motivated his suicidal ideation, but he eventually reported that he felt alone and that he was particularly depressed because the holidays were approaching and he had no family to celebrate with. (*Id* ) Plaintiff denied that his substance use was "dangerous" and said that he only drank one pint of beer per day. (*Id.* at 1010.) His girlfriend, however, told the hospital that Plaintiff drank liquor "all day, every day," often blacked out, and got into fights with strangers on the street. (*Id* ) She also reported that he used cocaine on weekends, although Plaintiff denied any drug use besides marijuana. (*Id.*) She also said that Plaintiff only became suicidal when he was drunk. (*Id.* at 1011–12; *see also id.* at 1008.) On December 4, 2010, Plaintiff was transferred to Metropolitan Hospital Center ("Metropolitan") because there was no available bed at Lincoln. (*Id.* at 1120; *see also infra* at (b) regarding this transfer).)

**\*11** On March 19, 2011, though, Plaintiff was again hospitalized at Lincoln following another episode of suicidal behavior. (*See generally* R. at 636–922.) He was found on a park bench holding a box cutter to his face and threatening to kill himself. (*Id.* at 642, 653.) The records state that Plaintiff was determined to have had a history of depressive disorder and substance dependence, and that he "present[ed] to the hospital intoxicated and crying." (*Id.* at 653.) Plaintiff was described as having slurred speech, appearing lethargic, and having alcohol on his breath. (*Id* ) He reported that he was homeless and that he had been drinking a pint of vodka. (*Id* ) He stated that he became suicidal when he started thinking of deceased family members. (*Id* ) Plaintiff was diagnosed with substance induced mood disorder, cocaine and alcohol dependence, and alcohol intoxication. (*Id* )

At that time, Plaintiff tested positive for cocaine and had an alcohol level of 287 mg/dL. (*Id.* at 660, 704.) An emergency service assessment was performed, and Plaintiff was recorded as having a depressed mood and impaired impulse control, judgment, and insight. (*Id.* at 662–63.) Plaintiff's attitude was reported to be cooperative and his speech was pressured but fluent. (*Id.* at 662.) Plaintiff's thought process was reported to be coherent and goal-directed. (*Id.*) The assessment also showed that Plaintiff had no insight into his substance use. (*Id.* at 663.) Plaintiff was diagnosed, on Axis I, with depressive disorder with suicidal gestures, cocaine abuse, borderline personality disorder, and alcohol dependence. (*Id.* at

664.) On Axis II, Plaintiff was diagnosed with borderline personality disorder, and, on Axis III, with hypertension and diabetes. (*Id.*) Plaintiff's GAF was recorded as 30. [25] (R. at 664.) At the hospital, Plaintiff reported drinking one pint of vodka daily, smoking marijuana daily, and using cocaine on weekends. (*Id.* at 666–67.) He denied that his substance use was dangerous and stated that he had never been in detoxification or rehabilitation programs. (*Id.* at 666.)

On March 21, 2011, Plaintiff was seen by Dr. Madeleine O'Brien. (*Id.* at 693.) Dr. O'Brien reported that she called Plaintiff's girlfriend, who informed the doctor that Plaintiff's most recent suicide attempt was an isolated incident, that Plaintiff had not been depressed, but that sometimes he drank too much alcohol and became morose. (*Id.* at 693.) At the time of the appointment, Plaintiff denied any suicidal ideation. (*Id.* at 693.) He explained that, on the night he was hospitalized, he was sitting on the park bench and feeling increasingly depressed, after having used cocaine and alcohol. (*Id.* at 693–94.) Noting his lack of present suicidal ideation, the hospital discharged Plaintiff after he met with an addiction counselor. (*Id.* at 694–96.)

### b. *Metropolitan Hospital* (December 4–9 and 15, 2010; January 5, 2011)

**\*12** The first reference in the Record to Metropolitan appears on December 4, 2010, when, as noted above, Plaintiff was transferred there from Lincoln. (*See supra; see also* R. at 1120.) On December 5, 2010, Plaintiff was evaluated in Metropolitan's Psychiatric Emergency Department, and was diagnosed, on Axis I, with major depressive disorder, polysubstance abuse, rule out substance induced mood disorder. (R. at 557.) On Axis III, Plaintiff was diagnosed with diabetes mellitus, hyper cholesterolemia, and history of throat cancer. (*Id.*) On Axis IV, the doctor noted "economic, primary support group, [and] psychosocial," and, on Axis V, he recorded a GAF of 30. [26] (*Id.*) On December 7, 2010, a therapist at Metropolitan noted that Plaintiff "frequently" followed directions, organized materials, had well-coordinated motions, solved problems independently, completed tasks, and expressed self-creativity. (*Id.* at 523.) Plaintiff was discharged from Metropolitan on December 9, 2010. (*Id.* at 317, 381.)

Records then show that, on December 15, 2010, Plaintiff attended outpatient counseling at Metropolitan. (*See generally id.* at 481–82, 487–88.) He was seen by Joyce Baumboltz–Racz, LCSW, and Dr. Carmen I. Leon, who described Plaintiff as "angry looking" and recorded that he had "mood swings, anger outbursts where [he] [would] hit[ ] a wall or look[ ] for a fight, [and] poor impulse control." (*Id.* at 487.) Plaintiff reported drinking one pint of alcohol and smoking THC every day, and using cocaine every weekend. (*Id.*) Plaintiff was diagnosed with cocaine abuse unspecified, on Axis I, and borderline personality disorder, on Axis II. (*Id.* at 488.) Baumholtz also noted that Plaintiff was then on Celexa for depression. (*Id.*)

Finally, on January 5, 2011, Plaintiff returned to Metropolitan for a follow-up appointment. (*Id.* at 484–85.) A mental status exam revealed a guarded, negative and resistant attitude, normal psychomotor activity, alert concentration, an irritable mood, blunted affect, fair impulse control, intact thought process, mild judgment, and no suicidal or homicidal ideation. (*Id.* at 484.) The exam also showed that Plaintiff was aware of his need for treatment. (*Id.*) At this appointment, Plaintiff's urine tested positive for cocaine. (*Id.*) The attending psychiatrist referred Plaintiff to a chemical dependency program, but Plaintiff refused treatment, stating that he could stop using drugs whenever he wanted to do so. (*Id.*) The attending psychiatrist ultimately "agree[d] with closing [the] case of this patient who refuses to address substance abuse issues." (*Id.* at 485.)

#### c. *FEGS Biopsychosocial Evaluation at Bronx Lebanon Hospital* (March 17, 2011)

The Record also contains a report of a FEGS biopsychosocial evaluation of Plaintiff, conducted on March 17, 2011, at Bronx Lebanon Hospital ("Bronx Lebanon"). (*See generally id.* at 439–74; *see also supra* n. 16 (regarding "FEGS").) At this evaluation Plaintiff reported feelings of depression, loss of interest or pleasure and fatigue, as well as appetite and sleeping abnormalities. (*Id.* at 449.) He had a PHQ–9 score of 21. [27] (*Id.*) Plaintiff also reported a history of suicide attempts beginning at age 36, but he denied any history of alcohol or substance abuse. (*Id.* at 448–53.) He stated that he had been seeing social worker Rodriguez for about six months, but had not seen him for a year and a half because his Medicaid was cut off. (*Id.* at 450.) Plaintiff reported suicidal ideation with plan and intent. (*Id* ) He stated that, after his last

suicide attempt three months earlier, he was referred to a psychiatrist, but "since they [would not] give him medicine[,] he stopped going." (*Id.*) Plaintiff reported that he found it difficult to work, take care of things at home, and get along with others. (*Id.*) He reported that his daily activities included washing dishes and clothes, sweeping, mopping, and vacuuming his floor, watching television, making beds, shopping for groceries, cooking meals, reading, socializing, and grooming. (*Id.* at 451.) A physical examination revealed tenderness, swelling, and edema in Plaintiff's paraspinal muscles and lower back, and decreased range of motion in Plaintiff's right shoulder. (*Id.* at 459.) Plaintiff was diagnosed with diabetes mellitus, disorders of the autonomic nervous system, joint derangement, hypertension and depressive disorder. (*Id.* at 463.) Dr. Charles Pastor concluded that Plaintiff had unstable medical and/or mental health conditions, including major depressive disorder and neuropathy, that required treatment before a functional capacity determination could be made regarding Plaintiff's ability to work. (*Id.* at 464.)

#### d. *Bellevue Hospital* (August 21–23, 2011; September 16, 2011)

**\*13** On August 21, 2011, Plaintiff was admitted to the Bellevue Hospital Center ("Bellevue") after another seeming suicide attempt, in which he threw himself down a flight of subway stairs. (*See generally id.* at 389–414.) During his hospitalization, Plaintiff was diagnosed, on Axis I, with alcohol dependence, cocaine abuse, cannabis abuse, and depressive disorder. (*Id.* at 397.) He was diagnosed with diabetes mellitus, on Axis III, and with occupational and primary support group problems, on Axis V. (*Id.*) His GAF was recorded as 55. [28] (*Id.*) At the time he was admitted to the hospital, Plaintiff's alcohol level was at 409 mg/dL. (*Id.* at 390.) On initial examination, he was "dysphoric, intoxicated and reported that he [did not] care whether he lived or died." (*Id.* at 394.) Plaintiff was still walking and talking despite his high alcohol level, and hospital staff placed him on a Librium taper, [29] as they thought he may suffer from withdrawal. (R. at 394.) Plaintiff reported drinking one pint of alcohol daily from Monday to Friday and one fifth of liquor on Saturdays and Sundays. (*Id.* at 390.) The doctor noted that Plaintiff's alcohol level actually suggested that he consumed more than one pint per day. (*Id.*) Plaintiff said that he used to drink heavily, but that he had only started drinking every day for the past four or five months. (*Id.*)

Morales v. Colvin, Not Reported in F.Supp.3d (2016)
Case 7:15-cv-04794-KMK   Document 25   Filed 08/02/16   Page 82 of 108
215 Soc.Sec.Rep.Serv. 596

He also admitted to having used marijuana and cocaine during the previous month. (*Id.* at 391.) Plaintiff stated that he did not believe that his drinking interfered with his ability to work. (*Id.* at 390.) Plaintiff's girlfriend told hospital staff that she thought Plaintiff was drinking two fifths of liquor a day. (*Id.* at 391.) She said that Plaintiff had been a heavy drinker for the entire five years that she had known him, but that his drinking may have increased in the prior five months. (*Id.* at 392.) Even though he seemed depressed, she said that he was a pleasant and completely different person when he was not drinking. (*Id.* at 391.) Plaintiff had no history of detoxification, rehabilitation, or withdrawal. (*Id.* at 392.) Hospital staff were unable to assess the effects of his alcohol abuse, at that time. (*Id.*)

Plaintiff told hospital staff that he had engaged in suicidal behavior on over 20 occasions, beginning when he was in his 20s. (*Id.* at 390, 392.) Plaintiff said that he did not intend to kill himself when he purposefully threw himself down the stairs, but that he did not care whether he lived or not. (*Id.* at 390.) He alluded to multiple stressors in his life, but would not talk about them. (*Id.*)

On the third day of his hospital stay, Plaintiff demonstrated a bright affect and denied any signs of depression. (*Id.* at 395.) Upon examination, Plaintiff appeared cooperative and well related, with normal eye contact, gait, movement, and speech. (*Id.*) He was reported as having a goal-directed and normal thought process, normal thought content with no suicidal ideation, full and appropriate affect, intact impulse control, full orientation, and no gross impairments in insight or judgment. (*Id* ) Hospital staff counseled Plaintiff on the importance of complying with his medical treatment and abstaining from alcohol. (*Id.* at 395–96.) He voiced understanding and confirmed a need to maintain sobriety, but refused substance-abuse treatment referrals. (*Id.* at 396.) Given his clinical improvement and that his suicidality was considered likely to have been secondary to substance use, Plaintiff was found safe for discharge. (*Id.* at 395–96.)

**\*14** On September 16, 2011, Plaintiff again attempted suicide and was again admitted to Bellevue. (*See generally id.* 387–88, 415–22.) In particular, Plaintiff reportedly tried to jump in front of a subway train while he was intoxicated with alcohol. (*Id.* at 387 .) A urine toxicology report came back positive for cannabis and cocaine. (*Id*

) Upon examination on September 17, 2014, Plaintiff denied feelings of suicidality. (*Id.*) He informed the examining physician that he had recently lost his off-the-books job and had been asked to leave his house. (*Id.*) He said that he had recently told his counselor, Rodriguez, that he wanted to go into drug rehabilitation. (*Id.*) Plaintiff was quoted as saying "I gotta do something because I'm sick of hurting myself when I'm drunk," and "I don't want to kill myself. I've accepted that I've lost my job and house because of my drinking. I want to get help with this." (*Id.*) Plaintiff was discharged that afternoon. (*Id.* at 415.)

**3. *Consultative Reports***
**a. *Internal Medicine Examination (Dr. William Lathan, November 2010)***

Dr. William Lathan performed an internal medicine examination of Plaintiff on November 16, 2010. (*See generally id.* at 281–84.) Dr. Lathan noted that Plaintiff "ha[d] been treated by a psychiatrist since 2008 for depression." (*Id.* at 281.) He reported that Plaintiff had a history of hypertension, diabetes, diabetic neuropathy in his lower extremities, depression, and neoplastic throat nodules. (*Id.* at 283.) He reported that Plaintiff's prognosis was "stable." (*Id.*) Dr. Lathan opined that Plaintiff had a "moderate restriction in prolonged standing and walking." (*Id.*) He also found that Plaintiff was "appropriate in dress and affect and [was] cooperative" and could "perform all activities of personal care and daily living." (*Id.* at 281.) Dr. Lathan reported that Plaintiff "den[ied] the use of tobacco, alcohol, [and] street drugs." (*Id.*)

**b. *Psychiatric Consultative Examination (Dr. Dmitri Bougakov, November 2010)***

Dmitri Bougakov, Ph.D., a consultative psychologist, conducted a psychiatric evaluation of Plaintiff on November 16, 2010, at the request of the Social Security Administration. (*See generally id.* at 277–80.) During this evaluation, Plaintiff complained of difficulty falling asleep, increased appetite, "feeling down," and having low energy. (*Id.* at 277.) Plaintiff described his daily activities, which included dressing and grooming himself, occasionally cooking, dropping his clothes at the Laundromat, and staying home watching television in lieu of socializing with friends and family. (*Id.* at 278–79.) Plaintiff also reported that he could manage money and take public transportation. (*Id.* at 279.) Dr. Bougakov

found that Plaintiff was cooperative and wellgroomed; was adequate in "expressive and receptive languages"; possessed fair insight and judgment; had a neutral mood; was "coherent and goal directed" in his thought process; and displayed normal gait, posture, and motor behavior, as well as appropriate eye contact. (*Id.* at 278.) Dr. Bougakov also found, however, that Plaintiff's recent and remote memory skills were mildly impaired, and that Plaintiff had average intellectual functioning with a somewhat limited fund of general information. (*Id.*) Plaintiff's attention and concentration were reported to be "[i]ntact for counting, simple calculations and serial [threes]" (*Id.*)

 **\*15** On the multiaxial system of assessment (*see supra* n. 18), Dr. Bougakov diagnosed Plaintiff, on Axis I, with depressive disorder related to a medical condition, and, on Axis III, with laryngeal carcinoma, hypertension, diabetes and hyperlipidemia. (R. at 279.) Dr. Bougakov gave Plaintiff a "fair" prognosis, "given the fact that he [did] not present with any significant psychiatric symptomatology, and his cognitive symptoms [were] mild." (*Id.*) He also opined that Plaintiff was "somewhat limited in ability to learn new tasks and perform complex tasks" and that those difficulties were related to psychiatric symptomatology. (*Id.*) Dr. Bougakov concluded that Plaintiff could "follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, and should be able to maintain a regular schedule" and that Plaintiff was "able to mak[e] appropriate decisions, relate adequately with others, and deal with stress." (*Id.*) He further opined that, while "[t]he results of the examination appear[ed] [to be] consistent with psychiatric problems," those problems did "not appear to be significant enough to interfere with [Plaintiff's] ability to function on a daily basis ." (*Id.*)

#### c. *"Psychiatric Review Technique" (T. Harding, December 1, 2010)*

On December 1, 2010, psychological consultant T. Harding ("Harding") completed a form entitled "Psychiatric Review Technique," in connection with Plaintiff's disability application. (*See generally id.* at 285– 300.) Harding specified that Plaintiff had a non-severe medically determinable affective disorder (Listing 12.04). (*Id.* at 287.) [30]

### B. *Plaintiff's Own Reports Relating To His Claimed Impairments*

Plaintiff completed a form "Disability Report" (*See id.* at 147–59), in connection with his August 3, 2010 application for disability benefits. He reported that he was disabled due to throat cancer (stage three), diabetes, neuropathy, high blood pressure, high cholesterol, depression, anxiety, insomnia, lower back pain, and arthritis in the right shoulder and arm. (*Id.* at 151.) Plaintiff reported that he had stopped working on March 1, 2009, due to those conditions, and alleged the onset of a disability beginning on the same date. (*Id* ) Plaintiff reported that he had previously been employed as a construction worker. (*Id.* at 152.)

The Record also includes a form on which Plaintiff appears to have recorded his answers to questions regarding his pain levels. (*See generally id.* at 157–59.) He indicated that he experienced a dull and stabbing pain in his feet, back, hands and right arm that had started two years earlier and had become progressively worse. (*Id.* at 157.) He also stated that lifting and bending made him feel pain, and he listed Gabapentin, Motrin, Januvia and Metformin as medications that he took for the pain. (*Id.* at 157–58.) Plaintiff indicated that his daily/weekly activities included walking, shopping, and doing household chores. (*Id.* at 158.)

### C. *Procedural History*

#### 1. *Plaintiff's Application For Benefits*
 **\*16** Plaintiff applied for Social Security Disability benefits on August 3, 2010, alleging an onset date of March 1, 2009. (*Id.* at 126–34.) SSA denied Plaintiff's claim on December 3, 2010 (*id.* at 69–74), and Plaintiff filed a request for a hearing on January 14, 2011 (*id.* at 77– 83).

#### 2. *Administrative Hearing And Decision*
On October 19, 2011, Plaintiff, represented by attorney Colin Sherman, Esq. of Binder & Binder, appeared and testified before ALJ Scheer. (*See generally id.* at 39– 66.) During the hearing, Plaintiff's counsel argued that Plaintiff met the listing for 12.04 (Affective Disorders) and referred the ALJ to Dr. Stern's opinions regarding Plaintiff's mental impairments. (*See id.* at 42.)

Plaintiff testified that he was born on September 22, 1963 and had completed schooling through the 10th grade. (*Id.* at 51.) He testified that he had previously worked in construction, specializing in carpentry, but that he was laid off in 2009.[31] (*Id.* at 46, 51.) Plaintiff reported that part of the reason he lost his job was his excessive drinking. (*Id.* at 46, 52.) When the ALJ asked Plaintiff how much he was drinking at that time, Plaintiff estimated four to five pints of vodka a day. (*Id.* at 46.) Plaintiff also testified that he had previously used about a bag of powder cocaine a day, with friends. (*Id.* at 62–63.) Plaintiff testified that, after his most recent hospitalization (which was at Bellevue, following a suicide attempt), he had stopped using drugs and alcohol and had not used since that time. (*Id.* at 46–47, 62.) Plaintiff also described other suicide attempts to the ALJ and reported that he would often "flip" and become sad when he saw a happy family because all of his family members had died. (*Id.* at 57–58.) After Plaintiff described his suicide attempts and alcohol use, the ALJ requested more information from Plaintiff's attorney concerning whether Plaintiff's alcohol consumption was material to his psychiatric condition. (*Id.* at 49.)

Plaintiff also testified regarding his diabetes, high cholesterol, high blood pressure, foot pain, back and arm pain, and throat cancer. (*Id.* at 53–54; 56–58.) Plaintiff reported that he spent his days either walking around in the park or staying home and watching television. (*Id.* at 55.) He testified that he could not "stay still" and, instead, had to walk and then sit down, but that he could not stand up or sit down for long. (*Id.* at 55–56.) Plaintiff testified that, due to the pain in his back, he could not bend, could only walk about a block and a half before he had to sit, could sit for only 10 to 15 minutes, and could stand for only 10 minutes. (*Id.* at 56.) Plaintiff stated that he was taking medicine, but, except for Geodon, he had trouble remembering the names of his medications. (*See id.* at 60–61.) He testified that, at the time of the hearing, he was living with his girlfriend. (*Id.* at 50.)

**\*17** In a decision dated March 2, 2012, the ALJ found Plaintiff not disabled. (*Id.* at 21–38.) The ALJ's decision is discussed in detail below. (*See infra* at Discussion Section II.)

**3. *Plaintiff's Request for Review by the Appeals Council***

On April 6, 2012, Plaintiff requested that the Appeals Council review the ALJ's decision. (R. at 18–20.) The ALJ's decision became final after the Appeals Council denied Plaintiff's request for review on August 9, 2013. (*Id.* at 1–7.)

**4. *The Motions Before This Court***

On September 26, 2013, Plaintiff filed a Complaint in this Court, contending that "the decision of the [ALJ] affirmed by the Appeals Council was erroneous and unfounded[,]" was "not supported by substantial evidence," and was "contrary to the law and its provisions as found in the Social Security Act." (Complaint, filed Sept. 26, 2013 (Dkt.1), ¶¶ 13, 14.) Defendant filed an answer on April 23, 2014. (Dkt.13.)

On May 22, 2014, Plaintiff moved for judgment on the pleadings (Dkt.15), and submitted a memorandum of law in support of his motion (Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, dated May 22, 2014 ("Pl.Mem") (Dkt.16). In his motion, Plaintiff only challenges the ALJ's findings as they relate to his alleged mental impairments. (*See* Pl. Mem., at 1 n. 3.)

On June 23, 2014, Defendant filed a cross-motion (Dkt.19) and supporting memorandum (Memorandum of Law in Support of Defendant's Cross–Motion for Judgment on the Pleadings, dated June 23, 2014 ("Def.Mem") (Dkt.20)), seeking judgment affirming the final decision of the Commissioner.

## *DISCUSSION*

### I. *APPLICABLE LEGAL STANDARDS*

#### A. *Standard of Review*

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,' " *Guzman v. Astrue,* No. 09cv3928 (PKC), 2011 WL 666194, at \*6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland,* 901 F.2d 266, 269 (2d Cir.1990)), and a judgment on the merits can be made " 'merely by considering the contents of the pleadings.' " *Id.* (quoting *Sellers v. M.C. Floor Grafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988)).

Judicial review of a decision of the Commissioner is limited. The Commissioner's decision is final, provided that the correct legal standards are applied and findings of fact are supported by substantial evidence. 42 U.S.C. § 405(g) (2006); *Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000) (citations omitted). "Where an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir.1984) (citation omitted). Thus, the first step is to ensure that the Commissioner applied the correct legal standards. *See Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999); *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987).

**\*18** The next step is to determine whether the Commissioner's decision is supported by substantial evidence. *See Tejada,* 167 F.3d at 773. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted). In making this determination, a court must consider the underlying record. The reviewing court does not, however, decide *de novo* whether a claimant is disabled. *See Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir.2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998); *Beauvoir v. Chater,* 104 F.3d 1432, 1433 (2d Cir.1997). Therefore, if the correct legal principles have been applied, this Court must uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists. *See Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder"); *see also DeChirico v. Callahan,* 134 F.3d 1177, 1182–83 (2d Cir.1998) (affirming decision where substantial evidence supported both sides).

**B. *The Five–Step Sequential Evaluation***

To be entitled to disability benefits under the Act, a claimant must establish his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A); *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998). An individual is considered to be under a disability only if the individual's physical or mental impairments are of such severity that he or she is not only unable to do his or her previous work, but also cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(C)(i).

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits. *See* 20 C.F.R. §§ 404.1520; *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam). Throughout the inquiry, the ALJ must consider four primary sources of evidence: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir.1999) (citations omitted).

**\*19** The first step of the inquiry requires the ALJ to determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If not, at the second step, the ALJ determines whether the claimant has a "severe" impairment or combination of impairments that significantly limits his or her physical or mental ability to do basic work activities. *Id.* §§ 404.1520(a)(4)(ii), (c). If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals an impairment listed 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). *Id.* § 404 .1520(a)(4)(iii). If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience." *Id.*

Where the plaintiff claims mental impairment, steps two and three require the ALJ to apply a "special technique," outlined in 20 C.F .R. § 404.1520a(b) to determine the severity of the claimant's impairment at step two, and to determine whether the impairment satisfies Social Security regulations at step three. *See Kohler v.. Astrue,* 546 F.3d 260, 265 (2d Cir.2008). If the claimant is found to have a "medically determinable mental impairment," the ALJ is required to "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)" and then to "rate the degree of functional

limitation resulting from the impairment(s) in accordance with paragraph (e) of [section 404.1520a]," which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation." [32] 20 C.F.R. §§ 404.1520a(b)(1)-(2), (c) (3); *see Kohler,* 546 F.3d at 265. The functional limitations for these first three areas are rated on a five-point scale of "[n]one, mild, moderate, marked, [or] extreme," and the limitation in the fourth area (episodes of decompensation) is rated on a four-point scale of "[n]one," "one or two," "three," or "four or more." 20 C.F.R. § 404.1520a(c)(4).

If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine, based on all the relevant evidence in the record, the claimant's residual functional capacity ("RFC"), or ability to perform physical and mental work activities on a sustained basis. *Id.* § 404.1545. The ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to perform his or her "past relevant work." *Id.* § 404.1520(a)(4)(iv). Finally, if the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to determine whether, in light of the claimant's RFC, age, education, and work experience, the claimant is capable of performing "any other work" that exists in the national economy. *Id.* §§ 404.1520(a)(4)(v), (g).

**\*20** On the first four steps of the five-step evaluation, the claimant generally bears the burden of establishing facts to support his or her claim. *See Berry,* 675 F.2d at 467 (internal citation omitted). At the fifth step, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009); *see also Bluvband v. Heckler,* 730 F.2d 886, 891 (2d Cir.1984). The Commissioner must establish that the alternative work "exists in significant numbers" in the national economy and that the claimant can perform this work, given his or her RFC and vocational factors. 20 C.F.R. § 404.1560(c)(2). Where the claimant only suffers from exertional impairments, the Commissioner can satisfy this burden by referring to the Medical–Vocational Guidelines, set out in 20 C.F.R. Pt. 404, Subpt. P, App. 2 (the "Guidelines"). Where, however, the claimant suffers non-exertional impairments, such as visual impairment, psychiatric impairment, or pain, *see* 20

C.F.R. § 404.1569(a), that " 'significantly limit the range of work permitted by his [or her] exertional limitations,' the ALJ is required to consult with a vocational expert," rather than rely exclusively on these published guidelines. *Zabala v. Astrue,* 595 F.3d 402, 410 (2d Cir.2010) (quoting *Bapp v. Bowen,* 802 F.2d 601, 604–05 (2d Cir.1986) (internal citations omitted)).

### C. *Drug or Alcohol Abuse*

"When there is medical evidence of an applicant's drug or alcohol abuse, the 'disability' inquiry does not end with the five-step analysis." *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 123 (2d Cir.2012) (citing 20 C.F.R. § 416.935(a)), *cert. denied,* 133 S.Ct. 2881 (2013). Pursuant to the Act, "an individual shall not be considered to be disabled ... if alcoholism or drug addiction would ... be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. §§ 423(d)(2) (C), 1382c(a)(3)(J); *see also* 20 C.F.R. § 404.1535(a). Accordingly, where an ALJ finds that a claimant is disabled under the sequential analysis and the medical evidence demonstrates that the claimant suffers from drug or alcohol addiction, the ALJ must determine whether the Plaintiff would still be "disabled" if he stopped using drugs or alcohol. *See* 20 C.F.R. § 404.1535(b)(1). Should the ALJ determine that the physical and mental limitations that would remain after the cessation of drug or alcohol use would not be disabling, then the ALJ should conclude that addiction is a contributing factor material to a determination of disability, and that the claimant is not entitled to disability benefits. *Id.* § 404.1535(b)(2).

It is clear from the language of Section 404.1535 that "the ALJ must first make a determination as to disability by following the five-step sequential evaluation process, 'without segregating out any effects that might be due to substance use disorders.' " *Piccini v. Comm'r of Soc. Sec.,* No. 13cv3461 (AJN)(SN), 2014 WL 4651911, at \*12 (S.D.N.Y. Sept. 17, 2014), *adopting report and recommendation* (citing Brueggmann v. Barnhart, 348 F.3d 689, 694 (8th Cir.2003)); *see also Day v. Astrue,* No. 07cv157 (RJD), 2008 WL 63285, at \*5–6 (E.D.N.Y. Jan. 3, 2008); *Webb v. Colvin,* No. 12cv753S, 2013 WL 5347563, at \*5 (W.D.N.Y. Sept. 23, 2013); *Dinner v. Comm'r of Soc. Sec.,* No. 08cv1240, 2010 WL 653703, at \*3–4 (N.D.N.Y. Feb. 19, 2010). Therefore, an ALJ's initial disability determination should "concern[ ] strictly symptoms, not causes." *Newsome v. Astrue,* 817 F.Supp.2d 111, 134 (E.D.N.Y.2011) (citing Brueggemann, 348 F.3d at 694)).

Only after the claimant has been determined to be disabled should the ALJ consider whether the claimant would remain disabled if he stopped abusing drugs and alcohol. See Piccini, 2014 WL 4651911, at *12 (citing Cordero v. Astrue, 574 F.Supp.2d 373, 377 (S.D.N.Y.2008)).

## D. Consideration of Medical Opinions

**\*21** The medical opinion of a treating source [33] as to "the nature and severity of [the claimant's] impairments" is entitled to "controlling weight," where the opinion is "wellsupported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Treating physicians' opinions are generally accorded deference because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's condition and "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. § 404.1527(c)(2); see Taylor v. Barnhart, 117 F. App'x 139, 140 (2d Cir.2004).

Where the ALJ decides to give less than controlling weight to a treating physician's opinion, and also in determining the weight to be accorded to the medical opinion of a non-treating physician, the ALJ is required to consider a number of factors. These include: (1) the length, nature, and extent of the relationship between the claimant and the physician; (2) the supportability of the physician's opinion; (3) the consistency of the physician's opinion with the record as a whole; and (4) the specialization of the physician providing the opinion. 20 C.F.R. §§ 404.1527(c)(2)-(5); see also Shaw v. Chater, 221 F.3d 126, 134 (2d Cir.2000) (noting that these factors "must be considered when the treating physician's opinion is not given controlling weight").

An ALJ must "give good reasons" for the weight accorded to a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2). Failure to "give good reasons" is grounds for remand. Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir.2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion...."). In addition, a consultative physician's opinions should generally be given "little weight." Giddings v. Astrue, 333 F. App'x 649, 652 (2d Cir.2009) (internal quotation marks and citation omitted). This is because consultative examinations "are often brief, are generally performed without benefit or review of [the] claimant's medical history, and, at best, only give a glimpse of the claimant on a single day." Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir.1990) (internal quotation and citation omitted).)

## II. THE ALJ'S DECISION

In his March 2, 2012 decision, the ALJ found that Plaintiff was not disabled under the Act and thus denied Plaintiff's request for SSD benefits. (See generally R. at 21–33.) In his decision, the ALJ applied the five-step sequential evaluation procedure set out in the Commissioner's regulations. [34] At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability on March 1, 2009. (Id. at 26.) At step two, the ALJ found that Plaintiff's diabetes and depression constituted severe impairments that caused "more than minimal functional limitations." (Id. at 27.) The ALJ, however, rejected Plaintiff's claims that his alleged hypertension, lower back pain, right arm pain, and throat cancer constituted severe impairments. (Id.) The ALJ cited records provided by treating physician Dr. Stahl and consultative examiner Dr. Lathan in support of this conclusion. (Id.)

**\*22** At step three, the ALJ found that Plaintiff's impairments did not meet, or medically equal, the severity of one of the listed impairments contained in the applicable listings (the "Listings"), focusing specifically on Listings 12.04 (affective disorders) and 12 .09 (substance addiction disorders). (Id. at 27.) The ALJ concluded that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, and pace. (Id.) As Plaintiff's mental impairments did not result in at least two "marked" limitations, or in one "marked" limitation and "repeated" episodes of decompensation, the ALJ found that the requirements to satisfy step three had not been met. (Id. at 28 .)

The ALJ thus proceeded to conduct an RFC assessment before moving on to step four of the evaluation. (Id.) After examining the record, the ALJ concluded that Plaintiff had the RFC to perform the full range of unskilled, sedentary work as defined in 20 C.F.R. § 404.1567(a). (Id ) He stated that he based his finding on a two-step

process, whereby he examined (1) whether there existed an underlying medically determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's symptoms and (2) the intensity, persistence, and limiting effects of Plaintiff's symptoms and the extent to which they limited Plaintiff's functioning. (*Id.*) The ALJ found that, while Plaintiff's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms," Plaintiff's "statements concerning the intensity, persistence or limiting effects of the[ ] symptoms [were] not credible to the extent they [were] inconsistent with [the ALJ's] [RFC] assessment." [35] (*Id.* at 29.)

The ALJ concluded that, despite Plaintiff's physical impairments, Plaintiff was capable of performing exertionally sedentary work. (*Id.*) As to the only physical impairment that the ALJ determined was severe, diabetes, the ALJ noted that, while Plaintiff "[had] significant peripheral neuropathy in the extremities," treating physician Dr. Stahl had concluded in his September 2010 assessment that Plaintiff "was able to lift up to twenty pounds occasionally and up to ten pounds frequently, sit unlimited, and stand and walk for up to six hours each during the course of the workday." (*Id.*) The ALJ also cited to Dr. Stahl's July 2011 finding that, even though Plaintiff had "decreased sensation in his feet ... [he] would be able to work with restrictions." (*Id.*) The ALJ also considered the assessment of consultative physician Dr. Lathan, citing to Dr. Lathan's specific findings and to his conclusion that Plaintiff had only a "moderate restriction for prolonged standing and walking." (*Id.*)

The ALJ concluded that "the record evidence also support[ed] the finding that [Plaintiff] retain[ed] the ability to perform all basic mental work activities" (*id.*), which he defined as "understanding and remembering simple instructions, using judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting" (*id.* at 29–30 (citing 20 C.F.R. § 404.1521)). Before reaching this conclusion, the ALJ first recited consultative psychologist Dr. Bougakov's findings that Plaintiff "was able to follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, make appropriate decisions, relate adequately with others, and deal with stress." (*Id.* at 30.) The ALJ also noted Dr. Bougakov's findings that Plaintiff's "cognitive symptoms were mild, and that [Plaintiff's] psychiatric difficulties did not appear to be significant enough to interfere with his ability to function on a daily basis." (*Id.*)

**\*23** The ALJ then went into a detailed discussion of Plaintiff's "significant history of substance abuse," citing many portions of the evidentiary record. (*Id.* at 30–31.) He noted that all of Plaintiff's suicide attempts were "subsequent to using and abusing substances" and that Plaintiff had "repeatedly been diagnosed with substance induced mood disorder, cocaine dependence, ETOH dependence, and intoxication." (*Id.* at 30.) The ALJ cited to numerous statements by the Plaintiff's girlfriend suggesting that Plaintiff's suicidal and combative behavior only occurred "when he [was] drunk," as well as statements from Plaintiff that his depression was exacerbated by alcohol. (*Id.*) The ALJ pointed to treatment documentation from Plaintiff's September 2011 admission to Bellevue that showed that Plaintiff was "cooperative and well related, with goal directed and logical thought process, normal thought content, no aggressive ideation, a normal and stable affect, and intact impulse control when not abusing substances." (*Id.*) He also stated that, "[e]ven while under the influence of substances, [Plaintiff] [had] presented with a constricted affect, impaired impulse control, and impaired insight and judgment, but also as well related and cooperative, with normal eye contact, fluent but pressured speech, intact attention and concentration, and goal directed and logical thought processes." (*Id.* at 31.)

The ALJ then went on to describe the findings of Plaintiff's treating psychiatrist, Dr. Stern, placing particular emphasis on Dr. Stern's finding that Plaintiff was diagnosed with "continuous and excessive alcohol abuse [and] polysubstance dependency," in addition to depression. (*Id.*) He recited Dr. Stern's assessments of Plaintiff's limitations, including Dr. Stern's opinion that Plaintiff had "marked limitations in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, sustain an ordinary routine without special supervision, work in coordination with or proximity to others, perform at a consistent pace, and interact appropriately with supervisors, co-workers and the public." (*Id.*) He then noted, though, that Dr. Stern's finding of marked limitations was in an "assessment dated August 10, 2011, while [Plaintiff] was still abusing substances," and that "[Plaintiff] reported that he stopped using after his admission to Bellevue Hospital in September 2011." (*Id.*)

The ALJ again stated that all of Plaintiff's suicide attempts and hospital admissions "occurred subsequent to abuse of drugs and alcohol" and, therefore, found that Dr. Stern's "opinion that [Plaintiff's] substance abuse [was] not material to his mental illness" was "completely contrary to the evidence." (*Id.*) He further stated that the treatment notes of the examining sources and the statements of Plaintiff and his girlfriend supported this finding. Moreover, the ALJ again noted that Dr. Stern's assessment of Plaintiff's limitations "occurred in August 2011, while [Plaintiff] was still abusing substances." (*Id.*)

**\*24** The ALJ concluded that Plaintiff's allegations regarding the symptoms of his impairments were not "entirely consistent with objective medical evidence." (*Id*) He stated that, although Plaintiff experienced "symptoms of physical and mental impairments, he ha[d] not shown a restriction on his activities of daily living which correspond[ed] to the alleged severity of his impairments." (*Id.*) Specifically, the ALJ found that Plaintiff's "admitted activities of daily living contradict[ed] his allegation of disability." (*Id.*)

The ALJ stated that he had considered all of the opinions present in the record in making his RFC determination. (*Id.* at 32.) He stated that he gave "[s]ignificant weight" to the findings of the consultative examiners, Dr. Bougakov and Dr. Lathan. (*Id.*) He stated that he gave weight to the mental status assessment completed by state psychological consultant, Dr. Harding, "to the extent it [was] consistent with the medical evidence of record and the opinion of Dr. Bougakov." (*Id.*) As to treating physician, Dr. Stahl, the ALJ stated that he accorded "significant weight" to his opinion, "as it is consistent with the medical evidence of record." (*Id.*) As to Plaintiff's treating psychiatrist, however, the ALJ stated that

> the opinion of Dr. Stern ... regarding [Plaintiff's] mental limitations and the non-materiality of substance abuse is not accorded much weight, as it is completely contrary to the medical evidence of record, including diagnoses of substance induced mood disorder, the statements of [Plaintiff] and his girlfriend regarding his behavior

while drinking, and [Plaintiff's] activities of daily living.

(*Id.*) The ALJ also noted that determination of disability was not a medical issue, as it was, instead, reserved to the Commissioner; thus, the ALJ found that Dr. Stern's opinion that Plaintiff was unable to work for 12 months did not have to be given "controlling or significant weight." (*Id.*)

After performing the RFC assessment, the ALJ proceeded to step four of the evaluation and concluded that Plaintiff could not perform his past relevant work as a painter because the medium exertional level required to carry out such work exceeded Plaintiff's RFC. (*Id.*) Finally, the ALJ moved on to step five of the sequential evaluation. There, the ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (*Id* ) In making this determination, the ALJ followed the Guidelines (specifically, Rule 201.18, 20 C.F.R. Pt. 404, Subpt. P, App. 2) which dictated the conclusion that Plaintiff was not disabled. (*Id.* at 33.)

## III. *REVIEW OF THE ALJ'S DECISION*

Plaintiff argues that the ALJ did not properly evaluate the psychiatric medical evidence in this case. (Pl. Mem. at 13.) Specifically, Plaintiff contends that the ALJ did not afford enough weight to treating psychiatrist Dr. Stern's opinion that Plaintiff's substance abuse was merely a symptom of his mental impairments and was not a material contributing factor to those impairments. (*Id.* at 14–15.) There appears to be two related arguments here: (1) that the ALJ did not properly apply 20 C.F.R. § 404.1535 as to Plaintiff's drug and alcohol abuse, and (2) that the ALJ did not properly apply the treating physician rule.

**\*25** In response, Defendant argues that "the ALJ properly did not go through the full process for determining the materiality of Plaintiff's substance abuse because the ALJ did not first find that Plaintiff was disabled according to the sequential analysis." (Def. Mem., at 26.) Instead, the ALJ "properly reviewed the full record and, in going through the full five-step sequential evaluation, reasonably found that plaintiff was not disabled even considering his substance abuse." (*Id.*) While this explanation describes an analysis that would

Morales v. Colvin, Not Reported in F.Supp.3d (2016)
Case 7:15-cv-04794-KMK   Document 25   Filed 08/02/16   Page 90 of 108
215 Soc.Sec.Rep.Serv. 596

follow Section 404.1535, it is not clear from the ALJ's decision that he actually went through the full five-step sequential evaluation first with an eye "strictly [on the] symptoms, not [the] causes" *see Newsom*, 817 F.Supp.2d at 134, and thereby found that Plaintiff was not disabled.

In fact, in the section discussing the analysis for his RFC determination, the ALJ discussed the Plaintiff's history of drug and alcohol abuse and its effects on his symptoms in detail, and appeared to focus on the ways in which the substance abuse caused or exacerbated Plaintiff's symptoms. (R. at 30–31.) For example, the ALJ noted (with all bold-faced phrases shown here emphasized, in bold, by the ALJ himself) that "[t]reatment notes indicate that [Plaintiff's] alcohol abuse 'ha[d] **exacerbated suicidality**" and that, according to Plaintiff's girlfriend, Plaintiff became **"combative with strangers when he dr [ank]"** and **"only bec[ame] suicidal when he [was] drunk."** (*Id.* at 30.) The ALJ also referred to Plaintiff's own statements that he was **"sick of hurting [him]self while [he was] drunk"** and that, immediately preceding a suicide attempt, Plaintiff **"started to feel more and more depressed after having used cocaine and alcohol."** (*Id.*) These comments of the ALJ suggest that, in connection with making his initial RFC assessment, he examined the reasons behind Plaintiff's symptoms, and then discounted the symptoms where he found that they were caused by alcohol and drug abuse-an approach that is improper under the regulations. *See e.g., Webb*, 2013 WL 5347563, at *6 (remanding where "[t]he ALJ's decision [was] unclear as to whether he determined that [p]laintiff was not disabled after consideration of [all plaintiff's] symptoms, or if symptoms resulting from [p]laintiff s substance abuse were discounted prior to this determination"); *Newsome*, 817 F.Supp.2d at 134 (ALJ did not follow the proper procedure where he made an RFC assessment "without taking into account any disabling symptoms causing physical limitations that he determined were attributable to the [p]laintiff's alcohol abuse"). Similarly, as to step three, after finding that Plaintiff "experienced three episodes of decompensation, each of extended duration," the ALJ noted that each of the episodes occurred "after a suicide attempt [by Plaintiff] subsequent to drinking and drug use." (R. at 28.) These statements "indicate that the ALJ may have improperly minimized or excluded symptoms because they may have been caused by substance abuse." [36] *See Piccini*, 2014 WL 4651911, at *15.

**\*26**  It also appears that the ALJ's initial, improper focus on substance abuse as a "cause" of Plaintiff's symptoms may have led the ALJ to have assigned inappropriately reduced weight to the opinions of Plaintiff's treating psychiatrist, Dr. Stern, regarding the nature and severity of Plaintiff's mental impairments. The ALJ stated that he was not according "much weight" to Dr. Stern's opinions regarding Plaintiff's mental limitations because, according to the ALJ, such opinions were "completely contrary to the medical evidence of record." (R. at 32.) Although inconsistency with the medical record can be a proper basis for choosing to give less than controlling weight to a treating physician's opinion, the Record in this case does not actually reflect that Dr. Stern's opinions regarding Plaintiff's mental impairments were at odds with the underlying medical evidence. After citing to Dr. Stern's opinions that Plaintiff had "marked limitations" in a number of categories, [37] the ALJ merely noted that Dr. Stern's assessment "was dated August 10, 2011, while the claimant was still abusing substances" and that "claimant reported that he stopped using after his admission to Bellevue Hospital in September 2011." (R. at 31.) This is insufficient to demonstrate that the Dr. Stern's opinions were in conflict with the medical tests and psychiatric evaluations that had been performed during the course of Plaintiff's treatment, and the ALJ did not point to medical evidence showing that any tests or evaluations of Plaintiff's mental ability to perform work-related activities had changed significantly after September 2011. [38] Moreover, while substance abuse is ultimately "relevant in determining whether a claimant is disabled under the regulations ... it bears no relevance to the weight that must be given to the opinion of a treating physician." *Vernon v. Astrue*, No. 06cv13132 (RMB)(DF), 2008 WL 5170392, at *20 (S.D.N.Y. Dec. 9, 2008), *adopting report and recommendation.*

Even if the ALJ had a proper basis for determining that Dr. Stern's opinions were inconsistent with the medical evidence in the Record, and were therefore not entitled to controlling weight, the ALJ was still required to apply the factors listed in 20 C.F.R. §§ 404.1527(c) to determine the weight to accord to this treating source's opinions. *See* Social Security Ruling 96–2P (S.S.A. July 2, 1996) (stating that a finding of inconsistency "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected," and that the opinion "is still entitled to deference and must be weighed using all of the factors" in the applicable regulations). These

factors include not only consistency, but also the length of the doctor's treating relationship with the claimant, the nature and extent of the relationship, the supportability of the doctor's opinion, and the nature of the doctor's specialization. 20 C.F.R. §§ 404.1527(c). Here, the ALJ's decision does not reflect that he evaluated these factors.

**\*27** The ALJ also found that "Dr. Stern's opinion that [Plaintiff's] substance abuse [was] not material to his mental illness" was "completely contrary to the evidence" and stated that he was therefore not according this opinion on "materiality" much weight. (R. at 31–32.) Yet, as discussed above, the ALJ should not even have been considering the materiality of Plaintiff's drug and alcohol abuse to his mental impairments during the initial, five-step evaluation. *See Piccini,* 2014 WL 4651911, at \*15 (noting that "whether alcoholism or drug addiction is a contributing factor to disability may be considered only *after* the initial disability determination is made" (emphasis in original)); *accord* Social Security Ruling 13–2p (S.S.A. Mar. 22, 2013) ("SSR 13–2p") (directing ALJs to "apply the steps of the sequential evaluation a second time to determine whether the claimant would be disabled if he or she were not using drugs or alcohol"). [39] Instead, as previously described, the ALJ should have first performed the evaluation regarding Plaintiff's symptoms and related impairments, and if, as a result of those impairments, he found that Plaintiff was disabled, then he should have proceeded to perform the evaluation a second time to determine if Plaintiff's substance abuse was a contributing factor to the disability.

It may well be that, upon a proper evaluation, the ALJ reaches the same ultimate conclusion as he reached here-*i.e.,* that Plaintiff is not disabled-because, even if Plaintiff's impairments are found to be disabling, his substance abuse may still be found to be a material contributing factor to those impairments. Nonetheless, the Court should not speculate as to the result the ALJ would reach upon following the correct evaluative procedures. Nor should the Court substitute its judgment for the ALJ's as to the proper weight to be assigned to the opinions of Plaintiff's treating psychiatrist, absent an initial consideration by the ALJ of the factors relevant to that determination. *See Piccini,* 2014 WL 4651911, at \*16 (stating that "[t]he Court is mindful that, when the proper legal analysis is followed, the ALJ may conclude that substantial evidence supports a finding of no disability. But to assume that conclusion creates an unacceptable

risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." (internal quotation marks and citations omitted)).

Given that the ALJ apparently erred in his application of both Section 404.1535 and the treating physician rule, and that it is not entirely clear that the ALJ would have made reached the same conclusion had he adhered to the regulations, I recommend that this case be remanded "so that the ALJ can separately determine [Plaintiff's] disability before assessing whether or not [his] [substance] abuse constitutes a contributing factor material to that determination," *Piccini,* 2014 WL 4651911, at \*15, and so the ALJ can properly evaluate the opinions of Plaintiff's treating psychiatrist, Dr. Stern. [40]

## *CONCLUSION*

**\*28** For all of the foregoing reasons, I respectfully recommend granting Plaintiff's motion for judgment on the pleadings (Dkt.15), to the extent that her claim be remanded for further consideration of whether Plaintiff is disabled due to his mental impairments. I recommend that Defendant's cross-motion (Dkt.19) be denied.

I further recommend that, upon remand, the ALJ be specifically directed, in the first instance, to utilize the five-step sequential evaluation to determine whether Plaintiff's mental impairments are sufficient to render him disabled, and, if so, to turn *then* to the question of whether Plaintiff's substance abuse constitutes a contributing factor material to that determination. Also, in connection with evaluating Plaintiff's level of functioning in each of the domains relevant to Listings 12.04 and 12.09, and in evaluating Plaintiff's RFC, the ALJ should be directed to reconsider the evidence in the Record regarding Plaintiff's mental impairments in accordance with 20 C.F.R. § 404.1527(c), regarding the weighing of medical opinion evidence, and to develop the Record as necessary to fill in any gaps or to clarify medical findings.

This Court also notes that Plaintiff has raised certain additional arguments here-specifically regarding the ALJ's assessment of Plaintiff's credibility and reliance on the MedicalVocational Guidelines (*see* Pl. Mem., at 20, 23)-that the need Court not reach at this juncture, given that the ALJ's analysis may change on these points upon

remand. Nonetheless, I recommend that, on remand, the ALJ be reminded (a) to apply Social Security Ruling 96–7p, in evaluating Plaintiff's credibility (*see* SSR 13–2p (noting that "[a]djudicators must not presume that all claimants with [drug and alcohol abuse] are inherently less credible than other claimants ... and [should] apply [the regular] policy in SSR 96–7p")), and (b) to consult with a vocational expert, rather than rely solely on the Guidelines, should he find that Plaintiff suffers from psychiatric impairments that "significantly limit the range of work permitted by his exertional limitations," *Zabal, 595 F.3d at 410* (internal quotation marks and citation omitted); *see also* 20 C.F.R. § 404.1569a.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Lorna G. Schofield, United States

Courthouse, 40 Foley Square, Room 201, New York, N.Y. 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, N.Y. 10007. Any requests for an extension of time for filing objections should be directed to Judge Schofield. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

**\*29** Filed Feb. 10, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 2137776, 215 Soc.Sec.Rep.Serv. 596

Footnotes

1  The background facts set forth herein are taken from the administrative record (referred to herein as "R."), which includes, *inter alia,* Plaintiff's medical records and the transcript of the October 19, 2011 hearing held before Administrative Law Judge ("ALJ") Kenneth Scheer, at which Plaintiff testified.

2  Dr. Stahl's specialty appears to be internal medicine. (*See* R. at 222.)

3  Metformin is a medication used to treat Type 2 diabetes. *See* http://www.nlm.nih. gov/medlineplus/dmginfo/meds/a696005.html (last accessed Feb. 2, 2015).

4  A "restricted affect" means "[h]aving a far narrower range of emotional expression than would be expected; muted emotional activity." *See* http://p sychcentral.com/encyclopedia/2008/restricted-affect/ (last accessed Feb. 2, 2015).

5  Hyperlipidemia means high blood cholesterol levels. *See* http:// www.nlm.nih.gov/medlineplus/encv/article/000403.htm (last accessed Feb. 2, 2015).

6  A monofilament test uses a soft nylon fiber to measure sensitivity to touch. If a patient is unable to feel the filament, it is a sign that he or she has lost sensation in those nerves. *See* http:// www.mavoclin ic.org/diseases-conditions/di abetic-neuropathy/basics/tests-diagnosis/con20033336 (last accessed Feb. 2, 2015).

7  Gabapentin is a medication that is often prescribed to people with epilepsy to help control seizures, but is also used to relieve tingling due to nerve damage in people who suffer from diabetic neuropathy. *See* http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last accessed Feb. 2, 2015).

8  The supraspinatus is a shoulder muscle. *See* http://www.rad . washington.edu/academics/aca demic-sections/msk/muscle-atlas/upperbody/supraspinatus (last accessed Feb. 2, 2015).

9  Peripheral Neuropathy is the weakness, numbness, and pain that accompanies nerve damage. One common cause is diabetes. *See* http:// www.mayoclinic.org/di seasesconditions/peripheral–neuropathy/basics/definition/con–20019948 (last accessed Feb. 2, 2015).

10  Dysarthia is a motor speech disorder that results from impaired movement of the muscles used for speech production. *See* http:// www.asha.org/public/speech/disorders/dysarthria/ (last accessed Feb. 2, 2015).

11  Dysphagia is difficulty swallowing. *See* http:// www.mavoclinic.org/di seasesconditions/dvsphagia/basics/defmition/con–20033444 (last accessed Feb. 2, 2015).

12  Januvia is an oral diabetes medication that controls blood sugar levels. *See* http://www.drugs.com/ianuvia.html (last accessed Feb. 2, 2015).

13  Celexa is the brand name for Citalopram, an antidepressant in a group of drugs known as selective serotonin reuptake inhibitors. *See* http://www.nlm.nih. gov/medlineplus/druginfo/meds/a699001.html (last accessed Feb. 2, 2015).

14  Dr. Stern diagnosed Plaintiff with bipolar II disorder on June 2, 2011. (*See infra* at Background Section A(1)(c)(iii).) Bipolar II disorder is considered less severe than bipolar I disorder. It is characterized by "elevated mood, irritability, and some changes in ... functioning," although generally not enough to disrupt daily routines severely. In patients with bipolar II, periods of depression typically last longer than periods of hypomania. *See* http://w ww.mayoclinic.org/diseases-conditions/bipolar–disorder/basics/symptoms/con–20027544 (last accessed Feb. 2, 2015).

15  On September 15, 2011, Plaintiff visited Dr. Andrea Card, a colleague of Dr. Stahl's, for an "acute visit." (*See generally id.* at 611–14.) Dr. Card recorded impressions of hypomagnesaemia (abnormally low levels of magnesium in the blood, see http://www.nice.org.uk/advic e/esuom4/ifp/chapter/what-is-hypomagnesaemia (last visited on Feb. 8, 2015), and uncontrolled diabetes mellitus, likely due to poor adherence to a medication schedule. (R at 613.) Plaintiff was cooperative, well-appearing, had intermittent eye contact and a blunted affect. (*Id.* at 611–12.) He denied any plan of self-harm. (*Id.* at 612.)

16  On the same day that Dr. Stern and Rodriguez filled out this report, Plaintiff also met with Dr. Deborah Swiderski of Montefiore, for a physical examination for Federation Employment and Guidance Services ("FEGS"). (*Id.* at 628; *see also* http://www.fegs.org/whatwe-d o/employment-workforce/jobseekers/wecare# .VMrbS3vYhdA (last visited Feb. 1, 2015) (describing FEGS WeCare as a New York City program that "helps cash assistance applicants and recipients with complex clinical barriers to employment, including medical, mental health, and substance abuse conditions, to obtain employment or federal disability benefits").) Plaintiff told the Montefiore staff that he was being asked to work, but that he did not feel able to, "due to back an[d] leg pain." (R. at 628.) Plaintiff stated that he had not been taking his diabetes medication or going to doctor's appointments because of problems with Medicaid. (*Id.*) Plaintiff also reported smoking about a pack of cigarettes on days when he drank, which, he said, were Friday and Saturday. (*Id.*) Plaintiff indicated that, when he did drink, he consumed a liter of malt liquor and two pints of vodka. (*Id.*) He was diagnosed with diabetes mellitus, hyperlipidemia, peripheral neuropathy, and malignant neoplasm of glottis (*i.e.,* laryngeal cancer). (*Id.* at 629–30; *see also* http:// www.nlm.nih.gov/medlineplus/cancer.html (last accessed Feb. 2, 2015); http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0022325/ (last accessed Feb. 2, 2015).)

17  Geodon is the brand name for Ziprasidone, a medication that is used to treat symptoms of schizophrenia, as well as episodes of mania in individuals with bipolar disorder. *See* http:// www.nlm.nih.gov/medlineplus/dmginfo/meds/a699062.html (last accessed Feb. 2, 2015).

18  The multiaxial system of assessment "involves an assessment on several axes, each of which refers to a different domain of information." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 27 (4th ed. rev.2000) ("DSM–IV"). Axis I refers to clinical disorders and other conditions that may be the focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions that may be relevant to the understanding or management of the individual's mental disorder; Axis IV refers to psychosocial and environmental problems that may affect the diagnosis, treatment, and prognosis of mental disorders; and Axis V refers to Global Assessment of Functioning ("GAF"). *Id.* of self-injury; intense fear of being alone or abandoned; ongoing feelings of emptiness; frequent and intense displays of anger; and stress-related paranoia that comes and goes. *See* http://www.mayoclinic.org/di seases-conditions/personalitv-disorders/basics/svmptoms/con20030111 (last accessed Feb. 2, 2015).

19  Borderline personality traits include: impulsive and risky behavior; unstable or fragile self-image; unstable and intense relationships; up and down moods, often as a reaction to threats ordinary routine without special supervision, work in coordination with or proximity to others, perform at a consistent pace, and interact appropriately with supervisors, co-workers and the public. (R. at 31.)

20  The GAF scale, a scale from 0 to 100, was previously used by clinicians to report their judgment of an individual's overall level of functioning. DSM–IV at 32–34. A GAF of 31 to 40 meant that an individual had "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* at 34. The most recent (2013) addition of the manual, however, "has dropped the use of the [GAF] scale." *Restuccia v. Colving,* No. 13cv3294 (RMB), 2014 WL 4739318, at *8 (Sept. 22, 2014) (quoting *Mainella v. Colvin,* No. 13cv2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014)).

21  Abilify is the brand name for Aripiprazole, a medication used to treat the symptoms of schizophrenia. *See* http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html (last visited Jan. 30, 2015).

22    Doxepine is a medication used to treat depression and anxiety. *See* http://www.nlm.nih.g ov/medlineplus/druginfo/meds/ a682390.html (last visited Jan. 30, 2015).

23    THC is the active ingredient in marijuana. *See* http://www . nlm.nih.gov/medlineplus/mariiuana.html (last visited, Jan. 30, 2015).

24    A GAF score in the 41–50 range was understood to show that an individual had "serious symptoms" or "any serious impairment in social occupational, or school functioning." *See* DSM–IV at 34. A GAF score in the 31–40 range was understood to show that an individual had "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.*

25    A GAF score in the range of 21–30 was understood to indicate that an individual displayed behavior "considerably influenced by delusions or hallucinations," had "serious impairment in communication or judgment," or had an "inability to function in almost all areas." DSM–IV at 34.

26    *See* n. 25, supra.

27    The PHQ–9 is a test that measures the severity of depression. A score above 20 indicates severe depression. *See* http:// www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/ (last accessed Feb. 2, 2015).

28    A GAF score in the 51–60 range was understood to signify "moderate symptoms or moderate difficulty in social, occupational, or school situations." *Petrie v. Astrue,* 412 F. App'x 401, 506 n. 2 (2d Cir.2011) (citing DSM–IV at 376–77).

29    A Librium taper is a detoxification medication regimen that is used to combat alcohol withdrawal. *See* http:// www.ncbi.nlm.nih.gov/books/NBK64823/ (last accessed Feb. 2, 2015).

30    The Record also contains two consultant reports relating solely to Plaintiff's physical impairments: an RFC assessment dated December 2, 2010, by someone identified only as "C. Devost" (*See id.* at 301–06; *see also id.* at 42 (Plaintiff's counsel objecting, at the hearing, to this report, on the ground that it was unclear whether it was filled out by "a single decision maker or a medical consultant")), and a November 1, 2010 report by a consultative oncologist, Dr. B. Gajwani, opining that Plaintiff's laryngeal cancer did not equal any cancer listings (*id.* at 247–48).

31    Plaintiff testified that, for about two months in the spring of 2010, he had painted and plastered offices and received payment "off the books." (*Id.* at 43–45.)

32    "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." *Morales v. Colvin,* No. 13cv4302 (SAS), 2014 WL 7336893, at *8 (S.D.N.Y. Dec. 24, 2014) (quoting *Kohler v. Astrue,* 546 F.3d 260, 266 n. 5 (2d Cir.2008)).

33    "[T]reating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source who ... has provided [the claimant] with medical treatment or evaluation" and who has had "an ongoing treatment relationship" with him or her. 20 C.F.R. §§ 404.1502, 416.902. A medical source who has treated or evaluated the claimant "only a few times" may be considered a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s) ." *Id.*

34    Before engaging in the five-step sequential evaluation, the ALJ determined that Plaintiff satisfied the insured status requirement of the Act through March 31, 2013. (*Id.* at 26.)

35    Several recent decisions have identified identical language in ALJ decisions as, *inter alia,* "boilerplate" or "template-driven." *See Molina v. Colvin,* No. 13cv4989 (AJP), 2014 WL 3445335, at *14 n. 19 (S.D.N.Y. July 14, 2014) (collecting cases in which similar language has been used by ALJs); *Cahill v. Colvin,* No. 12cv9445 (PAE)(MHD), 2014 WL 7392895, at *23 (S.D.N.Y .2014) (characterizing identical language as "meaningless boilerplate").

36    This Court notes that the ALJ did refer to one record from a hospital admission where Plaintiff was reported to be "under the influence of substances" and impaired in impulse control, insight and judgment, but also "related and cooperative, with normal eye contact, fluent but pressured speech, intact attention and concentration, and goal directed and logical thought process." (R. at 31.) While the ALJ might have concluded, from this particular hospital record, that the symptoms exhibited by Plaintiff at that time (even while "under the influence") were not sufficiently significant to be disabling, this was just one reference amid several paragraphs of analysis that appeared to minimize Plaintiff's symptoms because of their relation to his substance abuse.

37    Dr. Stern reported that Plaintiff had "marked limitations" in his ability to: maintain attention and concentration for extended periods, perform activities within a schedule, sustain an

38    If there *had* been a basis for finding that any opinion of Plaintiff's treating physician opinion was inconsistent with the medical record for the relevant period, then the ALJ would have had an affirmative duty to develop the administrative record so as to clarify the basis for the opinion. *See Ocasio v. Barnhart,* No. 00cv6277 (SJ), 2002 WL 485691, at *8 (E.D.N.Y. Mar. 28, 2002) ("If the reports of treating physicians are insufficient or inconsistent, the ALJ may not simply

215 Soc.Sec.Rep.Serv. 596

dismiss them. Rather, he has an affirmative duty to develop the administrative record, including seeking additional information from the treating physicians." (citing *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998) (additional citations omitted))); *accord* Social Security Ruling 96–5p (S.S.A. July 2, 1996) ("Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion."). The ALJ, however, did not seek any additional information from Dr. Stern in this case.

39   SSR 13–2p provides a detailed description of the proper method for evaluating cases involving drug addiction and alcoholism. While this administrative ruling was released after the ALJ's decision regarding Plaintiff, the underlying regulations on which it is based are the same.

40   I do not recommend that Plaintiff's claim be remanded for further consideration of his physical impairments, as Plaintiff's motion before this Court focused solely on the ALJ's decision with respect to his mental impairments, raising no objection to the ALJ's findings regarding his physical impairments.

---

**End of Document** <span style="float:right">© 2016 Thomson Reuters. No claim to original U.S. Government Works.</span>

2014 WL 4651911
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Angela F. PICCINI, Plaintiff,
v.
COMMISSIONER OF SOCIAL
SECURITY, Defendant.

No. 13–cv–3461 (AJN)(SN).
|
Signed Sept. 17, 2014.

### ORDER

ALISON J. NATHAN, District Judge.

**\*1** Plaintiff Angela Piccini, proceeding *pro se,* brings this action seeking judicial review of the final determination of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. On January 13, 2014, the Commissioner moved for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Dkt. No. 19. Plaintiff did not oppose the motion.

On June 27, 2014, the Honorable Sarah Netburn, United States Magistrate Judge, issued a report and recommendation ("R & R") recommending that the Court deny the Commissioner's motion and remand the case. Dkt. No. 22. In particular, Magistrate Judge Netburn determined that the ALJ committed legal error by improperly "conflat[ing] the substance abuse analysis with the disability determination itself," and by "afford[ing] [Plaintiff's] treating physician's opinion little weight because the physician 'disregarded [Plaintiff's] admittedly pervasive alcohol and polysubstance abuse history in arriving at his assessment.'" Dkt. No. 22, at 27, 28. No objections to the R & R were filed.

A district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). In the absence of any objections, a district court reviews the R & R for clear error. *See Tarafa v. Artus,* No. 10–cv–3870 (AJN)(HBP), 2013 WL 3789089, at \*2 (S.D.N.Y. July 18,

2013) (citing *Gomez v. Brown,* 655 F.Supp.2d 332, 341 (S.D.N.Y.2009)).

Because no objections were filed by the Commissioner, the Court reviewed for plain error. Upon review, the Court finds no clear error on the face of the record. Accordingly, the Court adopts the R & R in its entirety and denies the Commissioner's motion for judgment on the pleadings, for the reasons set forth in the R & R. The matter is remanded to the Commissioner for further administrative proceedings consistent with this Order. The Clerk of Court is directed to enter judgment.

SO ORDERED.

This resolves Dkt. No. 19.

### REPORT AND RECOMMENDATION

SARAH NETBURN, United States Magistrate Judge.

**TO THE HONORABLE ALISON J. NATHAN.**
Plaintiff Angelina Piccini, appearing *pro se,* brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of the final determination of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB"). The Commissioner moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Piccini did not oppose the motion. Because I conclude that the administrative law judge ("ALJ") failed to follow 20 C.F.R. § 404.1535(a) in considering Piccini's substance abuse in his disability determination, I recommend that the Commissioner's motion be DENIED and the case be remanded for further consideration.

### PROCEDURAL BACKGROUND

**\*2** On September 16, 2010, Piccini submitted an application for DIB. On February 25, 2011, the Social Security Administration (the "SSA") denied this application, and on March 24, 2011, Piccini appealed, requesting a hearing before an administrative law judge. Piccini appeared with counsel before ALJ Michael Rodriguez on March 19, 2012. The ALJ issued a decision on April 6, 2012, denying Piccini benefits. The Appeals

Council denied Piccini's request for review of the ALJ's decision on April 4, 2013, thereby rendering the decision of the Commissioner final.

On May 22, 2013, Piccini filed this *pro se* action. On June 6, 2013, the Honorable Alison J. Nathan referred Piccini's case to my docket for a report and recommendation. On January 13, 2014, the Commissioner filed a motion for judgment on the pleadings with supporting memorandum of law. On February 24, 2014, the Court issued an Order directing Piccini to file a response by March 10, 2014, otherwise the motion would be considered fully briefed. Piccini did not file a response to the Commissioner's motion for judgment on the pleadings, and the motion is considered fully briefed.

## FACTUAL BACKGROUND

The following facts are taken from the administrative record.

### I. Non–Medical Evidence

Piccini was born on November 18, 1982, and at the time of the hearing, lived in an apartment in New York with her two young sons. She completed the ninth grade and had attempted, but failed to pass, the General Educational Development ("GED") test.

Piccini's sister, who had lived with her until only a few months before the hearing, completed a function report for Piccini, dated January 10, 2011. According to this report, Piccini prepared her older son for school each day, attended appointments, and cared for her younger son at home during the day. She prepared meals for her children and bathed them. She was able to help her older son with his homework. Her sister indicated that Piccini had no problem with personal care.

Piccini shopped in stores once or twice a month for clothing, groceries, or household supplies, and she could pay her bills, count change, and use a checkbook. Piccini's sister reported that Piccini watched television and interacted with her children, but did not go outside very often. She socialized on Facebook or on the phone once or twice a week. Her sister described Piccini as a loner. The family had tried to speak with her about the effect of alcohol on her life, but alcohol had consumed her.

Her sister indicated that Piccini's impairments made it difficult for her to concentrate on her daily activities, and thus, she often completed chores improperly. Piccini could not work, think properly, or live a normal life, all of which she could do before her illness. Her sister also had concerns about Piccini's ability to manage her money. Piccini's condition affected her ability to understand, concentrate, follow instructions, complete tasks, and get along with others. Piccini did not know how to handle stress, took longer to adjust to changes, and was very emotional. Her sister indicated that Piccini's comprehension was not age-appropriate, and she could follow only about 30 percent of written instructions and 40 percent of oral instructions. Piccini did not get along well with authority figures.

**\*3** Piccini's sister stated that she did not believe that Piccini could handle a job at that time. She had mental health issues since she was a teenager and had not been able to live a normal life. She had been dealing with bipolar disorder, depression, suicidal thoughts, and alcoholism for many years. Her sister believed that a program to help her with her expenses would allow her to focus on getting better.

### II. Relevant Medical History

#### A. Medical Evidence Before June 29, 2010

Piccini was taken to Lincoln Hospital by her sister on March 8, 2009, after claiming to have consumed 17 Seroquel and three beers. Piccini described being angry at her boyfriend because he was seeing someone else and had not been helping with their baby. Piccini was subsequently transferred to New York Presbyterian Hospital ("NYPH").

On March 10, 2009, a social worker at NYPH completed a psychiatric intake evaluation. Piccini told the social worker that she had exaggerated the number of pills she took because she wanted the attention, but she loved her life and her kids and did not want to die. Piccini admitted having problems controlling her anger and coping with her feelings. She denied psychotic or manic symptoms or any homicidal ideation. The social worker indicated, however, that it was unclear if Piccini was minimizing her symptoms. Piccini described having behavioral problems as a teen and using cocaine at 14. She was prescribed Seroquel in October 2008 by a psychiatrist

at her drug treatment program, but Piccini did not take the medication because it made her feel "too dopey" to take care of her children. (R. 202.) She also failed to take an antidepressant that had been prescribed for her.

Piccini's general appearance and hygiene were adequate. She was cooperative and her attention was good. Her speech was normal and her mood was euthymic. Her thought process was goal-directed and she displayed no delusions or hallucinations. Her insight, judgment, and impulse control were poor. Her cognitive functioning and memory were intact, and her intellectual functioning was average. She was diagnosed with depressive disorder and her Global Assessment of Functioning ("GAF")[1] was 11–20, indicating that there was some danger of hurting herself or others. Piccini indicated that she might consider taking an antidepressant but generally did not want to be medicated. The report noted that "admission to a psychiatric facility was medically necessary to provide acute psychiatric treatment that could reasonably be expected to improve her symptoms/condition." (R. 205.) This report was also signed by Dr. Zambenedetti.

On March 19, 2009, a psychiatric psychosocial assessment was performed by a social worker at NYPH. Piccini reported that she lived with her children and had a "close and supportive family" that were involved with her treatment. (R. 190–91.) Piccini described herself as a "troubled kid," who did not obey school rules and often fought with her peers. (Id.) Piccini informed the social worker that she had an active social life with family and friends but stopped communication with her friends because they all used drugs. The father of Piccini's younger child was physically and emotionally abusive. Piccini indicated that she planned to move to Virginia in two weeks. The social worker noted that she might be without treatment or benefits for a period of time during the transition.

**\*4** On the same date, Dr. Asemota completed a psychiatric discharge summary. Piccini's clinical disorders were depressive disorder, alcohol abuse, and cocaine dependence. Piccini's GAF was 51–60, indicating moderate symptoms. Dr. Asemota indicated that Piccini had no prior psychiatric hospitalization. While Piccini admitted to one previous suicide attempt at the age of 15, she denied any subsequent suicidal ideation. Piccini reported chronic anxiety and mild depression. She denied having low energy, but stated that she became emotional

easily. She denied having a history of manic symptoms or psychosis. She had not used any illegal substances for a year and had attended outpatient substance abuse treatment in the past. Piccini informed that doctor that she did not have a current psychiatrist. She had received the Seroquel from her previous addiction psychiatrist but only took one dose because it made her feel tired.

Piccini originally minimized her alcohol intake but then admitted that she would drink five drinks at a time, usually twice a week, but had escalated her drinking recently. She admitted that she used alcohol to replace cocaine but declined an intensive rehab referral. Piccini believed she could quit drinking on her own with the help of the groups she attended.

Piccini's mood was good and her affect was euthymic throughout her stay at NYPH. She had no further suicidal ideation and was prescribed Celexa for her depression. Piccini's appearance and hygiene were adequate. She was cooperative and her attention was good. Her speech was normal and her affect was full. Her thought process was goal directed, and there was no evidence of delusions or hallucinations. Her insight, judgment, and impulse control were fair. Piccini's condition upon discharge was much improved and her prognosis was good.

### B. Medical Evidence After June 29, 2010

#### 1. Northern Virginia Mental Health Institute
After moving to Virginia to live with her parents, Piccini was sexually assaulted by her uncle. This led to Piccini drinking and overdosing on Advil, resulting in her hospitalization from September 3–8, 2010. She was diagnosed with recurrent major depression and alcohol abuse. Her GAF was 45, indicating serious symptoms. The reason for her hospitalization was mood disturbance. She was discharged as improved, though not recovered. She was prescribed medication for her depression and to help her sleep.

#### 2. Newburgh Mental Health Clinic
Upon returning to New York State, Piccini began treatment at the Newburgh Mental Health Clinic. On March 3, 2011, Dr. Prasad Angara performed a psychiatric evaluation for Piccini and diagnosed her with major depressive disorder (recurrent and moderate), bipolar II disorder, panic disorder with agoraphobia,

alcohol dependence, and borderline personality disorder. Piccini's GAF was 55, indicating moderate symptoms. Dr. Angara described Piccini as young and articulate with a fair prognosis with treatment. Piccini needed individual psychotherapy for low self-esteem. Dr. Angara would consider medication, particularly Zoloft, after reviewing her lab work and medical records. Dr. Angara also recommended treatment for alcohol and substance abuse as well as a referral for VESID for vocational training.

 **\*5** During the examination, Piccini was alert and cooperative, though slightly anxious. Her speech was spontaneous, coherent, relevant, and goal-directed. Piccini reported vague feelings of paranoia but denied hearing any voices. She also reported mild mood changes but there was no evidence of manic episodes. Piccini reported depression, panic, and anxiety. Piccini denied any thought of harming herself or others. She was oriented but reported problems with her memory and concentration. Piccini could recall only one out of three items after five minutes, could not perform serial sevens, and could not interpret proverbs. Her intellect was average, insight limited, and judgment fair.

On April 6, 2011, Dr. Angara completed a psychiatric assessment for Piccini. Dr. Angara noted that Piccini had been admitted to the clinic at Rockland Psychiatric Center–Newburgh approximately one month prior. She was scheduled for weekly therapy sessions and was being offered group therapy. She would also be seen monthly by the psychiatrist for medication and symptom management. Dr. Angara described Piccini as exhibiting mood lability. Piccini reported panic attacks, during which she believed she was dying. She had emotional regulation problems, including depression, panic, and angry outbursts. Piccini reported racing thoughts and restlessness. Dr. Angara noted that Piccini's impairments lasted or could be expected to last at least twelve months.

On April 7, 2011, Dr. Angara completed a Medical Assessment of Ability to Do Work–Related Activities (Mental) form and concluded that Piccini's symptoms interfered with her ability to work. Dr. Angara noted that Piccini had paranoid ideation, mood lability, emotional regulation problems, panic attacks, racing thoughts, and difficulty in getting along with others, particularly her peers. Dr. Angara described Piccini as highly anxious, pacing, and restless. Dr. Angara also noted that Piccini had particular difficulty in public places. Dr. Angara

concluded that Piccini's ability to relate to co-workers, deal with the public, deal with work stresses, and maintain attention and concentration was poor or none. [2] Dr. Angara also indicated that Piccini's ability to understand, remember, and carry out complex job instructions was only fair, as was her ability to follow work rules, use judgment, and interact with supervisors. While Piccini's ability to maintain her personal appearance was unlimited or very good, her ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability was only fair. Dr. Angara indicated that Piccini had unlimited or very good ability to function independently and could manage benefits in her own best interest. [3]

### C. The Commissioner's Medical Exams

#### 1. Alan Dubro, Ph.D., Consultative Physician
On February 22, 2011, Dr. Alan Dubro, Ph.D. evaluated Piccini at the Commissioner's request. Piccini took a taxi to the exam. Piccini reported that she was psychiatrically hospitalized in March 2009, September 2009, and September 2010 for the treatment of a mood disorder and substance abuse problems. Piccini reported that she had received psychiatric medication management at a residential substance abuse treatment program from June 2008 through March 2009, and in the fall 2010. Piccini reported intermittent sleep difficulty and a fair appetite. She had longstanding difficulty in dealing with day-to-day stresses and was frequently irritable and angry. Piccini described that her alcohol abuse began when she was a teenager. She reported drinking hard liquor on a daily basis through September 2010. She had decreased her consumption over the past few months but continued to use alcohol to treat the symptoms of her stress. Piccini reported that she had not used cocaine on a regular basis since 2008.

 **\*6** Dr. Dubro described Piccini as cooperative during the examination. She was adequately groomed and there was no evidence of fidgety or hyperactive behavior. Her speech was fluent and clear, and her thought processes were coherent and goal directed. She presented with no delusions, hallucinations, or thought disorder. Her affect was full and her mood was euthymic. Dr. Dubro found Piccini's attention and concentration to be mildly impaired. Piccini was able to perform simple mental addition and subtraction and could perform

simple multiplication and division with repetition of the problem. Piccini was unable to perform two-step arithmetic calculations mentally, even with repetition. Piccini's recent and remote memory skills were mildly impaired. She recalled three out of three items within one minute and two out of three items after five minutes. She could repeat four digits forward and three backward. Dr. Dubro estimated Piccini's cognitive functioning to fall in the below average range, and she possessed a general fund of information that was appropriate for her experience. Piccini's insight was fair but her judgment was poor as a result of her problems with alcohol.

Piccini could dress herself and maintain her hygiene independently. She cleaned her home several times a week, did laundry, and shopped for food approximately once a week. She prepared meals for her children every day. She spent time with only her immediate family. Piccini reported that she used public transportation independently and could manage her own money.

Dr. Dubro diagnosed Piccini with mood disorder, NOS, alcohol abuse in partial remission, and cocaine abuse in sustained remission. Dr. Dubro concluded that Piccini could follow, understand, remember, and attend to directions and instructions. Her attention span and concentration were mildly impaired, and she would have mild difficulties in learning new tasks. Dr. Dubro assessed that Piccini could perform daily tasks and complex tasks independently and on a regular basis. She displayed moderate difficulties in her ability to interact with others, and due to her alcohol abuse, had displayed problems with adequate judgment. Dr. Dubro stated that Piccini would have mild difficulties in her ability to regularly follow a routine and maintain a schedule.

According to Dr. Dubro, Piccini's symptoms did not significantly interfere with her ability to function on a daily basis. Dr. Dubro recommended that Piccini be referred for outpatient substance abuse and mental health treatment. Piccini's prognosis was fair.

**2. Dr. T. Bruni, State Psychologist**
On February 24, 2011, Dr. T. Bruni, a state agency psychologist, evaluated the evidence of record and completed a Psychiatric Review Technique form. Dr. Bruni determined that Piccini's impairments, affective disorder and substance addiction disorders, were not severe. Dr. Bruni concluded that the medical evidence did

not establish a "Paragraph B" listing impairment. Piccini had no restrictions in activities of daily living and only mild restrictions in maintaining social functioning and concentration, persistence, or pace. Furthermore, Piccini had no episodes of deterioration of extended duration. Dr. Bruni also concluded that Piccini's impairments did not satisfy the "Paragraph C" criteria for disability.

**\*7** Dr. Bruni noted that Piccini was not in any mental health or substance abuse treatment programs at the time of his review of the record. He also noted that though Piccini informed the consultative examiner that she had been hospitalized three times, none of them were of extended duration. Dr. Bruni concluded that the medical evidence of record indicated that Piccini had mild limitations in maintaining social functioning, attention, and concentration. The limitations, however, were not severe and did not significantly interfere with her ability to function on a daily basis.

### III. The Administrative Hearing

#### A. Piccini's Testimony
Piccini appeared at the hearing on March 19, 2012, with counsel. Piccini testified that she resided in Poughkeepsie, New York, in an apartment with her two children, ages 7 and 3 at the time of the hearing. Social Services paid for Piccini's rent and utilities. Piccini also received food stamps. Piccini previously applied for disability benefits in May 2009, and was denied but did not understand that she could appeal the decision.

The ALJ questioned Piccini about her drinking. She testified that she was clean and sober at the time of the hearing, but that she had briefly relapsed in November 2010 after she was raped by her uncle. Piccini testified that before the relapse, she had not consumed alcohol for approximately two to three months. While Piccini had previously voluntarily participated in a treatment program she was not currently in one. Piccini testified that she did not believe she needed the assistance of a program anymore and her therapist did not seem to be worried about her. Piccini's family would not drink around her, and she no longer would hang out with friends who were a bad influence on her. Piccini testified that she spent most of her time with her mom or her sister.

At the time of the hearing, Piccini was not working. She last tried to work as a temporary employee in June 2011.

She worked in the stock room of Saks Off 5th, but quit after a week and a half. When she began working at 6:00 a.m., she was fine because there were no people around at that time. But then she would have panic attacks being in the mall. When the ALJ asked Piccini what would make her panic, she responded, "I can't really-I can't explain it, it just comes and goes, sometimes it gets worse or sometimes it gets a little calm...." (R. 48.)

Piccini testified that she would take the bus to work, and her sister would care for her children while she was at work. Piccini's mother would occasionally come to help her. Piccini told the ALJ that she had dealt with child protective services when she tried to commit suicide in 2008 while her children were in the house.

The ALJ asked Piccini about her job in Virginia before her return to New York. Piccini was in charge of makings shipments of T-shirts. It was a very small factory with only approximately nine people in the whole warehouse. Everyone had their own space. During this job, Piccini experienced panic. She missed work days but was ashamed to tell people about her condition because she was worried they would look at her like she was crazy. The ALJ asked her to describe what keeps her from working. Piccini testified that it was her depression. She wants to be normal and work. She is tired of the panic attacks and believes that she will one day get better. She has been aware of the fact that something is wrong with her since she has refrained from alcohol and drugs.

 **8**  Piccini told the ALJ that she cannot shop for food. She gets red and her heart starts racing. Her ears get hot and she needs air. When she gets to the store, she completely forgets why she went shopping. She feels like everybody is looking at her or following her. She just wants to hurry up and get out so she can get in her "comfort zone." (R. 53.) She never goes to the store alone. She constantly smokes cigarettes because of her nerves. She gets headaches because she is constantly thinking about random things and cannot focus on one thing.

Piccini testified that she is able to take care of her children at home. She feels safe in her house. She cooks every day. Her parents are the ones who usually take the kids outside. When she tries to take her children to the park, she can stay for only around five minutes because she cannot sit still. Piccini would usually take her seven-year-old child to school and would meet with the teachers.

The ALJ asked Piccini to describe the medications she was taking. Piccini testified that she was taking Zoloft for depression and Xanax for her panic attacks. The psychiatrist Piccini saw in Newburgh stopped taking her insurance and so she went for a period of months without any medication. When she came to New York, her therapist told her to go to the emergency room because it would take a month to get an appointment with the psychiatrist to get her medication. It was a big risk to be off the medication for a couple of months. Piccini stated that she could feel the Zoloft starting to work. She was not sleeping as much as she was before, and the panic attacks were better, though they were not completely gone.

Piccini testified that she used to take Abilify, but the medication was switched because it did not work for her. Piccini stated that she sometimes stays in bed for three or four days. At other times she would stay in bed only one day out of the week. She would often try to have small projects at home to help her get out of bed. Now that her sister is gone, she has to get out of bed to care for her younger child.

The ALJ inquired about Piccini's education. She told him that she completed the ninth grade and was an average student, always on the borderline. She testified that she struggles to read and feels embarrassed to read a book to her son because he is a better reader. The ALJ asked Piccini about her math skills, specifically about whether she knew if she was given the right change after purchasing cigarettes. Piccini stated that she did not count the change; if something cost $9.53, she would give the cashier ten dollars plus an extra dollar for tax.

Piccini testified that she had wanted to be a paralegal and took a clerical program but did not pass the test, despite taking it twice. She also went to night school for a period of time to get her GED, but it was really hard for her. She also tried to take college courses, but did not qualify for financial aid because her scores were too low. She had recently finished a night class in December 2011. There was hardly anybody in the class and the teacher focused on Piccini one-on-one because she was behind. Piccini took the GED test but did not pass because she did not take the second part of the test.

 **9**  Piccini testified that she did not have a computer but did own a television, which had been purchased for

her by her parents. She did not watch television very often because she would lose interest. Piccini would attend medical appointment every week and had not missed any recent appointments. She would go to the appointment with her younger child.

The ALJ further inquired into Piccini's employment. Piccini testified that she worked in Manassas in the shipping department of an insurance company that belonged to her uncle. The position involved clerical work and included answering phones and processing payments. Her employer was aware of her situation and allowed her to go home early if she needed to. When she was younger she had several full-time jobs with 40–hour work weeks. She worked for Sprint in telemarketing and for her father overseeing a shipping department. Even though Piccini was using drugs and alcohol at that time, she was able to function well at work. Piccini testified that her memory was now a problem. In the orientation for her last job, she was always lost.

Piccini's attorney asked her to clarify the living arrangements with her sister. Piccini testified that up until two months before the hearing, Piccini's sister had lived with her since the birth of Piccini's first child. Her sister helped her with the children during this period. Now that her sister had moved out, her parents tried to help but it was difficult because of the distance. Piccini considered moving to the city to be closer to them, but she could not afford to give up the financial assistance she was receiving. She testified that she calls her mother when she has really bad panic attacks, and her mother tries to calm her down. Sometimes her mother would come and spend three to four days to help Piccini. Piccini would constantly call the ambulance because she thought she was having a heart attack.

Piccini recounted that she was raised in a good home and does not know why she is the only one with these issues. She was sexually assaulted by her son's father and was a victim of domestic violence. She was in a relationship with this man for 15 years. When she stopped taking drugs, she began to feel like she could not control her mind.

## B. Vocational Expert Testimony
Pat Green, a vocational expert, testified at the hearing. The vocational expert first summarized Piccini's prior work experience. Piccini previously performed work that fell into five different general work categories: (1) material

handler, semi-skilled work at a heavy exertional level; (2) telemarketer, semi-skilled work at a sedentary exertional level; (3) administrative assistant, skilled work at a sedentary exertional level; (4) sales clerk, unskilled work at a light exertional level; and (5) shipping and receiving supervisor, skilled work at a light exertional level.

The ALJ then asked the vocational expert to assume that Piccini's residual functional capacity had the following limitations: (1) no work around hazards such as moving machinery or heights; (2) limited to unskilled, simple one-to two-step tasks; (3) low stress, meaning only occasional decision-making or exercising of judgment, only occasional changes in work setting, and no fast paced production; (4) no public interaction and only occasional interaction with coworkers; and (5) limited to working with things rather than people. Given these limitations, the vocational expert testified that Piccini could not perform any of her prior work.

 **\*10** The ALJ then asked the vocational expert to assume Piccini's age, education, experience, and the described RFC and asked if there were any jobs that matched. The vocational expert identified three jobs that would match these qualifications. Piccini could work as a hand packager, which required unskilled medium exertional work. There were 3,500 of these jobs in the region and 164,000 in the national economy. She could also perform the job of dishwasher, an unskilled medium exertional position. There were 6,000 of these jobs in the region and 272,000 in the national economy. Finally, Piccini could work as a garment sorter, an unskilled job with light exertion. There were 3,800 of these jobs in the region and 125,000 jobs in the national economy. The ALJ asked the vocational expert if these jobs were exhaustive or representative, and the vocational expert testified that they were representative.

The ALJ asked the vocational expert to also consider whether any jobs would be available if Piccini needed additional time of task, specifically missing two days of work a month and being off task 15 percent of each work day. The vocational expert testified that such limitations would exclude the work previously identified. Furthermore, there would be no available jobs that could accommodate these restrictions.

On April 6, 2012, the ALJ issued his decision denying Piccini's claim for DBI, and on April 4, 2013, the Appeals

Council denied Piccini's request for review, thereby rendering the decision of the Commissioner final.

## DISCUSSION

### I. Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed-but early enough not to delay trial." Fed.R.Civ.P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Dargahi v. Honda Lease Trust* 370 F. App'x 172, 174 (2d Cir.2010) (citation omitted). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala,* 59 F.3d 307, 312 (2d Cir.1995). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. See *Brault v. Soc. Sec. Admin., Comm'r,* 683 F.3d 443, 448 (2d Cir.2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise* " (citation and internal quotation marks omitted; emphasis in original)).

**\*11** When, as here, the court is presented with an unopposed motion, it may not find for the moving party without reviewing the record and determining whether there is sufficient basis for granting the motion. See *Wellington v. Astrue,* 12 Civ. 03523(KBF), 2013 WL 1944472, at \*2 (S.D.N.Y. May 9, 2013) (recognizing, in

an action appealing the denial of disability benefits, the court's obligation to review the record before granting an unopposed motion for judgment on the pleadings); *Martell v. Astrue,* 09 Civ. 01701(NRB), 2010 WL 4159383, at \*2 n. 4 (S.D.N.Y. Oct. 20, 2010) (same); *cf. Vt. Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 246 (2d Cir.2004) ("[C]ourts, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." (citation and internal quotation marks omitted)).

*Pro se* litigants "are entitled to a liberal construction of their pleadings," and, therefore, their complaints "should be read to raise the strongest arguments that they suggest." *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001) (citation and internal quotation marks omitted); *see Alvarez v. Barnhart,* 03 Civ. 8471(RWS), 2005 WL 78591, at \*1 (S.D.N.Y. Jan. 12, 2005) (articulating liberal *pro se* standard in reviewing denial of disability benefits).

### II. Definition of Disability

A claimant is disabled under the Act if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be determined to be disabled only if the impairment(s) are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy 42 U.S.C. § 423(d)(2)(A).

Under the authority of the Act, the Social Security Administration has established a five-step sequential evaluation process when making disability determinations. *See* 20 C.F.R. § 404.1520. The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals has described the process as follows:

First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

**\*12** *Jasinski v. Barnhart,* 341 F.3d 182, 183–84 (2d Cir.2003) (citation omitted). A claimant bears the burden of proof as to the first four steps. *Melville v. Apfel,* 198 F.3d 45, 51 (2d Cir.1999). It is only after the claimant proves that she cannot return to prior work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given her RFC, age, education, and past relevant work experience. 20 C.F.R. § 404.1560(c)(2); *Melville,* 198 F.3d at 51.

"When there is medical evidence of an applicant's drug or alcohol abuse, the 'disability' inquiry does not end with the five-step analysis." *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 123 (2d Cir.2012). In 1996, Congress enacted the Contract with America Advancement Act (the "CAAA"), which amended the Social Security Act so that "[a]n individual shall not be considered ... disabled ... if alcoholism or drug addiction would ... be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U .S.C. § 1382c(a)(3)(J). *See also Cage,* 692 F.3d at 123. Accordingly, if the ALJ determines that a claimant is disabled under the sequential

analysis, the ALJ must then determine whether the SSA would still find the claimant disabled if she stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b)(1). *See also* 20 C.F.R. § 404.1535(a) (" '*If we find that you are disabled* and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.") (emphasis added).

The language of § 404.1535 makes it clear that the ALJ must *first* make a determination as to disability by following the five-step sequential evaluation process, "without segregating out any effects that might be due to substance use disorders." *Brueggemann v. Barnhart,* 348 F.3d 689, 694 (8th Cir.2003). *See id.* at 693–94. ("The plain text of the relevant regulation requires the ALJ first to determine whether [claimant] is disabled.... The ALJ must base this disability determination on substantial evidence of [claimant's] medical limitations without deductions for the assumed effects of substance use disorders."); *Newsome v. Astrue,* 817 F.Supp.2d 111, 134 (E.D.N.Y.2011) ("The ALJ's initial disability determination under the regulations 'concerns strictly symptoms, not causes.' " (quoting *Brueggemann,* 348 F.3d at 694)). Once the claimant is found to be disabled, the ALJ then considers whether the drug addiction or alcoholism is a contributing factor by asking whether the claimant would still be considered disabled if he stopped abusing drugs or alcohol. *See Cordero v. Astrue,* 574 F.Supp.2d 373, 377 (S.D.N .Y.2008). *See also* Corpus Juris Secundum, 81 C.J.S. Social Security and Public Welfare § 105 ("A conclusion may be reached whether a claimant's substance use is a contributing factor material to the determination of disability, so as to preclude benefits, only after an administrative law judge has made an initial determination that the claimant is disabled, determined that drug or alcohol use is a concern, and obtained substantial evidence showing what limitations would remain in the absence of the claimant's alcoholism or drug addiction.").

**\*13** If the claimant's remaining impairments are disabling, the claimant's drug or alcohol abuse is not a contributing factor material to the disability determination, and the SSA will find that the claimant is disabled. 20 C.F.R. § 404.1535(b)(2)(ii). *See also Ward v. Comm'r of Soc. Sec.,* 11 Civ. 6157(PAE), 2014 WL 279509, at \*14 (S.D.N.Y. Jan. 24, 2014). The Second Circuit has joined a majority of other circuits in concluding

that the claimant bears the burden of proving that her drug or alcohol abuse is immaterial to the disability determination. *Cage,* 692 F.3d at 123.

### III. The ALJ's Determination

On April 6, 2012, after evaluating Piccini's claims pursuant to the sequential evaluation process, the ALJ issued a decision finding that Piccini was not disabled from June 29, 2010, within the meaning of the Social Security Act. At step one, the ALJ determined that Piccini had not been engaged in "substantial gainful activity" ("SGA"). At step two, the ALJ found that Piccini had the following severe impairments: (1) bipolar disorder; (2) mood disorder; (3) anxiety disorder with panic attacks; (4) depression; and (5) alcohol and cocaine abuse.

At step three, the ALJ found that Piccini's impairments, however, did not meet or medically equal any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ concluded that Piccini's impairments did not satisfy the paragraph B requirements under sections 12.04 (Affective Disorders) or 12.06 (Anxiety Related Disorders). To satisfy the paragraph B criteria for both sections, Piccini's impairments had to result in two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.[4] 20 C.F.R. Pt. 404, Subpt. P, App'x 1 at §§ 12.04(B) and 12.06(B).

The ALJ found that the restrictions or difficulties resulting from Piccini's impairments were only mild to moderate. As to the activities of daily living, the ALJ determined that Piccini's restrictions were only mild, based on an examination of the consultative report of Dr. Dubro and Piccini's testimony at the hearing. The ALJ noted that Piccini did not allege having any difficulties tending to her personal needs or performing daily living activities, including the care of her two children. Furthermore, Piccini told Dr. Dubro that she was able to do general cleaning several times a week, take care of the laundry, shop, prepare meals for her two children, use public transportation, and manage her own money.

With regard to social functioning, Piccini's difficulties were also only mild. In support of this determination,

the ALJ noted a report from NYPH, dated March 2009, which included a diagnosis of depressive disorder, alcohol abuse, and cocaine abuse. The record indicated that Piccini had overdosed on her psychiatric medication and alcohol following an argument with her boyfriend. Piccini reported that she became emotional easily but had no history of psychosis. While Piccini had an active social life with friends and family, she had stopped communicating with her friends because they abused drugs.

**\*14** As for Piccini's concentration, persistence, and pace, the ALJ concluded that Piccini's impairments were only moderate. Dr. Dubro's report indicated that Piccini had intermittent sleep difficulty and "longstanding difficulties in dealing with day to day stress...." (R. 14.) Piccini reported to Dr. Dubro that she was frequently irritable and angry. The ALJ noted that Piccini did not show signs of fidgety or hyperactive behavior during her examination by Dr. Dubro. Her recent and remote memory skills, as well as her attention and concentration, were only mildly impaired. Her insight was fair but her judgment was poor due to Piccini's alcohol problems. The ALJ noted Dr. Dubro's assessment that Piccini could follow, understand, and attend to directions and instructions, and had only mild difficulties in learning new tasks. She did, however, display moderate difficulties in her ability to interact with others. Dr. Dubro concluded that Piccini could independently perform daily tasks and complex tasks regularly.

Finally, in his paragraph B analysis, the ALJ noted that Piccini had experienced no episodes of decompensation of extended duration. Though the record showed that Piccini had a history of psychiatric treatment for depression, anxiety, and suicide attempts, Piccini had not maintained compliance with her formal mental health treatment. Furthermore, Piccini's condition had not required inpatient psychiatric hospitalization. The ALJ emphasized that the medical evidence did not demonstrate that Piccini's symptoms worsened or remained the same following a period of sobriety or compliance with medical treatment: "To the contrary, the record shows that when she was compliant with psychiatric medications, and abstinent, albeit for short periods of time, her symptoms improved." (R. 15.) The ALJ concluded that the record showed that Piccini did not have a sustained period of sobriety. Because Piccini's impairments did not result in more than two areas of marked restriction or one area of marked restriction and repeated episodes of

decompensation, Piccini did not satisfy the criteria of 12.04(B) or 12.06(B).

The ALJ also considered whether Piccini satisfied the criteria of paragraph C for sections 12.04 and 12.06 and concluded that "the evidence fail[ed] to establish the presence of the 'paragraph C criteria.'" (R. 15.) Because neither the paragraph B nor the paragraph C criteria of sections 12.04 or 12.06 were met, Piccini's impairments did not constitute a Listings level impairment.

The ALJ then proceeded to assess Piccini's residual functional capacity, concluding that she was able to perform a significant range of work at all exertional levels but had non-exertional limitations due to her mental impairments. [5] These non-exertional limitations restricted Piccini to "the performance of simple 1 to 2 step low stress jobs defined as performing duties involving occasional decision making, exercise of judgment in job performance and occasionally adapting to changes in the work setting with no fast production paced jobs." (R. 15.) Piccini could not interact with the public and was limited to occasional work-related interaction with her coworkers. She was also limited to jobs that dealt with things rather than people.

**\*15** At step four, the ALJ found that Piccini was unable to perform any of her past relevant work. At step five, the ALJ determined that Piccini, given her age, education, work experience and RFC, had the capacity to perform other types of jobs that existed in significant numbers in the national economy, including hand packer, dish washer, and garment sorter.

### IV. Legal Analysis

#### A. Alcohol Abuse
In connection with step three of the sequential evaluation process and in determining Piccini's RFC, the ALJ wove in evidence concerning the effects of Piccini's alcohol abuse. Although the ALJ's decision is otherwise thorough, this legal error prevents the Court from applying the substantial evidence standard to uphold a finding of no disability. Rather, because of this legal error, it is unclear whether or not Piccini's alcoholism was the reason for the determination that she was not disabled.

The ALJ's opinion made reference to Piccini's alcohol consumption throughout his decision. For instance, at step three, the ALJ indicated that the record evidence does

not show that Piccini's "mental symptoms had worsened or remained the same following a period of sobriety and or compliance with medical treatment. To the contrary, the record shows that when she was compliant with psychiatric medications, and abstinent, albeit for short periods of time, her symptoms improved, however, the record also shows the claimant has not had a sustained period of sobriety." (R. 15). He continued to reference her alcoholism in connection with her RFC assessment. The ALJ noted that the "record documents the claimant's history of alcohol and polysubstance abuse, including the claimant's own admission to a February 2011 consultative psychiatric interviewer that she was still drinking," and he referenced Piccini's sister's report that Piccini has been abusing alcohol for over 10 years. (R. 17.) The ALJ noted that there "is no indication in the record that the claimant has had a sustained period of sobriety." (R 17.)

Relatedly, the ALJ relied extensively on the consultative examiner, who indicated that there was a relationship between Piccini's alcohol use and her symptoms. The ALJ stated that "[Piccini's] [j]udgment was noted to be poor [by Dr. Dubro] and this had been associated with the claimant's problems with alcohol." (R. 15.) He also emphasized that Dr. Dubro found Piccini's "mood disorder symptoms [to be] associated with her alcohol abuse problems...." (R. 15). Such statements indicate that the ALJ may have improperly minimized or excluded symptoms because they may have been caused by substance abuse. Whether alcoholism or drug addiction is a contributing factor to disability may be considered only *after* the initial disability determination is made. The ALJ never cited to 20 C.F.R. § 404.1535 in his decision.

The ALJ's references to Piccini's alcohol abuse, sprinkled throughout the decision, appear to conflate the substance abuse analysis with the disability determination itself. *See Brueggemann*, 348 F.3d at 694 ("The ALJ must base this disability determination on substantial evidence of [claimant's] medical limitations without deductions for the assumed effects of substance use disorders."). Accordingly, remand is necessary so that the ALJ can separately determine Piccini's disability before assessing whether or not her alcohol abuse constitutes a contributing factor material to that determination. *See Newsome*, 817 F.Supp.2d at 134–35 (remanding in light of legal error where ALJ did not go through five step process before making a materiality determination); *Webb v. Colvin*, 12 Civ. 0753(WMS), 2013 WL 5347563, at *5

(W.D.N.Y. Sept. 23, 2013) (remanding where "the lack of further specific discussion of these limitations renders it impossible to determine whether the ALJ's mental RFC determination was made after improperly discounting any non-exertional limitations stemming from Plaintiff's significant history of drug and alcohol abuse"); *Day v. Astrue,* 07 Civ. 0157(RJD), 2008 WL 63285, at *6 (E.D.N.Y. Jan. 3, 2008) (remanding where "[i]t is unclear whether or not plaintiff's alcoholism and drug abuse were reasons for the determination that she was not disabled at step three of the ALJ's analysis"); *Orr v. Barnhart,* 375 F.Supp.2d 193, 201 (W.D.N.Y.2005) (remanding to require the ALJ "to consider the ill effects that plaintiff's alcoholism had on her impairments and limitations" when determining the issue of disability and "only after finding that plaintiff is disabled, determine which impairments would remain if plaintiff stopped using alcohol").

**\*16** The Court is mindful that, when the proper legal analysis is followed, the ALJ may conclude that substantial evidence supports a finding of no disability. But to assume that conclusion "creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Schaal v. Apfel,* 134 F.3d 496, 504 (2d Cir.1998). *See Schuler v. Colvin,* 13 Civ. 0144(GLS), 2014 WL 2196029 (N.D.N.Y. May 22, 2014) (noting that the ALJ's language that ' "[t]he evidence does not indicate disabling mental impairments, particularly if [the claimant] abstains from abusing substances and takes her medications as directed' ... could suggest that the ALJ improperly segregated out the effects of [the claimant's] substance use disorders in the first instance.... [I]t is clear that the ALJ considered the ill effects of [the claimant's] substance use on her functional abilities when determining that [the claimant] was not disabled.").

**B. Treating Physician**
The ALJ committed an additional error when he afforded Piccini's treating physician's opinion little weight because the physician "disregarded the claimant's admittedly pervasive alcohol and polysubstance abuse history in arriving at his assessment," concluding that the opinion was "not a reliable assessment regarding the claimant's mental residual functional capacity." (R. 19.) Dismissal of a physician's opinion during the initial determination of disability because he or she did not factor in substance abuse is improper under the regulations. *See Brueggemann,* 348 F.3d at 694 ("Substance use disorders

are simply not among the evidentiary factors ... the regulations identify as probative when an ALJ evaluates a physician's expert opinion in the initial determination of the claimant's disability." (citing 20 C.F.R. § 404.1527)). *See also Vernon v. Astrue,* 06 Civ. 13132(RMB)(DF), 2008 WL 5170392, at *20 (S.D.N.Y. Dec. 9, 2008) ("While drug and alcohol use is relevant in determining whether a claimant is disabled under the regulations, see 20 C.F.R. § 416.935, it bears no relevance to the weight that must be given to the opinion of a treating physician. *See* 20 C.F.R. § 416.927(d)(2) .")

Accordingly, on remand, the ALJ must either afford Piccini's treating physician substantial weight, or provide legitimate reasons not to.

**CONCLUSION**

Based on the evidence in the administrative record, the ALJ erred in failing to evaluate Piccini's disability in accordance with 20 C.F.R. § 404.1535. Accordingly, I recommend that the Commissioner's motion for judgment on the pleadings be DENIED in its entirety and that the case be remanded.

\* \* \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed.R.Civ.P. 6(a), (d) (adding three additional days when service is made under Fed.R.Civ.P. 5(b)(2) (C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed.R.Civ.P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Alison J. Nathan at the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections

must be addressed to Judge Nathan. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(b), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).

**\*17  SO ORDERED.**

Filed June 27, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4651911

## Footnotes

1   "[Global Assessment of Functioning] rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning." *Zabala v. Astrue,* 595 F.3d 402, 405 n. 1 (2d Cir.2010) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM–IV"), at 34 (4th ed. rev.2000)). The Court notes that the Fifth Edition of the DSM has discarded the use of GAF Scores. *See Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed.2013). The DSM IV, however, was in effect at the time of Piccini's treatment.

2   The assessment form provides the following descriptions for each of the possible categories from which the physician may choose: "Unlimited or Very Good–Ability to function in this area is more than satisfactory. Good–Ability to function is this area is limited but satisfactory. Fair–Ability to function in this area is seriously limited, but not precluded. Poor or None–No useful ability to function in this area." (R. 268.)

3   At the hearing, Piccini's counsel informed the ALJ that Piccini was no longer a patient of Dr. Angara. Due to issues with her insurance, Piccini was now seeing a new physician, but she had not yet had an examination. Piccini and her counsel stated that the new physician needed more time to assess Piccini's condition before an assessment could be provided.

4   "The term repeated episodes of decompensation, each of extended duration in the[ ] listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." If the claimant has experienced "more frequent episodes of shorter duration or less frequent episodes of longer duration, [the Commissioner] must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 at § 12.00(C)(4).

5   A non-exertional impairment is "[a]ny impairment which does not directly affect [the strength demands of work such as] the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments that affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, handle, and use of the fingers for fine activities." *Archambault v. Astrue,* 09 Civ. 06363(RJS)(MHD), 2010 WL 5829378, at *35 (S.D.N.Y. Dec. 13, 2010), *rep. and rec. adopted by* 2011 WL 649665 (S.D.N.Y. Feb. 17, 2011) (citation and quotation marks omitted; alteration in original).

---

**End of Document**                                        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.   13